# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

```
UNITED STATES OF AMERICA      . CRIMINAL NO. 16-10159-ADB
                              .
           V.                 . BOSTON, MASSACHUSETTS
                              . NOVEMBER 8, 2016
DANNY M. KELLY                .
      Defendant               .
. . . . . . . . . . . . . . . .
```

### TRANSCRIPT OF COMPETENCY HEARING
### BEFORE THE HONORABLE M. PAGE KELLEY
### UNITED STATES MAGISTRATE JUDGE

APPEARANCES:

UNITED STATES ATTORNEY'S OFFICE
Aloke Chakravarty, Esq.
1 Courthouse Way, Suite 9200
Boston, MA 02210
617-748-3658
Aloke.Chakravarty@usdoj.gov


Ian Gold, Esq.
Attorney at Law
2 Clock Tower Place
Suite 260 EF
Maynard, MA 01754
617-297-7686
ian.gold@iangoldlaw.com


Court Reporter:

Proceedings recorded by electronic sound recording, transcript
produced by transcription service.


***MARYANN V. YOUNG***
**Certified Court Transcriber**
**Wrentham, MA  02093**
**(508) 384-2003**

2

I N D E X

| WITNESSES | DIRECT | CROSS | REDIRECT | RECROSS |
|-----------|--------|-------|----------|---------|
| Danny Kelly | 15 | 60 | | |

EXHIBITS

None

3

1   (Court called into session)

2   (9:34:42 AM)

3           THE CLERK:  Today is Tuesday, November 8, 2016,

4   and we are on the record in Criminal Case No. 16-10159,

5   United States of America v. Danny Kelly, Honorable M. Page

6   Kelley presiding.

7           Would counsel please identify themselves for the

8   record?

9           MR. CHAKRAVARTY:  Good morning, Your Honor, for

10  the government, Assistant U.S. Attorney, Aloke

11  Chakravarty.

12          THE COURT:  Good morning, Mr. Chakravarty.

13          MR. GOLD:  Good morning, Your Honor, Ian Gold on

14  behalf of the defendant Danny Kelly.

15          THE COURT:  Good morning, Mr. Gold.  Good

16  morning, Mr. Kelly.

17          THE DEFENDANT:  Good morning.

18          THE COURT:  How are you today?

19          THE DEFENDANT:  Fine.

20          THE COURT:  Good.  Okay.  So we're here for at

21  least the first part of a competency hearing and just so

22  we're clear on where we are, I sua sponte have moved for

23  this hearing and neither of the parties has, but the

24  statute allows the Court to move for a hearing and I've

25  done that.  My understanding is that we're here today just

4

1   for Mr. Kelly's testimony and he still wishes to testify?

2          MR. GOLD:  Yes, Your Honor.

3          THE COURT:  Okay.  So I don't know that this is

4   the, that we will complete the hearing today.

5          Do the parties anticipate having other witnesses

6   they want to call?

7          MR. CHAKRAVARTY:  None for the government.

8          MR. GOLD:  Your, Your Honor, no.  We've, we've

9   talked to, I think the other two obvious witnesses would

10  be the doctors who authored the reports. 4247(d) gives Mr.

11  Kelly the right to cross examine witnesses against him.

12  Mr. Kelly and I spent a fair amount of time yesterday

13  talking about that and I believe we're, we're probably

14  going to be in a position to waive the right to cross

15  examine those and just, cross examine the authors of the

16  two reports and simply have the Court evaluate the reports

17  as they are.  So what we had thought about for this today

18  is a limited period of time for Mr. Kelly to testify.  Mr.

19  Chakravarty and I were speaking this morning about the way

20  we've been kind of feeling our way through this unusual

21  situation.  What I think is that it's the defendant's

22  burden here, or I guess the circumstances have provided a

23  kind of a production of evidence and, and the Court's sua

24  sponte motion that Mr. Kelly is not competent to stand

25  trial.  Mr. Kelly disagrees.  He has a right to a hearing

5

1  so it's, I think the way we had anticipated this hearing

2  would go is that the burden would functionally be on us to

3  prove competency to kind of answer the evidence that's

4  already in play which I believe is one report, another

5  report by two different doctors and then representations

6  by former counsel, and I think that's the, and, and

7  perhaps the Court's own observations and, and Mr. Kelly's

8  own statements, but so we'd, we'd have testimony just from

9  Mr. Kelly this morning and then figure out what to do,

10  whether we want to kind of close the evidence there, maybe

11  have a couple of days to think about that and address the

12  Court in writing.

13          THE COURT:  Okay, and that's all right with you,

14  Mr. Chakravarty?

15          MR. CHAKRAVARTY:  Yes, Your Honor.

16          THE COURT:  So I just want to be clear on the

17  record, the reason I am having this hearing on my own

18  motion is that I find there is reasonable cause to believe

19  that Mr. Kelly is presently suffering from a mental

20  disease rendering him mentally incompetent to the extent

21  that he's unable to understand the nature and consequences

22  of the proceedings or to assist properly in his defense

23  and under 42, 18 U.S.C. 4241, we are having a hearing and

24  what the standard is, is that I would find or not find by

25  a preponderance of the evidence that the defendant is

6

1   presently suffering from a mental disease or defect, etc.

2   It's the same language.  So after this hearing, I'm happy

3   to hear from the parties as to whether they, their

4   position has changed on whether they want to call

5   additional witnesses and I'll certainly give the parties

6   time to file whatever papers they want to.  Because Judge

7   Burroughs wants me to do a report and recommendation, I

8   think time is of the essence.  I know Mr. Kelly has

9   complained he's been locked up a long time and nothing has

10  been done substantively on his case, and so I don't want

11  that process to drag out.  The parties would have a

12  certain amount of time to object to the report and

13  recommendation and then Judge Burroughs has to rule on it.

14  So I think it would be good if we could wrap up the

15  hearing within a reasonable amount of time.  I'll try to

16  get whatever my decision is out.  The parties, if you're

17  going to waive objection, then obviously that would speed

18  things up, whatever your position is with regard to my

19  decision.  So, and then my understanding of the statute is

20  that if Mr. Kelly is found incompetent, then he gets

21  committed for a finding on whether or not he can be

22  restored to competency in their time limits for that set

23  out in the statute.

24          MR. GOLD:  Right.  Right.

25          THE COURT:  I do want to just note for the

1    record that I don't find that it's necessary for the

2    Court to have an evaluation done, and I note that 4247(b)

3    says that the Court may order that the BOP conduct its own

4    evaluation to determine competency, and given that I have

5    what I consider to be very thorough reports from both the

6    defense and the government on this topic, I don't feel

7    that we need to do that.  I don't want to spend the time

8    to do it and I'm satisfied with the reports.  I also

9    would just like to say on the record that my preliminary

10   finding that there's reasonable cause to believe that

11   there's a competency issue here is based on the two

12   evaluations which are basically in agreement.  Both

13   experts for both sides come to the same conclusion which

14   is that Mr. Kelly is not competent.  I note that on the

15   docket of the case there are numerous statements that have

16   been filed by Mr. Kelly which I have to admit I have not

17   read every line of them, but I've certainly gone through

18   them and I intend to read them very carefully, but to me

19   they appear to indicate that there's a serious mental

20   health problem here.  The facts of the case as set out in

21   the complaint I think confirm that Mr. Kelly is mentally

22   ill and that this crime was in many ways irrational, and

23   the product of that mental illness and also the facts of

24   the case to which he pled guilty years ago are the same.

25   So that's why I'm having the hearing.  I haven't made up

8

1   my mind yet, but I do think there's quite a body of

2   information that justifies having this hearing.

3          MR. GOLD:  And, Your Honor, just for the record,

4   I don't think we question whether it's advisable to have

5   the hearing.  It seems like there's plenty of evidence

6   that Mr. Kelly is, is not competent, but, we, just to kind

7   of get ahead of ourselves and, and what I see as the most

8   productive or what the jugular is or what the issue is, is

9   whether the doctors have confused or not confused, but

10  conflated mental disorder and the functional capacities

11  necessary to stand trial.  That is, I'm defining

12  competence in perhaps a, a more circumscribed area than

13  the doctors are.  I'm trying to, I, I acknowledge and I've

14  told Mr. Kelly and we may disagree about this that I, I

15  don't have any disagreement with the doctors and their

16  diagnosis.  That's their expertise and I have my own

17  observations, but that's not the, the issue.  The issue is

18  a sort of, you know, the, the First Circuit instructs us

19  all that, you know, competence and mental illness are two

20  discrete issues and, and the question is whether the

21  mental illness is so, is such an impairment that you

22  cannot make decisions such that a proceeding with trial is

23  a due process violation.  It's a, it's so contrary to the,

24  the desire of the defendant to be tried it's a due process

25  violation to continue with, with the hearing.  So I've

1  been very focused in my dealings with Mr. Kelly on his

2  ability to reason despite this evident disorder, and his

3  practical reasoning despite this evident disorder, and I

4  find him in contrary, and this is, we're wading into

5  interesting territory, but I don't see any way to avoid it

6  where I find in my relationship with him that he is not as

7  inflexible as I would have expected based on reading the

8  reports, and that he very well may have the, the

9  functional kind of ability to reason and also take a step

10 back from his own disorder in making decisions.  It's true

11 that both doctors say Mr. Kelly is someone who seems to

12 operate on all cylinders in other domains of his life.  A

13 very interesting situation.  So he's someone who has rich

14 relationships with his family but seems to fall into this

15 kind of persecutory delusional system around these, these

16 grievances, but I think and I've consulted with the

17 doctors about this informally, I don't know how much is in

18 the record but the, the treatment for this type of

19 disorder is a kind of, I don't think you ever get cured

20 and say, oh, that was all a mistake but that the intensity

21 and the, the intensity with which you grab on to these

22 ideas, lessens and perhaps you can start to take a step

23 back and, and make decisions that are, that, that bring in

24 other components.  So when I have been dealing with Mr.

25 Kelly, I have been very much laser focused on what he

1   wants, understanding that he's got this disorder.  I've

2   also kind of understood that he's a person with autonomy

3   and, and is able to engage in practical reasoning.  So,

4   you know, just in preparation for this hearing, what I

5   wanted to do for the Court, and then I, I will say and

6   with all, that sometimes I'm not sure.  So that's, that's

7   the, the process that I'm going through with Mr. Kelly,

8   but, you know, being instructed by what I think the

9   capacities are and not getting too far afield, you know,

10  going to trial requires certain understandings.  I think

11  he has those.  You know, whether to settle the case, I, I

12  think he's got the information that is required and is

13  able to kind of, kind of assimilate it and, and think

14  about it, and I think that the doctors recognize that, but

15  then say that it's also infected with the delusional

16  system that his, his judgement is permanently clouded and,

17  and no decision that he could make would be, would be a,

18  a, gosh, a, a sane one or a, a competent one, and I, I,

19  I'm, I disagree.  I, I do also want to get ahead of what

20  I'm saying right now to say that I myself, and I was

21  telling Mr. Kelly about this, I think it's useful to say,

22  very recently had a comp, competency come up where I was

23  in another case where I was in the Josh Hayne role and

24  someone else was in my role and I had a client who seemed

25  to have a firm fixed belief that something at trial would

1   happen that was simply not on the menu.  That is to say

2   he thought he would be able to litigate a motion to

3   suppress which we have fought very hard and lost during

4   the trial, the gun would be suppressed and he would be let

5   out the front door, and this was a firm fixed belief that

6   I just simply couldn't get around with this particular

7   client.  We had a competency hearing.  With the expert's

8   support he was found not competent.  I was relieved and

9   then new counsel came in and he was restored and went to

10  trial.  He was convicted.  It's a long story but I, as a

11  contrast, I don't find at least that sort of firm fixed

12  delusional belief in, in Mr. Kelly's mental disorder

13  scheme at all.  I think he takes in information from me

14  and when I ask him on the stand I think he'll agree about

15  what is likely to happen at trial, whether I think certain

16  initiatives that he has are going to succeed.  He seems to

17  be, you know, open to what I have to say and respectful of

18  the fact that, not overly respectful, but respectful

19  enough of the fact that I have trial experience and have

20  gone to law school and have something to say about the

21  issues that he confronts.  So, you know, I don't find that

22  sort of obdurateness.

23          Finally, before we start I think it's, oh, but I

24  also walk to talk, Judge, about the, the use of testimony

25  issue cause we've, we've, we've written a little bit about

12

1    it and what, how, what my thinking is about that.  But

2    finally before we start, the first thing I did in coming

3    into the case is say well, you know, he's got a five year

4    mandatory minimum, you know, is there any possibility of

5    breaking that down.  I'm not going to say anything about,

6    you know, or ascribe any statements to the government, but

7    I think they will agree with me that yes in theory there

8    is.  There is a possibility of breaking down this case.

9    At least it's not categorically off the menu.  So how do

10   we how do we think about Mr. Kelly's competence.  Well,

11   he's got all these reasons that he says he wants to go to

12   trial.  Some of them are dignitary.  He wants, he's got

13   grievances and he wants them aired.  I, I've been trying

14   to persuade him for a while that he's gone, you know,

15   pretty far down the field airing some of these grievances

16   by publishing them on the docket and maybe he wants to

17   kind of focus on this case and, and think about settling

18   it in a pragmatic way, but because of the competency

19   proceedings we, we, we just haven't been able to advance

20   the ball down that, that, down the field any further, and

21   to me that might be where the rubber hits the road really,

22   you know, what, what do you do when, when faced with these

23   really kind of distilled issues.  Right now it's, it's a

24   little abstract.

25         Finally, the testimony issue, I think, I, I

1  mean, I, I, I was telling Mr. Chakravarty yesterday, we

2  were just kind of canvassing the cases trying to figure

3  out, and I appreciate that he filed a memo with those

4  citations, but, you know, there's, there's some

5  variability here.  I, in the *United States v. Ventura*

6  *case*, a 2009 case in the District of Maine, Judge Woodcock

7  used the fact that the or, or noted the fact that the

8  defendant testified and admitted his own guilt and that

9  contacts as sort of evidence said he was off the

10 reservation and not competent so there was no, there was

11 no protection whatsoever.  I don't think, I don't think

12 that's a good idea.  I think what I've told Mr. Kelly and

13 I'm not sure if there's any way to get a ruling from this

14 Court or about future uses of his testimony, but what I've

15 been telling him is that if, if he wants to testify it

16 makes sense.  If he wants to avoid a competent,

17 incompetency determination is the only thing he can do.  I

18 don't see given the circumstances of the case a lot of

19 strategic downside to him no matter what based on other

20 factors in the case about the things that he's already

21 said and, and the things that I, I intend to elicit from

22 him, but that probably, our position is that the, the, the

23 testimony should only be used for impeachment and if he's

24 found by the Court to be incompetent, it should simply be

25 off, off limits because it's, it's testimony by someone

14

1  who's been deemed to be incompetent.

2        THE COURT:  Mr. Chakravarty?

3        MR. CHAKRAVARTY:  You Honor, we discussed this

4  issue in my brief--

5        THE COURT:  Yeah, thank you for filing that.

6        MR. CHAKRAVARTY:  --was just purely to provide

7  the Court with some overview.  The, the government's

8  position is to take at least what is perceived to be the

9  core issue off the table is it's not the government's

10  intention, and I'll represent the purposes of the law of

11  this case that the government is not going to use any of

12  Mr. Kelly's testimony affirmatively against him if he is

13  later found competent and we proceed towards trial.

14        As the Court knows with regard to a Simmons type

15  pretrial hearing, in certain circumstances such as

16  impeachment, if Mr. Kelly testifies at trial to something

17  completely inconsistent with something that he had

18  testified before in this proceeding, then it is customary

19  that the government would be able to cross examine him

20  with that so that a fraud is not perpetrated upon the

21  Court so that he also is aware that there's not complete

22  immunity from taking the stand and he can say whatever he

23  wants and then pivot at a later, at a later time.  I think

24  that's a different issue than the last point that Mr. Gold

25  had just referred to as the idea that if he's found

1   incompetent then the testimony is somehow tainted as

2   being incompetent testimony and that's why I cited to the

3   fact that, you know, the fact that he's a witness before

4   the Court is a different standard of competence, it's

5   whether he's a competent witness under 611 versus whether

6   he is a competent defendant.  So I don't know that he

7   should be given any other kind of priori immunization for

8   anything he says, certainly until it's ripe and the

9   circumstance.  That being said, I can't imagine the conse,

10  the, the, the, the context in which the government, at

11  least the prosecution role would use his testimony.

12  However, if, you know, restoration proceeding or at

13  another proceeding related to Mr. Kelly's mental health,

14  it may be completely appropriate to look at what he said

15  to develop the context for either a psychological

16  evaluation or one from the Court, and that I'd want to

17  distinguish from something that's going to be used against

18  his penal interest at a trial which the government does

19  not intend.

20          THE COURT:  Okay.  So I think this is a very

21  complex question because as Mr. Chakravarty pointed out in

22  his memo and Mr. Gold has alluded to, there really isn't

23  any firm law on this and I do think I, what I heard the

24  government say and I'm prepared to accept is that the

25  testimony would not, if Mr. Kelly's testimony, testifies

1   here today, his testimony will not be used against him

2   at a, in a criminal proceeding unless he testifies just as

3   defendant's testify at a suppression hearing may not be

4   used except for impeachment.

5        I think there is another question that I'm

6   really not prepared to rule on which is there could be

7   other mental health proceedings such as commitment

8   proceedings down the road and I really, I'm just, do not

9   feel that I am in a position now or have the authority to

10  rule on whether his testimony here today could be used in

11  that context.  So I think he's being protected

12  criminally, but I don't know with regard to future civil

13  proceedings what use this testimony may be put to and I'm

14  just not going to make any pronouncements about that, so.

15        MR. GOLD:  Thank you, Judge.

16        THE COURT:  Okay, and I'm going to assume for

17  our purposes, Mr. Gold, that you're able to communicate to

18  Mr. Kelly, he understands the import of his testifying

19  here today and so on, and if you would like any more time

20  to talk to him I'm happy to give it to you.

21        MR. GOLD:  No, Your Honor, thanks.

22        THE COURT:  Okay, all right, so, I think that's

23  all and I think we can just have the testimony if that's,

24  if the parties are ready.  Okay.

25        MR. GOLD:  Okay.

17

1       THE DEFENDANT:  Should I go up there?

2       MR. GOLD:  Yes, so, Your Honor, we call Mr.

3   Kelly to the stand.

4       THE COURT:  Okay.  Mr. Kelly, there's some water

5   there if you want to pour yourself a cup of water, you're

6   welcome to.

7       THE DEFENDANT:  Thank you.

8        THE DEFENDANT, DANNY MICHAEL KELLY, SWORN

9       THE CLERK:  And can you please state your full

10  name and spell your last name for the record?

11      THE DEFENDANT:  My full name is Danny Michael

12  Kelly, and the last name and the last spelling of the last

13  name is K-E-L-L-Y.

14      THE CLERK:  Thank you.

15      MR. GOLD:  So, Your Honor, just before I begin,

16  I'm going to assume that we have a kind of body of

17  knowledge about Mr. Kelly and the case and, and I'm not

18  going to go into a lot of information that everybody

19  already knows.

20      THE COURT:  Okay, thank you.

21                  DIRECT EXAMINATION

22  BY MR. GOLD:

23  Q    Good morning, Mr. Kelly.

24  A    Good morning.

25  Q    How are you feeling today?

1   A    Okay.

2   Q    Are you on any medications?

3   A    No.

4   Q    Do you feel like your mind is clear?

5   A    Yes.

6   Q    And do you understand the purpose of today's--

7   A    Yes.

8   Q    --hearing?

9   A    Um-hmmm.

10  Q    And, and can you, can you state for the Court what

11  you, what, what your understanding is?

12  A    Mostly to determine whether I'm competent or not

13  competent in order to get a trial.

14  Q    And what is the, what is your understanding of, of

15  what that means when you say competency, what do you mean?

16  A    What do I mean?

17  Q    What do you mean, yeah.

18  A    Well there, the determination is what my, my goal of

19  course is to have a trial so I can speak the truth and get

20  things resolved, and I'm being told that I'm not capable

21  of understanding what's going on and, you know, I feel

22  that's completely wrong.

23  Q    Well, and just you understand that your testimony at

24  this hearing today can be used against you in this

25  competency hearing?

1    A    Correct.

2    Q    That is to say that the Court could find what you say

3    to be further evidence of competent, incompetency or

4    competency.

5    A    Correct.

6    Q    And have you and I, have, did I coach you about what

7    to say today in any way?

8    A    Not really.

9    Q    Did we meet yesterday?

10   A    We did meet yesterday and you did give me some

11   advice.

12   Q    And did I sketch out how I thought this hearing would

13   go?

14   A    Yes.

15   Q    And about how many times have we met, you and I at

16   Plymouth?

17   A    I think three, three times?

18   Q    Could it be four?

19   A    It could be four, three or four.

20   Q    And what sort of things have we talked about just in

21   general?

22   A    Well I mean typically we talk about the case, you

23   know, my, my point of view, my side of the issues, that

24   kind of stuff.

25   Q    And do we talk about these proceedings, the

20

1    competency proceedings?

2    A     Yes, well we did that yesterday--

3    Q     And--

4    A     --and we actually I guess on that Friday too with Dr.

5    Privavus.

6    Q     Pivovarova?

7    A     Pivo--

8         THE COURT:  That's a very difficult name.

9    BY MR. GOLD:

10   Q    And you understand that this particular hearing is

11   not about whether you violated--

12   A     Right.

13   Q     --18 U.S.C. 844(i)--

14   A     844(i).

15   Q    Right, and you understand also that this hearing is

16   not about whether the Town of Chelmsford wrongfully

17   appropriated land from you, right?

18   A     No, and it's not about how the FBI refused to help me

19   or any of that stuff.

20   Q    And it's not about how Nortel wrongfully appropriated

21   intellectual property of yours?

22   A     Yeah, no, not about any of the frauds or anything

23   else that, like I said the government, you know, didn't

24   want to help me with.

25   Q    So I want to go over some of the, just the, just the

21

1   nuts and bolts of the criminal process that you and I

2   have talked about.

3        So do you understand what you're charged with?

4   A    Yes.

5   Q    And what's your understanding of what you're charged

6   with?

7   A    Well it's attempt to mal, attempt to maliciously

8   damage property which using interstate commerce, foreign

9   commerce, in this case it's powerlines and by means of

10  fire.

11  Q    Now, have you and I, and do understand what the

12  factual basis of, of this charge is more or less?

13  A    I think so.

14  Q    And, and just describe it as you understand it from

15  the documents in the case.

16  A    Well you mean the, the elements that make up the

17  crime or—

18  Q    No, let's talk about the elements in a minute.  What,

19  what is the gist of, of the--

20  A    Oh, I'm accused of trying to basically cut power

21  lines, you know, that, that's the gist of it. (Chuckle)  I

22  don't know how, how else I can say that.  I mean it's--

23  Q    No that's, that's, that's great.  No, thank you.

24  A    You know, that's the gist.

25  Q    And now, but let's, let's talk about the elements.

22

1   Have, have you and I spoken about elements?

2   A    Yes.

3   Q    And what did I tell you about elements?

4   A    Well that's how the Court determines things.  They

5   look at elements.

6   Q    And have we discussed the elements of 844(i), the

7   crime that you're charged with?

8   A    Well yeah.  Correct, plus you also gave me

9   jurisprudence on it.

10  Q    And did we also discuss possible defenses, that is--

11  A    Yes.

12  Q    --defenses in a criminal case?

13  A    Right.

14  Q    And is the defense of necessity one of those

15  defenses--

16  A    Yes.

17  Q    --that we took, that we discussed?

18  A    Right.

19  Q    Now--

20  A    But, well, go ahead.

21  Q    So have I given you opinions about whether I think

22  or, or what the evidence the government has that go to the

23  elements?

24  A    Yes.

25  Q    And have I provided you information about the

23

1   evidence the government has?

2   A    Yes.

3   Q    And have I given you an opinion about the potential

4   success of defenses you may have?

5   A    Yes, you have.  I don't necessarily agree with every

6   part of it but you've given me the opinion.

7   Q    And well, let's, so if you were charged, if a person

8   and, Your Honor, I've been thinking about how, how to do

9   this and let me, just in terms of linguistically and if,

10  if it's not working somebody can let me know, but let me

11  just try which is to say if you were charged with, if a

12  person were charged with a violation of 844(i) in

13  circumstances like this, what do you think would be

14  possible productive means of defense?

15  A    I guess I--

16  Q    And well let me--

17  A    I guess I'd have to be a little more detail otherwise

18  it's be, you know, everything depends of what the, you

19  know, what went on.

20  Q    Well it does, yes.

21  A    I mean, you know, like in my case, you know, the

22  defenses are whether or not I did what they claimed I did,

23  you know.

24  Q    Right.

25  A    That's part of it, I mean--

24

1   Q    But, but for example, would the contesting the

2   interstate commerce element of the statute be a productive

3   means of defense in this case?

4   A    Not in this case, no.

5   Q    And would the mental state require to make out a

6   conviction of the crime, be a productive area to explore

7   for defense?

8   A    The, the mental state being what motivated you when

9   you were doing it or?

10  Q    Well no, what is the element?

11  A    I mean mental?  I, I guess I'm confused by that.

12  Q    Well I might be, I--

13  A    Are you talking--

14  Q    ---I might be confusing the, the--

15  A    You talking--

16  Q    The mental state is the malice element.

17  A    The malice.  That's what I was wondering.

18  Q    Yeah.

19  A    You're talking about the malicious part about it?

20  Q    That's what I meant.

21  A    Yes.

22  Q    Yeah, so would that be a productive area to focus on

23  if you were thinking of defending the, the case?

24  A    I, I believe it so.

25  Q    And what do you think the mental state required to

1  make out a conviction is?  What, what do you think the

2  government has to show?

3  A     Oh, well they have to show malice and malice, that

4  was an argument we had Mr. Hayne.  Okay, if you read Ms.

5  Privovus, sorry--

6  Q     Privo--

7  A     --Pri, Privovuvus.

8  Q     Privova, varova.

9  A     Okay, if you read--

10  Q     You can say Mrs. P.

11  A     Ms. P.  Okay, thank you.

12  Q     Dr. P, Dr. P, sorry.

13  A     Dr. P, thank you.  If you read her report she talked

14  about, you know, my interaction with Mr. Hayne and that

15  was, you know, when I first, that was really an issue over

16  the term malice because one of the things I said to Mr.

17  Hayne just trying to get him just to listen to my side

18  was, well I'm being charged, you know, with malicious, you

19  know, attempt to damage interstate property or, you know,

20  cut the power lines.  The, you know, my point was very

21  simple that, you know, malice means that that was my

22  purpose, my intention, you know, and, you know, I, like

23  I'm trying to tell him I don't see that, you know, and he

24  just said it didn't matter.  So my argument and if you

25  read my petition for week 16, I think I documented it, my

1    position was that malice meant doing something without

2    an excuse without just cause okay, and Mr. Hayne just told

3    me that doesn't matter and that's what she said, well, you

4    know, I wouldn't accept, you know, that I didn't

5    understand the legal term.  Now when I brought that up

6    with Mr. Gold, rather than just telling me that I'm wrong,

7    he actually gave me copies out of Black's Law dictionary

8    or the definition of malice and then he gave me U.S., *USA*

9    *v. Guillette Jurisprudence* which was an 844(i) case that

10   had the elements and one of the elements was malice that

11   they were arguing that there was no, you know, that he

12   didn't have any malice, he didn't want to damage.  It was

13   a building, you know, and he, you know, but, you know, and

14   then I guess we do get a little bit of argument on how I

15   interpret, how I read the things versus how, you know, Mr.

16   Gold reads the things because I say if you really look at

17   the definition, you know, in Black's Law, the definition

18   that they gave in the jurisprudence, malice shows that,

19   you know, you don't have to prove ill will or hatred which

20   I understand.  I mean in a court you can't prove the way a

21   person's thinking, but you have to prove that they can

22   exist, you know, because in the *Guillette case* there was

23   actual damage, you know, so this is a little different

24   than attempt, but there was actual damage and the guy

25   said, well he didn't mean to damage it, but they said all

27

1   they had to do was show willful disregard because a

2   willful disregard means that he might have had ill will.

3   He might have wanted to do it, you know, so, you know,

4   they could show that because he used seven sticks of

5   dynamite (laughter) which logically would have blown up,

6   blown up the building, so--

7          THE COURT:  But his intention was not to get the

8   wires he was just trying to--

9          THE DEFENDANT:  Well it wasn't wires, it was, he

10  was trying to col, he was trying to kill, kill his partner

11  so he could collect on the insurance.  So he was going to

12  kill his partner.  I don't know if it was a parking lot or

13  the house next--

14         MR. GOLD:  We're, we've strayed into just

15  another case where malice--

16         THE DEFENDANT:  Yeah.

17         MR. GOLD:  --one of the, the Fourth Cir, a

18  Fourth Circuit case on malice.

19         THE DEFENDANT:  Right, Fourth Circuit.

20  BY MR. GOLD:

21  Q    But Mr. Kelly, I just want to draw back to, to our

22  reasoning about this particular case.

23  A    Yes.

24  Q    And I, I think for the sake of just because I started

25  this way, a hypothetical version of our case--

1  A      Okay.

2  Q      --but very similar in all material respects.   In this

3  hypothetical version we have discussed or a productive

4  defense may or may not have to do with the malice element.

5  Is that--

6  A      Correct.

7  Q      --and, and that is a subject that you and I have

8  discussed--

9  A      Correct.

10  Q      --and we are continuing to discuss it?

11  A      Correct.

12  Q      And we, you understand that a lot of what I tell you

13  are, is simply my predictions of what a court or a jury

14  will likely do given different factual scenarios?

15  A      Correct.  Correct, I, you know, I accept you have

16  experience in those areas.  I, you know, I don't have good

17  experiences in those areas, you know, (laughter) I, I

18  haven't, you know, I can't predict because, you know, I

19  come from a completely different environment.  I come from

20  an environment where, you know, it's all about the laws of

21  nature.  There's no politics.  If you get it wrong, you're

22  screwed, you know.  (Laughter.  Here, you know, in the

23  court, in these situations it's all this politics that I

24  don't understand.  I, I--

25  Q      Well but so--

1    A    --understand, you know, I--

2    Q    Right.

3    A    --like I said this is so I can see things, I see

4    things very clearly.  You say, well yeah but you have all

5    this mud.

6    Q    But Mr. Kelly, let me ask you this question and this

7    is I think, you know, you're under oath.  Try to answer

8    them--

9    A    Yeah.

10   Q    --as, as, as, as truthfully as, as you're able.  Do

11   you think I could, we've talked about the difference, a

12   possible difference of opinion about what malice requires

13   in a future possible--

14   A    Right.

15   Q    --jury trial?

16   A    Right.

17   Q    What it will require.  And that's a prediction about

18   what a judge will do and what a jury will find.

19   A    Right.

20   Q    Right?

21   A    You also gave me the First Circuit definition of what

22   was it, the, the elements that up a defense of necessity.

23   Q    Oh, the necessity defense.

24   A    Right.

25   Q    And we told, we talked about that--

1    A    Right, and--

2    Q    We think that's a dead letter, right?

3    A    Right.  That's a dead letter.

4    Q    We're kind of in agreement about that, right?

5    A    Yeah.

6    Q    But, would you be open to being persuaded by me about

7    what I think a jury would do?

8    A    Of course.

9    Q    And would that information, would you incorporate

10   that in your decisions about what to do or not?

11   A    Of course.

12   Q    But when you--

13   A    I mean I, you know, I have, that, that's all, that's

14   all I, well like I said, with Mr. Hayne I thought he

15   should at least hear my side and at least explain, you

16   know, give me some options.  Not just tell me oh, you're

17   wrong, you're wrong, you're wrong, you know, and never

18   have any sort of discussion.  You know, I don't understand

19   why, you know, we can't even have discussion.  Why

20   everything is oh, you're guilty.  Why are you even trying

21   to, you know, say anything.  Well no, I, I personally, I

22   don't see where I'm guilty, okay, and no matter how much

23   everybody tells me I'm probably not going to change my

24   opinion because I know what went on and I know the charges

25   against me, you know. I don't, you know, I'm not guilty of

31

1  that, you know, but if everybody insists that I must be

2  guilty about that, then I guess, you know, I, I lose the

3  case, but--

4  Q    Well, but Mr. Kelly, I just, just for the purposes of

5  clarity--

6  A    Yeah.

7  Q    --we have to I think, I, I have to ask you a few

8  questions about what you just said.

9  A    Yeah.

10  Q    Are you, when you say I'm not guilty,--

11  A    Yeah.

12  Q    --are you denying participating in certain acts or,

13  and let me finish the question, making the case that your

14  acts don't meet the elements of the crime with which

15  you're charged?

16  A    Correct, it's they don't meet the elements of the

17  crime in which I'm charged.

18  Q    Now--

19  A    I, you know, there are, there are things I did, you

20  know, that I know I did, you know, and that's a little

21  different than what been, what's being done to me. What's

22  being done to me is unfair compared to what I did.

23  Q    And you and I have disagreed about--

24  A    Right.

25  Q    --that point as well, right?

32

1   A    Yes, we disagreed about that.

2   Q    Yeah, but now are you familiar with the penalty

3   structure associated with a violation of 844(i)?

4   A    Yes.

5   Q    And what is it?

6   A    Well it's, since nobody was injured, it's 5 to 20

7   years.

8   Q    And--

9   A    A minimum of five years, a maximum of 20 years and

10  then there's guidelines.

11  Q    And that's laid out in the statute, right?

12  A    Right.

13  Q    And then--

14  A    And guidelines--

15  Q    --we haven't talked much about this sentencing

16  guidelines, have we?

17  A    No, well, we, we, we basically looked at it.  It's,

18  you know, five years three months or five years six months

19  or something.

20  Q    Maybe, right?

21  A    Yeah.  Yeah.

22  Q    But I, I, I think, I, I gave you a prediction about

23  what I thought the case was worth if you were convicted.

24  A    Right.

25  Q    What was that?

33

1  A    Five years.

2  Q    Probably five years?

3  A    Five years, yes.

4  Q    Now, and you understand what plea bargaining is?

5  A    Yes.

6  Q    I suppose?

7  A    Yes.

8  Q    And what would it be like in this case if, if, if it

9  were, well just tell us your understanding.

10 A    Well, you know, this is, this, this is my question.

11 I mean it's not, you know, when, when you talk about

12 things like, you know, pleading well, you know, you have

13 to give me some place to start.  I mean you have to give

14 me something I can look at because I also have my

15 objectives.  I have my needs.  Okay, it's not I'm going to

16 plead to anything just to get out, you know.  Maybe when I

17 was, well, like I said a lot of the kids do that.  That's

18 kind of where I made my mistake in my last case, you know.

19 My last case I was, I took the best option rather than

20 what I really felt was morally right, but I didn't see

21 where I had a choice--

22 Q    Now--

23 A    --you know, so, you know--

24 Q    --let's, let's--

25 A    --I have a little bit of different, I'm in a

34

1  different position right now than I was then.

2  Q    Well I'm going to ask you a couple of questions about

3  what I'm going to call with all respect, Mr. Kelly, you're

4  grievances.

5  A    Yeah.

6  Q    Just as a category of thing, right, because there's,

7  there's a few which are currently alive.  Chelmsford is

8  one.  Nortel is one that continues to be on your mind.

9  Q    Well, you know, I, I got rid of everything.  I mean I

10 didn't even really care that much about Chelmsford

11 anymore, but when I was attacked I had to, and that's the

12 same thing here.  I don't, you know, Nortel. I mean you

13 see what they did with Nortel.  I mean, you know, the

14 crime against society is horrible.

15 Q    Well--

16 A    You know the fact that, you know, like I said if, you

17 know, let me put it this way, society paid heavily for

18 what Nortel did to me--

19 Q    Well but now Mr. Kelly--

20 A    --you know, but--

21 Q    --you and I talked about your tendency to go off into

22 the weeds, right--

23 A    Right.

24 Q    --and we didn't want to do that here.

25 A    Right, I know, but you just asked the question--

35

1   Q    No, no, I know I did.

2   A    The reason we brought up Nortel is not because I want

3   to bring up Nortel--

4   Q    Yup.

5   A    --it's because, you know, if they, if they want to

6   use the case against me, then let's, let's bring up the

7   case against me and let's really talk about that.  I mean

8   that's just like here, you know, yes, what I'm after, you

9   know, what my, my goal or the thing that I have to resolve

10  is being able to keep my family's home, okay,--

11  Q    Yes.

12  A    --but I understand that has nothing to do with this

13  hearing here.

14  Q    Yes.

15  A    You know, so the hearing here is, you know, you know,

16  I understand they're completely separate, that's not the

17  issue, but that still is the problem I have.  I still have

18  to be able to able to save my family's home.

19  Q    Right, but when I started this line of questioning I

20  said--

21  A    Yeah.

22  Q    --let's just refer to certain things as grievances

23  and I--

24  A    Right.

25  Q    --I missed, I missed the big one I think or a big one

36

1   which is the, a grievance against the United States

2   Attorney's Office and the FBI,--

3   A     Right, right.

4   Q     --and I'm just going to characterize that grievance

5   and if you could agree or disagree as you have a grievance

6   against them for not doing their job,--

7   A     Right.

8   Q     --for failing to investigate certain items that you

9   brought to their attention.

10   A     Right.  They, they don't pay any attention to their

11   obligation to protect society.

12   Q     Now in your prior case is it true that you simply

13   felt you had no alternative after, but to, but to do what

14   you did?

15   A     In a prior case?

16   Q     Yes.

17   A     Well, yeah--

18   Q     What did you do?

19   A     --they took, they took every alternative away from

20   me.  Nobody would hear it.  I was threatened so, you know,

21   all I was trying to do was get, you know, paid maybe even

22   minimum wage for the work I did and, you know, so Verizon

23   was, you know, I worked many, many hours for Verizon just

24   in support of my product for Nortel.  So nothing I could

25   do against Nortel, you know, so I was trying to get paid,

1   you know, cause, you know, the, the court says, you

2   know, it's frivolous for me to think I have a right to own

3   what I build, what I create, what I develop.  The FBI

4   they, they even refused to find, how, how, how hard would

5   it be to send a letter, just a letter?  I mean not just

6   look at the fraud and everything that was done, but just

7   send a letter why Nortel had a right to claim a copyright

8   to my products.  It was on their website.  It was on

9   flyers.  I gave them everything.  I gave, I gave them even

10  a, a copy of my product that had, you know, Elaine

11  Jefferson, FBI on it as opposed to Nortel Networks or I

12  think it just said Nortel.

13          THE COURT:  So can I just ask you, what is the

14  connection between this that you're telling us now about

15  Nortel and so on?

16          THE DEFENDANT:  I'm not, there's--

17          THE COURT:  And, and your case.

18          THE DEFENDANT:  There's no connection between

19  that in this case per se, it's just that they bri, it's

20  just that in this case they bring up, you know, the, the

21  previous case, you know, and they bring up all these,

22  everybody's bringing up all this stuff that I've tried to

23  forget about, and as they bring up the stuff that I've

24  tried to forget about, then I got to talk about it, but

25  it's got nothing, it really has nothing to do with this

38

1    case.  You know, I very much understand the separation.

2    You know, I understand that this is a criminal case

3    against me, okay, and I view that differently than I view

4    the reasons that, you know, the reasons I took my actions.

5    You know, the reason I took my action wasn't because of

6    Nortel. I was, you know, fine.  You know, at least Verizon

7    paid something, you know, at least Nortel paid something,

8    the society paid something for what they did to me, but

9    they paid a hell of a cost for what, you know, the fact

10   that nobody would stop the, the fraud, okay, because

11   Nortel was $300 billion.  They lost $225 billion in one

12   month.  You know, maybe if, you know, the FBI, U.S.

13   Attorney would have investigated some of that fraud,

14   maybe, you know, the retirement funds would still be

15   around.  You know, that wasn't, you know, that was

16   basically Nortel took down the NASDAQ.

17          THE COURT:  So why would someone do what you did

18   or what you are charged with doing?  Let me ask you that.

19          THE DEFENDANT:  Well if you were talking, you

20   know, I'm charged with, like I said, that doesn't have

21   anything to do with Nortel.  Why somebody might do what I

22   did is to make a political statement about how they're

23   being mistreated and everything else.  That's my point of

24   view that, you know, this was, you know, I have to do

25   something.  I, for all practical purposes I was dead.  I

1  should have been dead a year ago, okay.  I was at least

2  three days a week in the hospital last year.  I couldn't,

3  couldn't even walk and in January the, the solution to my

4  problem was they were just going to put me on a morphine

5  drip, you know, but, you know, something's happened.  I've

6  gotten better.

7           THE COURT:  Well you're a fighter obviously.

8           THE DEFENDANT:  Yeah.

9           THE COURT:  So can I ask a few questions?

10          MR. GOLD:  Yes, Judge, of course.

11          THE COURT:  Okay.  So you said what's being done

12  to me is unfair compared to what I did?

13          THE DEFENDANT:  Correct.

14          THE COURT: What do you mean by that?

15          THE DEFENDANT:  Well I mean, you know, there

16  really was, I really just made a political statement.  I

17  didn't hurt anybody.  I didn't do anything.  I didn't

18  damage anything, you know, and what do you do?  You, you

19  throw me in prison.  You've kept, kept me there for over

20  seven months now. You deny me medical care, health care.

21  You, you're denying me food.  I mean you literally tried

22  to kill me.  You've literally, physically tortured me, and

23  then I wasn't even allowed to go to my daughter's wedding.

24  I mean that was very important, you know, so, I'm paying

25  for a crime many times over and I never can get any of

1  this back, you know, and fortunately I'm still alive,

2  you know, but I shouldn't be.  I mean logically I should

3  not be alive--

4          THE COURT:  But let me ask you a hypothetical--

5          THE DEFENDANT:  --and all I wanted was a trial.

6  You know, just give me the trial.

7          THE COURT:  And at the trial what would you

8  accomplish?

9          THE DEFENDANT:  Well, I would get out of this

10  case and hopefully bring some intellect to these problems.

11  See, you know, everybody acts like, you know - I, the

12  problem I think is I'm actually at a, my paradigm is much

13  wider than the court or than this hearing and everything

14  that everybody's holding against me.  They, they're

15  looking at it as oh well, this is a crime and they're

16  looking at it as their careers and they're looking at it

17  as well this is wrong and that's wrong.  I'm looking at it

18  more from a society point of view, okay.  I'm more

19  concerned with saving society.  Okay, that's my concern.

20  You know, I'm not--

21          THE COURT:  How would someone save society by

22  trying to set fire to a power line?  How, what's the

23  connection there?

24          THE DEFENDANT:  The connection there is to get

25  attention to get some sort of political, some sort of, you

41

1   know, you have to get, how do I put this?  How, how do I

2   correct a situation when I've been spending my life trying

3   to fix problems that I see, okay?  Now, like I said is I

4   don't bring the cases because I'm trying to make money or

5   I'm trying to manipulate or I'm not trying to do any of

6   this stuff.  I'm just trying to actually solve problems

7   for people.  Problems that I see out there and--

8          THE COURT:  When you say I don't bring the cases

9   you mean the civil cases?

10          THE DEFENDANT:  I brought quite a few civil

11  cases.

12          THE COURT:  Yes--

13          THE DEFENDANT:  Okay, one, one good example, you

14  know, is I went up, up against DET.  That was back in `92.

15  Okay, because that was everybody who, you know, it was

16  just wrong what they were doing.  Everybody when you get a

17  job, if you didn't get your last check, they would deny

18  you your last check.  It was kind of a game they played.

19          THE COURT:  But bringing a civil case in order

20  to right a wrong is different than committing a crime to

21  right a wrong, right?

22          THE DEFENDANT:  Well, I mean you see it as a

23  crime and that's because, you know, I, unless I get into

24  all the details, you see it as a crime.  I don't see it as

25  a crime.  What you, you can say, oh, blah, blah, blah, you

42

1  know, no, I mean you're creating, that's because you're

2  not looking at, you're not looking at it from, I want to

3  say my, my paradigm.  You're seeing it as a, as a crime

4  but, I don't see it quite as a crime.  I see, yes, you

5  have something you're charging me with but that doesn't

6  mean I did what you're claiming I did.

7            THE COURT:  Okay, so there is a, I mean as Mr.

8  Gold has gone over with you--

9            THE DEFENDANT:  Right, there is a crime that's

10  been committed.

11            THE COURT:  --there is a crime.  It has certain

12  elements.

13            THE DEFENDANT:   It has elements.

14            THE COURT:  There's certain defenses.

15            THE DEFENDANT:  Correct.

16            THE COURT:  Do you, do you not meet the elements

17  of the crime?

18            THE DEFENDANT:  I don't believe I meet the

19  elements of the crime.  That's--

20            THE COURT:  Which element just hypothetically,

21  which element do you not meet?

22            THE DEFENDANT:  Malicious attempt and fire.

23            THE COURT:  So okay.

24            MR. GOLD:  Your Honor, I, it's--

25            THE DEFENDANT:  I--

43

1          MR. GOLD:  Can I approach?  I don't know, and

2   you could maybe tell me whether to not, whether, whether

3   to tell the government - I mean, I, Mr. Kelly, there, let

4   me just say in terms of evidence there is a device very

5   similar to the devices that are found on these wires which

6   is found in his home.

7          THE COURT:  Right, I'm aware of that.

8          MR. GOLD:  Right, Mr., Mr. Chakravarty recently

9   gave me a report which shows that two latent prints found

10  on one of the devices match Mr. Kelly's prints.  So

11  there's not a lot unless there's some problem with the

12  searches which I don't, the search warrant which Your

13  Honor, I think signed.  I don't suspect that there's

14  really much going to be much dispute about whether Mr.

15  Kelly took certain acts, but Mr. Kelly's, the way he's

16  expressing himself sometimes even turns me around, but he

17  has in my view a non-frivolous account of what happened

18  which doesn't meet the elements.  If the, if the, and Mr.

19  Kelly and I, and you know, I'm kind of, you know, I'm, I'm

20  a little I guess I should be maybe more wary than I am,

21  but they, that if the set up was a tableaux designed to

22  show that he's capable of cutting the lines but that

23  they're, that cutting the lines wasn't actually

24  impossible, then he may have a defense.  That's all.  I

25  think Mr. Kelly can talk about it but it's something

44

1   that's--

2           THE DEFENDANT:  Yeah.

3           MR. GOLD:  --a productive line of inquiry.  I've

4   talked to him about facts which I think as a factual

5   matter make that defense probably not a, a winner, such as

6   the content--

7           THE DEFENDANT:  Right.

8           MR. GOLD:  --of the note and certain other

9   facts, but, but it's not crazy for him to say that there

10  may not be a case on malice.  That's--

11          THE COURT:  Okay.

12          THE DEFENDANT:  Not just malice but attempt.

13          MR. GOLD:  Yes, right.

14          THE DEFENDANT:  Correct.

15          THE COURT:  So if, assuming that you do have a

16  defense, so you want to have a trial--

17          THE DEFENDANT:  Correct.

18          THE COURT:  --do you think it was mistaken for

19  the government to charge you?

20          THE DEFENDANT:  With this crime?

21          THE COURT:  Yes.

22          THE DEFENDANT:  Yes, with this crime I think it

23  was a mistake they charged me with this crime.  I agree

24  there's other crimes they can charge me with, but I don't

25  think this is a crime they should be charging me with and

45

1   even that, you know, like I said it, I guess it's a

2   matter of opinion.  I, I, you know, desperate to, you

3   know, finally, I got to clean up the mess before I die,

4   okay, and so, you know, what was I supposed to do go back

5   to the U.S. Supreme Court again?  What, you know, how many

6   times do I have to go to U.S. Supreme Court?  How many

7   times do I have to file an appeal?  I've tried the First

8   Circuit, Second Circuit, Seventh Circuit?  You know, I've

9   been to the U.S. Supreme Court four times and I've kind of

10  given up on them too, you know, so.

11          THE COURT:  So this is just kind of an act of

12  desperation on your part to get some attention?

13          THE DEFENDANT:  Yeah, I have to straighten up

14  the mess, and like I said, I, you know, I think the

15  problem is I'm, you know, I have a large paradigm where

16  I'm looking at, you know, the society and the good of the

17  society and all this other stuff, and I think in the

18  court, yes, you just want to focus on this tiny little

19  section, but the problem is if you don't understand the

20  full picture, you're doing a lot more harm than you're

21  doing good.  You know, you're, you're, you know, the, the

22  court should be responsible for society, you know, not

23  just sit around and try to figure out how they can benefit

24  and how you can, you know, make personal profits and how,

25  you know, no, it really, you know, there, there's a, you

1  know, I hate to say it, I, the, the court is so critical

2  to our society and what I've seen, you know, I don't know

3  if you're going to take offense, but I've seen a

4  completely corrupt court.  I just read the, there was a

5  book because I'm kind of tired of writing.  I started

6  reading the books and there's no books in the library, so

7  the only thing I could get was a, it was a civil action.

8  It was about Woburn in the Leukemia cases and then you

9  read the book and that's exactly what I'm complaining

10 about, not so much that but even though they went through

11 the court and you know, they did all these things.

12       THE COURT:  Well they did win eventually in

13 court, right?

14       THE DEFENDANT:  No.

15       THE COURT:  Oh no?

16       THE DEFENDANT:  Logically not.  They threw out

17 Beatrice who was the major con, you know, after like nine

18 months of testimony and this and that they threw out

19 Beatrice which the EPA determined was the major polluter.

20 WR Grace was a minor, and the only reason that there was

21 any sort, there was a settlement with WR Grace rather than

22 actually going through the trial because he figured if he

23 went through the final stages of the trial, then the

24 people would get nothing which is what it looked like.  So

25 when you actually look at it, I mean it was, and then

1   actually later on they even showed that, the Beatrice

2   guys, you know, they perjured themselves, you know, so,

3   like I said, it's complicated, but it basically shows me

4   exactly what I've been dealing with, but I deal with an

5   extremely simple case.  You know, that's why I use the, I

6   use the Chelmsford, taking the land from me because I, I

7   can't conceive of how there could be a simpler case than

8   that.  I mean, you know, there, there's abstract thought

9   now.  I don't know, you know, like I said I'm not, I come

10  from engineering background so, you know, I think

11  logically.  Abstract thought is the only thing that

12  creates absolute truth, okay, so the fact that the Town of

13  Chelmsford took my land by definition says they deprived

14  me the right to own property under the color of state law.

15  That's by definition.

16          THE COURT:  Did they pay you for that?

17          THE DEFENDANT:  No.  Okay, but see that's

18  everybody wants to make it into a payment issue.  It

19  wasn't a payment issue.  It isn't about the compensation.

20  It's about whether or not they had the right to take the

21  property because they didn't take the property.  It, it's

22  kind of a policy if you really read Massachusetts eminent

23  domain laws and everything else.  All these, all these

24  politicians do the same thing.  They, they use these laws

25  to basically steal land from people and make big profits,

48

1   and that's what they--

2        THE COURT:  So someone made a big profit by

3   stealing your land?

4        THE DEFENDANT:  Well what it was was if you read

5   the town record, the sewerage pumping station should have

6   been on Massachusetts Electric's land.  The problem with

7   Massachusetts Electric's land was it's a big corporation

8   and as a big corporation if they went to take the land

9   nobody in the town could profit.  Okay, so it was easier

10  to take my land and Massachusetts Electric's land because

11  Massachusetts Electric had a shorter head and, you know,

12  it was appropriate.  I mean you have a utility station,

13  why not build another utility station next to it?  Why

14  destroy an acre and a half of open land?  You know, wild

15  land, cut down trees, you know, create a safety issue and

16  everything else, you know.

17       THE COURT:  So if I could just ask you to go

18  back, how did your doing the acts that you did that got

19  you in trouble here got you arrested, how did that profit

20  anyone?

21       THE DEFENDANT:  Well I don't understand.  I

22  guess I don't understand the question.  I was just saying

23  that that was the corruption in the court that I've been

24  fighting for over 15 years.  Okay, cause like I said, it's

25  not a question that the court's corrupt, you know, as far

1  as I'm concerned because, you know--

2          THE COURT:  So how--

3          THE DEFENDANT:  --but--

4          THE COURT:  For example, how is this Court, I

5  mean I'm not taking offense at all--

6          THE DEFENDANT:  Right.

7          THE COURT:  --I'm just curious about your

8      thought.

9          THE DEFENDANT:  I'm not saying, I, I'm hoping

10  this Court is not corrupt.  You know, that was one, one of

11  the questions they, one of the questions that I was asked

12  in the evaluation report, you know, how can you know you

13  got a fair trial?  You know, well, you know, if it's not

14  found in your favor?  Well, you know, by definition if I

15  didn't do the crime and I got found guilty, it wasn't a

16  fair trial so I can't really answer that, but everybody

17  keeps acting like, you know, I, I don't accept these

18  things.  I don't understand these things.  No, I, I

19  understand it.  You know, I understand, you know, is it a

20  fair trial or not?  I have no history where I seen a fair

21  trial, so it's kind of stupid for me to think I could get

22  a fair trial.  Okay, and that, but that doesn't mean I

23  don't believe I could get a fair trial.  I, you know, I

24  hold up hope that, you know, I hold up hope that there are

25  good people left in this society who give me a fair trial.

50

1       THE COURT:  But if you lost your trial that

2  would mean that people are corrupt?

3       THE DEFENDANT:  No, well, I mean not

4  necessarily.  I have to know the details of the situation,

5  but to say that if I lost the trial and I know I'm

6  innocent to say that, you know, the trial was fair, I

7  wouldn't, you know, I would not say it's fair because, you

8  know, I'm found guilty of something I didn't do, you know,

9  so why would I say it's fair.  Now I might be able to go

10 in and say whether or not it was legal cause there's a

11 difference between legal and being fair, you know.  I mean

12 I, I think I made those points in my, in my statements

13 too.  I mean, you know, sometimes, you know, there,

14 there's legal and there's fair and that was actually

15 where, you know, I have the 1948 theory where I think is

16 where we see a lot of the corruption in the court because

17 we got rid of the court of equity and we combined it with

18 the law, with the court of law, and that's where, you

19 know, fairness left and then, you know, I go from there

20 and now we have basically an environment where

21 everything's about manipulation, you know, it's not

22 necessarily about fair, you know, and, you know, but like

23 I said is, you know, at least, you know, if I can

24 interpret it, you know, as being valid under law, that's a

25 little different, then I won't say it's corrupt but you

51

1   know, it's just not right which, you know, I could kind

2   of, I don't know the details of the you know, the Woburn

3   spill, but it's kind of like well, a lot of those

4   decisions were probably valid under law okay, and my

5   arguments that I have because it's so simple, I say the,

6   you know, the, the findings have no validity under the

7   law.

8           THE COURT:  Which findings?

9           THE DEFENDANT:  In my civil case with the Town

10  of Chelmsford.

11          THE COURT:  So the court's--

12          THE DEFENDANT:  You know, because that was,

13  because if you look at it in that case, the basic argument

14  is, is I don't have, the case is not ripe for federal

15  review, and I go, well that's impossible because if they

16  took my land, by definition they deprived me the right to

17  own it under color state law and if 42 Section 1983

18  outlaws deprivation.  Deprivation's a noun so it's the,

19  it's the act of, so the act of depriving.  So by them

20  taking the land they deprive me the right to own it that

21  by definition brings up the question under, under federal

22  law.  Now whether or not they had a right to take it,

23  that's a separate issue, but to say it's not ripe for

24  federal review, that's, that's just wrong.  You know, I

25  covered that in my 66 statement.  Okay, you know, that's,

52

1   there's no validity there.  It's impossible for that to

2   be correct.  You know, I'm sorry the, the finding of the

3   court is impossible to be valid under the law okay.  You

4   know, but like I said that doesn't have anything to do

5   with this case.  I understand that, but I hope people

6   understand that the only reason this case exists is

7   because of these other battles.

8          THE COURT:  The other--

9          THE DEFENDANT:  The, the battle like with the

10  Town of Chelmsford.  The reason this case exists is

11  because we're going to lose, you know, basically we're

12  going to lose the house because I can't get a hearing on

13  whether or not they had a right to take my land.

14         THE COURT:  So can I just ask you, why would you

15  think that setting up some devices that look like they're

16  going to blow up power lines would cure that problem with

17  the Town of Chelmsford?

18         THE DEFENDANT:  Well no, I was hoping--

19         THE COURT:  That's what baffles me.

20         THE DEFENDANT:  Well no, I was hoping, I was

21  hoping that I could get help from a big corporation to pay

22  off the court so that they would allow my case to be

23  heard.

24         THE COURT:  So you thought if you did that the

25  company would pay you a lot of money?

53

1          THE DEFENDANT:  No.

2          THE COURT:  Oh.

3          THE DEFENDANT:  No, there's no intention to get

4   money.  I, I have no grievance.  I didn't even know it was

5   National Grid.

6          THE COURT:  So how did you intend, how'd you

7   think you could pay off your debt by the--

8          THE DEFENDANT:  I'm not trying to pay off the

9   debt.  I'm trying to get a valid hearing on the civil

10   case.  That's all.  All I want is a valid hearing on the

11   civil case.

12          THE COURT:  So why would setting up the devices

13   to look like they're going to blow up--

14          THE DEFENDANT:  Well look at--

15          THE COURT:  --power lines get you a hearing?

16          THE DEFNENDANT:  Well look at--

17          THE COURT:  How, what is the connection?

18          THE DEFENDANT:  Well look at everything the

19   court's told me.  Look at U.S. Supreme Court.  Look at

20   Judge Souter.  He says that money's more important than

21   the law.  He says that, you know, money's more important

22   than his obligation.  You know, well money is more

23   important to the court than the law.  So what I want to do

24   is get somebody with some power that comes in and says

25   well wait a minute, maybe the court should respect the

1   law.

2           THE COURT:  So did you think the people from the

3   power company were going to force the court to give you a

4   hearing?

5           THE DEFENDANT:  I thought they would, you know,

6   throw the limelight on the court and say, you know,

7   because I, you know, I don't know what to say here, but,

8   you know, it really, I mean we're, we're look, we're

9   looking at the possibility of the destruction of society

10  and I'm trying to avoid that, but, you know, we--

11          THE COURT:  How is society--

12          THE DEFENDANT:  The thing is, is that, you know,

13  the big corporations, you know, maybe it's no longer true,

14  but when I, when I was working at, I worked at Bell

15  Telephone Laboratories, when I was working there they were

16  very concerned with, you know, making sure, you know, the

17  politics was right because that's how they survive, you

18  know, and utility companies can't survive if the court

19  gets too corrupt, you know, and that's what I'm seeing.

20  You know, we can, you know, the, I don't, how do I put

21  this.  You know--

22          MR. GOLD:  Your Honor, can I--

23          THE DEFENDANT:  I'm not, like I said, I'm not

24  I'm just looking for--

25          MR. GOLD:  --whisper in Mr. Kelly's ear if you

1    don't mind?

2            THE COURT:  Okay.

3            MR. GOLD:  Thank you.

4            THE DEFENDANT:  I, you know, the question, you

5    can't use the newspapers.  They don't work.  You can't use

6    the media.  It doesn't work.  I haven't found anything

7    that works and all, like I said, I, I'm to the, the court

8    to me is the very last stage that anybody should ever have

9    to go to to resolve an issue, and I can't even use the

10   court, you know, so, you know, I'm desperate.  You know,

11   I'd like to clean up the mess before I die.  Not, you

12   know, it doesn't matter anymore what was done to me.  It's

13   a matter of, you know, getting my, you know, let my wife

14   keep the house.  Why should she have to go through these

15   things?  You know, why are we punishing my family just

16   because I said that maybe we should respect the law.

17   Maybe we should, you know, have some, do what's right.

18   Maybe we should be concerned about society because one of

19   the, like I said, in the statements you'll see I, you

20   know, the way, I, I think of things I guess mechanically

21   or whatever you want to talk, as systems, and everybody

22   somehow thinks that, you know, like the society is getting

23   harder and harder but yet, I claim, you know, it, it's

24   very dangerous, you know, cause like any system, any

25   complex system, it's only as reliable as the weakest link,

1  you know, as you build, you actually build in, you know,

2  unrelia, that's the problem.  You have to be sure every

3  section is functioning right in order to advance, you

4  know, and we have a society here where I see one, the

5  court is broken.  Two, I see the DOJ broken.  I see the

6  Attorney General's Office broken.  I see the FBI broken.

7          THE COURT:  Sot do you think there's some kind

8  of a conspiracy that led to your being prosecuted here?

9          THE DEFENDANT:  Well that's, that's what they

10  do.  I mean naturally they would prosecute me.  Now when

11  you say is there a conspiracy, it, it's hard to say as far

12  as I don't see it as a conspiracy.  I see yes, they would

13  probably try to prosecute me but you would think that they

14  would at least look at the situation and evaluate it and

15  then evaluate the proper way, you know, in other words, we

16  should really have a, more of a discussion or a, you know,

17  some sort of intelligence rather than this attack on me,

18  and this attack on me I think is misplaced, okay, and I

19  know Mr. Gold kind of disagrees with me, you know, that he

20  thinks that there is plenty of evidence that this is a

21  valid attack.  I don't think this is really a valid attack

22  and I think it's a very dangerous attack, and I think it's

23  an attack that could, you know, I think it's a negative

24  attack, okay, and, you know, that's, like I said if you

25  read the statements you'll, you'll, you'll see that, that

57

1  I, I think that this, this attack is more of a, you

2  know, it's kind of to their personal benefit as opposed to

3  the benefit of society.  They're not really looking at

4  what the real obligation is.  It's--

5          THE COURT:  Well let's say that the government

6  is getting a personal benefit from--

7          THE DEFENDANT:  This attack.

8          THE COURT:  --attacking you.

9          THE DEFENDANT:  Right.

10          THE COURT:  Who's paying them?

11          THE DEFENDANT:  Oh well, it's, you know, in

12  other words, I was going to die, so they could do anything

13  they want.  They could charge me any way they want and

14  they'd look like heroes because I'll never get to trial.

15  I'll never get to tell my side of the story so whatever

16  they want to charge me with they can say oh, he's a

17  homegrown terrorist and all this other stuff and then the

18  FBI gets to say hey, we stopped a homegrown terrorist, but

19  that's only because nobody ever got, I never got to trial.

20  I never got to tell my side and you know, they know I was

21  dying, so why not?

22          THE COURT:  So this, the case is just an attempt

23  to silence you?

24          THE DEFENDANT:  Well I don't know.  I want, I

25  don't want to say it's an attempt to say to silence me,

1  but I think it just, you know, in other words, nobody

2  talks to me about anything.  They just come up with these

3  charges.  They don't really, I don't think they really

4  looked at I don't think they really looked at the charges.

5  I don't think they really looked at the whole situation

6  and really evaluated the situation before they started the

7  charges against me, and like I said, they've kept me in

8  jail for, you know, what should be more than, more than my

9  lifetime, you know, without the right to get to a trial to

10  have where, where I can address them, you know.

11       THE COURT:  So do you think you're being held

12  in, why do you think you've been held so long without a

13  trial all these months?

14       THE DEFENDANT:  Well, it's because they, Mr.

15  Hayne brought up the competency issue.  You know, when I

16  got arrested, that's what I told them.  The first thing I

17  was after was after my public trial.  I wanted a public

18  trial before the limelight went away, you know, and

19  everything he did was to prevent me from getting the

20  public trial and prevent me from getting a detention

21  hearing and to prevent me from, you know, basically being

22  able to tell me side.  That's why I had to start the

23  statements.  You know, I wrote to newspapers and said,

24  hey, will you at least tell my side so maybe my attorney

25  will read it, you know.  So if the, if my attorney--

1          THE COURT:  You wanted him to read your side

2    in the newspaper?

3          THE DEFENDANT:  Well he wouldn't listen to my

4    side.

5          THE COURT:  Yeah.

6          THE DEFENDANT:  So if he won't listen to my

7    side, I mean I didn't want to, you know, in other words I

8    was looking for somebody like Mr. Gold that would at least

9    talk to me about what my options were, you know, how he

10   saw this because, yes, I have to get out of the criminal

11   complaint or--

12         THE COURT:  So what if you're, not that this is

13   your attorney's advice, but what if your attorney's advice

14   was, you can't win the trial.  You're going to be found

15   guilty under the rules of the law--

16         THE DEFENDANT:  Right.

17         THE COURT:  --which may not be perfect, but the

18   chances of you're getting found not guilty and walking

19   away are very slim, let me cut a deal for a shorter period

20   of time than five years for you.  What would your reaction

21   to that be?

22         THE DEFENDANT:  Well now I might consider it,

23   you know, because you have to understand, I, I didn't

24   expect to live to see my daughter get married, you know,

25   but I'm alive today and I don't know why I'm, you know, I

60

1  have no idea why I'm alive because I don't get medical

2  care.  I mean it would be very nice if I could actually

3  get cat scans and, you know, some sort of review to see

4  what's happening to the tumors and everything in me, you

5  know, cause, you know, legitimately this makes no sense.

6  I mean if my ascites didn't stop, you know, they would

7  just starve me to death.

8          THE COURT:  If you were, would you, if you were

9  released, would you continue to do these things to make a

10  statement?

11         THE DEFENDANT:  Well, I think the statement has

12  been made, okay?  If I get released I'm still, I, I've got

13  to still solve the problem with, with the house and the

14  land and everything else.  I mean I, that's why I said,

15  when people start talking about well, you know, you can

16  make this plea bargain you can make that plea bargain.  I

17  go, yeah well, but that all depends because I still have

18  problems that I have to resolve.  You know, it's not like,

19  it's not like this is going, this is solving my problem.

20  I mean if I can have a hearing on my, you know, land case,

21  that's, you know, that would be my objective.  At least

22  let me--

23         THE COURT:  What if you could never have a

24  hearing on that case?  What if it just turned out that you

25  didn't get your way and there wasn't any way--

61

1            THE DEFENDANT:  I don't know.  You know,

2   that's what I said.  That's, I, you know, if they're going

3   to take my house away from me and do all these other

4   things to me just because I standed up, stood up for my

5   rights then, you know, I don't know, that's, that's why

6   we're here.  We're here because I spent 15 years trying to

7   figure out what to do.  Okay?  I've tried.  I think I've

8   tried about everything.  I mean if you read my civil

9   complaint, I don't know if you're read that one, okay, and

10  there's, that's a brief scenario.  It doesn't even cover,

11  you know, it doesn't cover everything.  It just covers the

12  highlights.  It doesn't even cover all the, the cases I

13  filed, in, in the case.  It just, you know, these are the

14  steps I've gone through to try to get a hearing on

15  something that like I said, I can't even consider it to be

16  complicated, you know, so, you know, it was kind of like,

17  I'm between a rock and a hard place.  Do I go back to the

18  U.S. Supreme Court or do I try to file another civil case?

19  I couldn't go to the U.S. Supreme Court because, you know,

20  that's going to take at least six months, and they're

21  going to turn you down cause you literally have no hope

22  there, they don't, I guess they don't understand the

23  importance.  What, the problem I see in the court is they

24  think they have this, I don't know whether they want to be

25  a god image or whatever, but they think that, you know,

62

1   they don't understand the importance of the little

2   things.  It's the little things that really indicate your

3   problem and it's the little things that destroy you.

4   That's my experience.  It isn't the big ones that have all

5   the limelight and have, everybody knows about.  Those

6   don't destroy you.  It's the little things nobody pays any

7   attention to.  I think that's part of the problem with the

8   U.S. Supreme Court and that's really where I got in a

9   fight with Judge Souter was over that.  That my argument

10  was this is a perfect case for them to review because it's

11  so simple.  It shows a broken system.

12          THE COURT:  So when, what happened with Judge

13  Souter?  Did you--

14          THE DEFENDANT:  Well no, he--

15          THE COURT:  --have a case before him or--

16          THE DEFENDANT:  No, no, I, that was kind of a

17  letter argument with Judge Souter.  Well it was actually

18  was--

19          MR. GOLD:  He was sitting by designation on one

20  of the panels.

21          THE DEFENDANT:  It was actually the Chief Clerk

22  Sutter and Souter was the one that I made the final, that

23  handled the final appeal--

24          THE COURT:  I see.

25          THE DEFENDANT:  --and they threw the, well

63

1     basically

2  They didn't throw the case out.  They wanted me to pay the

3  filing fees and you know, they took me from in forma

4  pauperis to having to pay, and I literally didn't even

5  have the $300.  I sent him my bank statements and

6  everything else and I don't have the $300.  I can't

7  proceed, but the question that was there, the question

8  that I had presented to the U.S. Supreme Court was really

9  it came out of Judge Woodlock, Woodlock?  No, not

10  Woodlock, sorry, Groton, Gorton.  Okay.  Woodlock was in

11  the Nortel case.  Judge Gorton and he, the only hearing I

12  ever, the only federal hearing I ever had on a case was in

13  front of him and I had put in a motion for summary

14  judgement because we had the evidence that the town took

15  my property based upon ownership okay, and he, he just

16  said, you know, he wouldn't even entertain my position.

17  So he never addressed any of my positions or any of my

18  things.  He said unless I hired a lawyer he wasn't going

19  to entertain my positions and then the First Circuit did

20  basically the same thing.  They weren't going to entertain

21  any of my positions.  So the question is, is, you know, if

22  I can't have my position heard because I don't have enough

23  money, okay, so I don't have enough money to pay to have

24  my position heard by the court, so that was what really

25  what was the U.S., that was what I took to the U.S.

64

1   Supreme Court was the question of whether or not a

2   person has to have enough money to have their position

3   heard, and so when they said that they, you know, I didn't

4   have enough money to even present that, you know, I said

5   okay.  That's the U.S. Supreme Court through, you know,

6   with all the appeals and everything through, I think it's

7   with an O, because they, the clerk, I think the chief,

8   the, the, the law clerk was a Sutter.  One was with a U

9   and the other one was with an O.  That's what I remember

10  and so the judge, the judge just ruled that, you know, I

11  had to pay the money and I didn't have $300, and I

12  appealed that--

13            THE COURT:  Right.  So Mr. Chakravarty, do you

14  have a question?

15            MR. CHAKRAVARTY:  Just a few to, in order to

16  clear up the record a little bit.

17                    CROSS EXAMINATION

18  BY MR. CHAKRAVARTY:

19  Q    Mr. Kelly--

20  A    Yeah.

21  Q    Good morning, I'm the prosecutor in this case--

22  A    Yes.

23  Q    --and you understand that prosecutor means that I'm

24  the A person who's charged with presenting evidence if you

25  were found competent--

1  A     Right.

2  Q     --that would be presented to a judge or a jury to

3  determine whether you were guilty of the crime?

4  A     Right.

5  Q     And I think you said that you disagree that you are

6  guilty of the crime with which you are currently charged

7  but that you may have committed some other crimes that

8  have different elements, that don't have an element of

9  malice--

10  A     Right.

11  Q     --and that the fire, you said something about--

12  A     The fire.

13  Q     --disagreeing with the fire.  What do you mean by

14  that?

15  A     Well I mean there was a brush fire.  How's that going

16  to take down power lines?

17  Q     So you think that if there's a fire that has to be

18  correlated to the power lines?  You think that that would

19  have been something, evidence you could present?

20  A     Well according, according to the elements it has to,

21  you know, according to the elements the charge was that I

22  was going to damage it through fire.

23  Q     So you--

24  A     Okay, so what, you know, what fire are we talking

25  about?  You know, there's lots of questions there.

1  Q    All right, so at a trial, you believe that you

2  could fairly contest the evidence against you and you

3  present evidence--

4  A    No, I'm not, I'm not contesting the evidence, I'm

5  contesting--

6  Q    This isn't the trial so we're not--

7  A    Yeah.

8  Q    --but if there were a trial--

9  A    Yeah.

10 Q    --you feel that you could help Mr. Gold and formulate

11 a defense in which you would be able to contest these

12 particular elements of the criminal charges?

13 A    Oh, the elements.  I'm sorry, I thought you said, I,

14 I was thinking you meant evidence.  No, yes, I agree with

15 that.

16 Q    So, and that means challenging the evidence that I

17 would present as well as presenting evidence potentially

18 on your own behalf?

19 A    Right.

20 Q    And you recognize that in this case the, the

21 incendiary devices were created with thermite--

22 A    Yes.

23 Q    --that you were familiar with and you had actually I

24 think experimented with some of these cutters on your own

25 premises?

1  A    Well, I wouldn't call them cutters but go ahead--

2  Q    All right.

3  A    --well I mean I would--

4  Q    You have called them cutters haven't you?

5  A    --I would call them, I would call them cutters but I

6  wouldn't say that I experimented as thermite is not a

7  cutter.

8  Q    Right, and that's because you understand that, if you

9  said that they were a cutter that would be something that

10  would be contrary to your interests at a trial.

11  A    I, it depends on how you want to present it.

12  Q    So if the--

13  A    I mean it depends on, you know, that's what I said

14  is, I by rights, I mean, you as a prosecutor, you're

15  supposed to prove that I'm guilty, not that I have to

16  prove myself innocent.  So it depends on how you present

17  it.

18  Q    That's right so that, that's purely--

19  A    Okay, so that's your job.  You have--

20  Q    That's the government's burden--

21  A    That's government's burden.

22  Q    Right, and so if the government's theory of the case

23  is that you intended to cut down these wires--

24  A    Right.

25  Q    Then if you were to say I made a cutter, then that

68

1  would be something that would be contrary to your

2  interest, right?

3  A    To tell you the truth, it depends on how you look at

4  it.  No, I don't see it necessarily contrary to my

5  interest.  It depends on, it really depends on how you

6  look at the case and I, you know, don't think it's

7  appropriate for me to talk about it.

8  Q    Okay, and that's because - what I'm trying to draw is

9  you understand when sometimes you say something, that that

10 could actually hurt you if you go to trial?

11 A    Oh yes.

12 Q    And you've been careful to say things in a safe

13 environment where it's not going to hurt you to go to

14 trial?

15 A    Well, I've been care, within a certain sense.  I mean

16 it, it all depends, that's why I said, that's why I was

17 pretty upset with Mr. Hayne because I would have liked to

18 work things out before I say anything but I have no

19 choice.  I got to start, I got to start saying stuff

20 otherwise I'm never going to get a trial.

21 Q    Okay, so let's say hypothetically you went, you were

22 able to go trial--

23 A    Yes.

24 Q    --and let's say that you were acquitted of the

25 charges.  You were right.  Your defenses worked--

1   A    Right.

2   Q    --and you were acquitted of the charges.  The

3   underlying reason why you did what you did up in

4   Tyngsboro, that hasn't gone away has it?

5   A    No, of course not.

6   Q    And that will remain the same, remain--

7   A    As a matter of fact they put, I, I, I suspect they

8   put it on hold, but I have no access to any information so

9   I can't find out what's going on with that case.

10  Q    And in fact even though there's been some attention

11  on this case, there was some attention on your earlier

12  case in front of Judge Tauro as well, the federal charge,

13  the press release, that kind of thing.

14  A    There was, yeah.

15  Q    And that case was resolved and I think you got

16  probation.  Is that right?

17  A    Well that case was resolved from, yeah--

18  Q    And--

19  A    --we'll call it resolved--

20  Q    And that didn't--

21  A    --whether you want to say it's resolved, but it was

22  resolved.

23  Q    Well it didn't resolve the grievances that you're

24  referring to.

25  A    It didn't apparently because, you know, there were

1  promises made to me by the FBI and the U.S. Attorney's

2  Office, what they were doing to do.  One of them was they

3  were going to investigate the case, my land case, okay.

4  So I remember specifically showing them the paper because

5  I had just received it over the fact that the land was

6  taken based upon the ownership, but I never saw what the

7  FBI or the U.S. Attorney ever did about their promises,

8  you know, so you can argue that, you know, oh it was

9  resolved from your standpoint of view, but it really

10  wasn't resolved from my standpoint of view because--

11  Q    And that's what I'm asking about, from your

12  standpoint, your issues were not resolved even though you

13  had been, you'd--

14  A    Well I was promised they were going to look into it

15  and do something about the various issues I had, but that

16  never happened.

17  Q    Okay, but you committed the crime before you had

18  those problems, right?

19  A    Yeah.

20  Q    And then you agreed that you plead guilty to the

21  crime and you--

22  A    Yes.

23  Q    --suffered the punishment and then the, the, your

24  problems weren't addressed so you reoffended recently?

25  A    Well the--

1        MR. GOLD:  Objection.

2        THE COURT:  Well he can answer.

3   A    Yeah, the, the, the problems, what do I want to say

4   that, there was, you know, part of my understanding was

5   this was going to start cleaning up some of the mess.  See

6   this is the mess I'm talking about.  The mess that, you

7   know, the FBI in that particular case, what you can say

8   well, that really wasn't, you know, yeah, well they

9   wouldn't do their job.  They wouldn't do their job.  They

10  wouldn't do their job.  This resulted in a lot of damage

11  to society.  Okay, and you know, you can even look to like

12  the financial crisis of 2008.  That's pure fraud.  I don't

13  care what anybody says but nobody's going to do anything

14  about it.  So to me that, you know, even though you can

15  say well oh, that's crazy.  No, it comes out of the same

16  situation.  Nortel was committing fraud.  A $300 billion

17  corporation--

18  BY MR. CHAKRAVARTY:

19  Q    Yeah, well let's not talk about Nortel.  I think we

20  understand and I, I have read everything in your file.

21  A    Okay.

22  Q    Both in this case and all of your other cases--

23  A    Okay.

24  Q    so I appreciate the, the syllogism with which you

25  went through those, but I'm trying to understand whether

72

1    the grievances that you did this act for, whether it's

2    criminal or not would remain to be decided, but this act

3    was done because of certain grievances that you felt?

4    A    I, yeah, they, the town sent us a letter that

5    basically they were fining us $133,000--

6    Q    Okay--

7    A    --because I didn't hook up to the sewer system

8    because I was still trying to fight whether or not I had a

9    right to own the property that I can't get a hearing to

10   have that determined.  So that was my desperation because

11   I was going to be dead.

12   Q    So--

13   A    So what else could I do?  I mean I could--

14   Q    I, I understand.  I think you said--

15   A    I could try another battle with the court.  I could

16   try, you know, you know, how, how, how many decades does a

17   person have to battle just to get a simple hearing?

18   Q    So I'm trying to understand, Mr. Kelly, whether your

19   grievance and that desperation was based on what was

20   happening to you or what you've described a few times as

21   saying things that were happening to society?  Who were

22   you fighting for?  Why, who were you doing this for?

23   A    Well I'm not fighting for society anymore.  I'm, I'm

24   an old man.  I'm going to die.  I really don't, I mean

25   that's the part that I am somewhat offended by.  I'm, I'm

73

1    the one who I feel is trying to protect society and yet

2    it doesn't matter.  I'm going to be dead.  You know, what

3    I think that really should be done and everybody I guess

4    wants to disagree with me, I think the FBI and U.S.

5    Attorney should be working for the good of society.  You

6    guys should be worried about protecting society.  You

7    know, me, you know, it's just kind of like a hobby I guess

8    you could say because it doesn't matter whether society

9    survives or doesn't survive because I'm gone.  You know,

10   you guys, you know, if you want pensions or you want

11   anything, you better hope society stays around.  You know,

12   so in other words, the promises that, you know, you make,

13   you know, well why not?  That's why, that's, you get like

14   the thing there, well why not?  Why, why would the FBI not

15   spend five minutes writing a letter?  You know, that's not

16   a lot of work but they wouldn't do that--

17          THE COURT:  So--

18          THE DEFENDANT:  --you know, because what I see

19   the FBI and I see the U.S. Attorney, they only protect the

20   big corporations.  I mean you take, you know, if you read

21   the statements, you take like, like the copyright issue

22   cause that's extremely simple.  Okay, that brings it down

23   to the very simple.  There, here, here's a giant

24   corporation claiming the copyright to a product.  Okay,

25   but I'm the one, I'm the only person in the world with the

1  source code for the product.  I'm the one who developed

2  the product.  They have to have a written agreement with

3  me, yet they're saying they have no agreement with me.

4  They have to have a written agreement with me.  Well why

5  can't the FBI just send a letter to get that written

6  agreement?  But when a 13-year-old girl downloads some

7  files off the internet, okay, that represents more music

8  than she could, you know, that represents music, more

9  music she could ever listen to and she did it for a 13

10 year old reason, she didn't make it to make a profit, not

11 like Nortel did, what does the FBI do?  They go after her

12 because what was that?  That was a threat to the RIAA, a

13 giant corporation who, you know, even today, you know,

14 they, they take so much out of these artists that the

15 artists can't even make a living.

16 BY MR. CHAKRAVARTY:

17 Q      So--

18 A    You know, Taylor Swift even complained about that.

19 Q    I get that the RIAA case, but let's talk about your

20 case.

21 A    Yeah.

22 Q    We're trying to find out the reason, you know,

23 whether your reason was a 13 year old reason or a 62 year

24 old reason.  The reason seems to be, what you're telling

25 the Court is that for all of these injustices that

1  happened to you, you were willing to stand up to, those

2  who've done these injustices to you?  Is that right?

3  A    Well I'm willing to fight injustice.

4          MR. GOLD:  Your Honor, I'm going to object--

5          THE DEFENDANT:  I was willing to fight

6  injustice.  I'm too old--

7          MR. GOLD:  --to Mr. Chakravarty's--

8          THE COURT:  Okay.

9          MR. GOLD:  --line of question.

10          THE COURT:  Just a minute.  We'll hear the

11  objection.  Yes?

12          MR. GOLD:  I, I think we're moving a bit far

13  field from the inquiry which is, and I understand that

14  there, which is competence to stand trial and in Mr.

15  Kelly's case disaggregate certain fundamental kind of

16  types of understanding from his mental disorder.  So kind

17  of wandering or, you know, I'm, you know, my apologies,

18  but the, or, or his grievances.  So I understand there's a

19  relation but, you know, can he understand what's going on

20  and make, you know, certain judgments despite the fact

21  that he's mentally disordered, period.  Period.  I think

22  that's, that's it.  So I think what Mr. Chakravarty is

23  questioning now is going to maybe whether he was

24  responsible but not this present sense functional inquiry

25  of what his understanding is right now.  So I would, I, I

76

1   think, you know, we've kind of ventured into that

2   territory but I'd like to kind of pull it back a little

3   bit.  The more Mr. Kelly talks, the more he, he's, he's

4   kind of getting into some of this stuff and unraveling a

5   bit but I think, you know, the focus should be simply on

6   his understanding of elements, whether things can be

7   proved, whether he understands that he set the case in

8   motion.

9              THE COURT:  I mean I do understand.  I think you

10  have shown he's able to consult with you to a reasonable

11  degree of rational understanding, and I think it's clear

12  you have a good relationship with your lawyer and you're

13  listening to him and he's a good listener too, and I think

14  really the issue is the understanding of the nature of the

15  proceedings here.  If he has a mental health issue, if he

16  has a mental health diagnosis that causes Mr. Kelly to

17  believe that this is a set up and he's just being

18  persecuted for things that happened long ago and the whole

19  system is corrupt then there's a problem, I mean Mr.

20  Kelly?

21             THE DEFENDANT:  Do you want me to address--

22             THE COURT:  Well yes.  You might as well because

23  you're--

24             MR. GOLD:  Yeah, let's put it to him.

25             THE COURT:  --because you're, you're so

1   intelligent, and I really also appreciate your attitude

2   because your, the, I know you are disagreeing that you are

3   incompetent and you're very patient.  You've answered

4   every question put to you in I think a very polite and

5   reasonable way and I really appreciate that.  It must not

6   be easy to be in your shoes, and I'm sorry that you're

7   here in this--

8           THE DEFENDANT:  Well like I said, I have no, no

9   problem understanding the difference between the civil and

10  the criminal, and I understand the case against me and I

11  understand why the case was brought against me.  You know,

12  what I'm saying is I would--

13          THE COURT:  Well why was the case brought

14  against you?

15          THE DEFENDANT:  Because, you know, basically

16  there were devices put up on power lines that, you know,

17  could destroy them.

18          THE COURT:  And so--

19          THE DEFENDANT:  And then those devices are

20  linked to me of course.

21          THE COURT:  Do you agree that - I mean you're

22  talking about taking a step back and looking at a big

23  picture.  Do you agree that we just really can't have that

24  happening in our society?  That people can't be putting

25  devices on--

78

1              THE DEFENDANT:  Oh that's, that's what I'm,

2   that's why I'm trying to prevent.  See I'm, that's what

3   I'm saying, I'm looking at it from the opposite side.

4   You, it's not that you can't have it happening.  I mean

5   you can't have, I mean when you say yes, you can't have

6   that happening in society, I agree.  That's 100% I agree

7   with, but you're not going to be able to stop it from

8   happening in society unless you correct other problems.

9   Okay, so yes you're right.  I broke the, well again, I

10  don't want to say that.

11             THE COURT:  But anyway--

12             THE DEFENDANT:  Okay.

13             THE COURT:  Assuming you broke the law--

14             THE DEFENDANT:  Assuming--

15             THE COURT:  --you broke the law to get attention

16  or something else that you felt had been done wrong to

17  you?

18             THE DEFENDANT:  Correct.

19             THE COURT:  But do you see that in the long run

20  you're just making your own situation worse?

21             THE DEFENDANT:  I'm dead.

22             THE COURT:  Like now you've been locked up.

23             THE DEFENDANT:  Yeah--

24             THE COURT:  Now you're charged with a crime.

25  You--

1          THE DEFENDANT:  But--

2          THE COURT:  --can't be with your family.

3          THE DEFENDANT:  But what, what's the

4    alternative?  The alternative--

5          THE COURT:  To not have done that.

6          THE DEFENDANT:  Yeah, the altern, yes, but the

7    alternative to not have done that means my wife loses the

8    house.  My family is destroyed.

9          THE COURT:  But now do you think your wife is

10   going to get to keep the house because you're in this

11   pickle?

12         THE DEFENDANT:  Well it depends on whether I win

13   the pickle or I don't.

14         THE COURT:  So let's say you're found not

15   guilty.

16         THE DEFENDANT:  Yeah.

17         THE COURT:  Does that mean your wife gets to

18   keep the house?

19         THE DEFENDANT:  Well hopefully, hopefully, then

20   the court will listen to the case.

21         THE COURT:  So if you're found not guilty, that

22   will cause a kind of domino effect where everyone will

23   then pay--

24         THE DEFENDANT:  Well I'm hoping--

25         THE COURT:  --pay better attention to your civil

80

1  case?

2        THE DEFENDANT:  You know, I, I have, I have to

3  hope for something.  You know, I have, I have to have some

4  hope somewhere.  You know, just like I hope I can get an

5  honest hearing.  I hope I can, you know, I, I hope I'm

6  dealing with an honest judge.  I mean these are not things

7  that I've really experienced so I don't know if it's

8  possible, you know, but I hope.  Every day I hope.  Every

9  day I, every day I look at the positive side of it, you

10  know, well, you know, Judge Casper I guess has this cas,

11  Casper?  DJC?

12        MR. GOLD:  Um-hmmm.

13        THE DEFENDANT:  Yeah, okay.  Judge Casper has

14  the, the civil case, okay.  I don't know anything about

15  Judge Casper but I, you know, I hope she didn't, you know,

16  I look at it well, I don't think she went to Harvard, you

17  know, so that makes me happy.

18        THE COURT:  So what's the deal with people who

19  went to Harvard?

20        THE DEFENDANT:  Well that was, actually if you

21  read the statement I think, yeah, cause it was Mrs.

22  Pinellis (ph), Ms. Pinellis who claimed I was paranoid.

23  That, that'll give you, that'll give you a little

24  background.  That had to do with Nortel.  Now Nor--

25        THE COURT:  Well I read that.  I've read a lot.

1   So but you just think if someone went to Harvard then

2   that means they're corrupt?

3          THE DEFENDANT:  The, if you look at the First

4   Circuit back when I was dealing with them, cause things

5   have changed now, but back then basically yeah somewhat

6   because it was through Ted Kennedy and Chappaquiddick and

7   Judge, like Judge Woodlock and Judge Harrington were both

8   appointed and they were appointed with, you know, all the

9   ties at Chappaquiddick and they were, you know, through

10  Hanify and King and it was Hanify and King who told me

11  that the law doesn't matter, that judges do whatever they

12  tell them to do.  Okay, so logically, you know, like

13  everybody says, oh well you can't prove it.  Well I'm not

14  an investigator.  I'm not the FBI.  I don't know, I don't

15  have access to a lot of the information.  I just have what

16  I can gather and then I have to put my theory together

17  based on what I can gather.  If you give me more

18  information maybe it's different but I saw, I saw this,

19  basically I'll call it a conspiracy, but I know I can't

20  prove it's a conspiracy.  I saw this conspiracy from

21  Harvard and Harvard does this.  I mean Harvard, Harvard,

22  even MIT and a lot of these other schools in the area of

23  venture capital and that, Harvard was one that started

24  very much protecting Harvard.  So you protect Harvard, you

25  only give to Harvard.  You, you know, so it becomes kind

1   of a boys club, and they did that in the venture capital

2   area and then MIT used to just have the 120 Venture Group,

3   but now MIT also does the same thing.  The money they get

4   goes to MIT graduates as opposed to anybody who they think

5   deserves it, and Harvard was the first to start that, and

6   I see no reason to suspect that they didn't also do that

7   in the court because every judge in the court except for

8   Judge Tauro and Judge Gorton, and of course I had the

9   conflict with Judge Gorton, but every judge in the court

10  was out of Harvard.  Okay, so I seen, you know, whatever

11  you want to say, I see this possible conspiracy.  Like I

12  said with Judge, Judge Woodlock, Judge Woodlock and John

13  Hanify work together and Judge Woodlock was good friends

14  with Edward Hanify okay, who was the guy who got Senator

15  Ted Kennedy out of the Chappaquiddick mess, and they

16  worked together to get Judge Harrington his position.  So

17  that's the information that I gathered.  Now whether that

18  means, like I said I did file a, a conflict of interest

19  case against Judge Woodlock because, you know, I was

20  literally told by Hanify and King that--

21              THE COURT:  Those are your lawyers?

22              THE DEFENDANT:  That was Nortel's lawyers.

23              THE COURT:  Oh, Nortel's lawyers told you what?

24              THE DEFENDANT:  That the law doesn't matter.

25  The law and the Constitution don't matter, they tell the

1  judge what to do.

2       THE COURT:  I see.  So those two people told you

3  they had told Judge Woodlock what to do?

4       THE DEFENDANT:  Well, it was Matt Connolly, the

5  two lawyers on my case was Matt Connolly and John Hanify,

6  okay, and Matt Connolly told me outright that, you know,

7  because I said well, you know, if Nortel claims they have

8  no agreement with me, then they're acting criminally by

9  selling my products and doing all this other stuff, and he

10  said it doesn't matter because they tell, they tell the

11  judge what to do.  That was documented in, that was

12  documented in my case against the Town of Chelmsford in

13  the, I think it was probably the original, you know, back,

14  you know, I'd have to look things up if I can find the

15  information, but I know I documented it, that, you know,

16  I'm told outright that the law doesn't matter, that it's,

17  you know, that the lawyers tell the judges what to do, and

18  that's also my 1948 theory I kind of explained that.

19       THE COURT:  Okay.

20       THE DEFENDANT:  You know, and so, that's what I

21  said, we have this, I have, you know, when I say Harvard

22  well, that's the conspiracy I see.  Whether it's valid or

23  not I don't know, I mean but, like I said, when I did file

24  the conflict of interest, you know, the only thing that,

25  that, I don't know if that goes to judicial counsel, like

84

1   it's been so long, but the only thing they said was is,

2   Judge Woodlock just said he didn't feel he had a conflict

3   of interest even though he was good friends with John

4   Hanify and I think it was John King.  I didn't, never

5   dealt with the, the other partner, you know, but so there

6   was really no investigation and then I had, you know, then

7   I had well, yeah, but look at the case, you know, look at

8   the case, but then they don't look at the cases because

9   judges' decisions are, you know, godlike.  (Laughter).  So

10  they don't review that.

11          THE COURT:  Well, right.  Okay.  So I'm going to

12  take a short break.  Five minutes, and I'll come back, and

13  if the parties have anything else they want to ask, I

14  think I may have cut you off, Mr. Chakravarty.  You're

15  welcome--

16          MR. CHAKRAVARTY:  I do have another question,

17  just one, one line of questions.

18          THE COURT:  Okay, so we'll do that, and so let's

19  just take a five minute break.

20  (Court in Recess)

21  (11:21:54 AM)

22  (Court back in session)

23  (11:37:37 AM)

24          MR. GOLD:  Your Honor, it's a, it's a work in

25  progress, but he's, he's been all right in the past couple

1  of weeks.

2         THE COURT:  Okay.  Mr. Chakravarty.

3         MR. CHAKRAVARTY:  Just have a couple of things

4  just to round out the record a little bit.

5  BY MR. CHAKRAVARTY:

6  Q    Mr. Kelly, I understand that it's good to hear that

7  you are feeling well and I, you said earlier that you're

8  not taking any med, any medications.

9      At any point have you taken any medications for, for

10 your kind of psychotropic aspects?

11 A    No.  I don't take medications.  I don't have to.  The

12 only medication I get is, I get a, every four weeks an

13 injection.

14 Q    Okay, but that has nothing to do with your mental

15 health?

16 A    No.

17 Q    After your last case you did go through some mental

18 health counseling?

19 A    Yes.

20 Q    Is that right, and then is it my understanding that

21 you mutually agreed that this was not useful for you?

22 A    That was my understanding.

23 Q    Did you, I'm just trying to get a sense, did you stop

24 that or did somebody else stop that counseling?

25 A    Well the, the, you know, what can I say?  I mean the

1  argument was, the at least the way I interpret the

2  argument, everything everybody told me and now they're

3  trying to tell me it's different, that the main problem I

4  had was I don't believe in money, you know.  My actions,

5  what I do is not based upon personal financial rewards, so

6  the things that I do cost me huge amounts of money which

7  basically I'm destroying my life trying to do things.  So

8  that was the counseling.  The counseling was to try to

9  explain to me that I have to be more concerned about my

10  personal life than, you know, how much, you know, I should

11  be more concerned about my personal life and not these

12  other issues, you know, so, you know, it was basically an

13  issue over, you know, well you have to worry more about

14  money than you have to worry about what's happening, and

15  like I said I, you know, I don't, to me money's just a

16  tool, but I guess I was spoiled because when I was, you

17  know, at least working when I got out of school, you know,

18  I was making more money out of school than I was making at

19  UPS loading trucks so I always had plenty of money.  So

20  money never was, you know, important to me until of course

21  I have none, you know, but, you know--

22  Q    So, so my, my, I'm trying to get at whether you said

23  I don't want to do anymore of the counseling--

24  A    Well we kept going there and, you know, basically,

25  you know, basically the, I guess it was a psychiatrist.

1    Was it Grey?  I don't know if it was Grey.

2    Q    There was a Dr. Grey who treated you before.

3    A    Dr. Grey.  Then it must have been Dr. Grey.  The name

4    is familiar.  You know, basically he was agreeing with me,

5    so were we making any progress or not making any progress,

6    you know, was just, yeah, you know, well yeah, you

7    shouldn't always be worried about money.  You shouldn't be

8    this.  You shouldn't be that.  You know--

9    Q    So--

10   A    --I was more concerned about, you know, well, you

11   know, my career was destroyed.  I couldn't do things

12   anymore.  I couldn't afford to build anything, you know,

13   so, you know, I was a little depressed over that.

14   Q    So this--

15   A    One of the main things I, you know, go ahead.

16   Q    I'm, was just trying to get this, when you say, you

17   weren't making progress and that's why you decided to stop

18   the counseling.

19   A    Well I don't know who decided to stop it because it

20   was I think the government was paying for it.  I, I don't,

21   I wasn't paying for it.  So it was just one of things

22   where well, you know, what is there to really correct if

23   like I said, is, is I, you know, I wasn't going to change

24   my opinion thinking that money was the most important

25   thing in the world, you know, that all my actions should

88

1  be based upon financial gain, but I, You know, I agree

2  with them that my actions, you know, my actions weren't

3  based upon financial gain, and that's what was causing me

4  my problems--

5  Q    So--

6  A    --because I could be in much better shape if, you

7  know, my motivation was based upon money.  That's what I

8  said.  I mean it's just if I just stayed at Mitre, where

9  it was boring, you just receive what I was referred to as

10  middle class welfare, I would have made millions of

11  dollars.  Now in Mrs. P's report, is it Mrs. P's report?

12  Yeah, she talks about how I thought my Nortel products

13  were worth millions of dollars.  Well I never thought me

14  Nortel products were worth millions of dollars.  Nortel

15  used my products to make billions of dollars by scamming

16  investors, but even if Nortel met the, the goals they had,

17  I still would have made a lot more money if I just was

18  sitting in a cubicle at Mitre, you know, and that's only

19  if they actually met their goals, but I wasn't building a

20  product for money or to get that.  What I was building the

21  product for was to get market access for another product I

22  had that I felt would, you know, I, I don't even think

23  there's any equal to it today on the market, but I, I felt

24  at least that was a direction to, you know, that was - the

25  goal of that product was, you know, really to advance

1  society.  It was to make, you know, well it was the next

2  generation of UI which I haven't really seen.  Google's

3  been trying it---

4  Q    Okay, I think that's a little farther beyond--

5  A    Okay.

6  Q    --what I'm trying to get to.  The, you know this

7  hearing to determine your competence--

8  A    Right.

9  Q    --is not a hearing to determine whether you are

10  mentally ill or not?

11  A    Right.

12  Q    All right, so do you think you are mentally ill?

13  A    I don't feel I'm mentally ill.

14  Q    So do you think you need any counseling or any

15  medicine for that?

16  A    I don't think so.

17  Q    Okay, so--

18  A    I'm, I, I, agree I think differently than other

19  people, but I don't think that's a mental illness.

20  Q    And that's the nub of what I'm trying--

21  A    Yeah.

22  Q    --my questions are just to make a record to see, to

23  give you a chance to explain how your belief system may

24  not be mental illness derived,--

25  A    Yeah.

1    Q    --and so you're explaining a lot in terms of your

2    grievances.

3         Do you think that your mental health and your belief

4    system is more or less the same or different somehow from

5    how it was 10 years ago after you met with Dr. Grey?

6    A    My well, I'm more concerned with money than I was

7    back then because I've had so little.  I mean like I said,

8    I, it never dawned on me that money was important and I

9    always, you know, I always got amazed by people who, you

10   know, were worried about money.  I, you know, that didn't

11   occur to me.  Now I realize why people worry about money

12   because like, you know, like I said, well, if you're going

13   up against the court, if you don't have money you can't

14   have your side heard.  So I guess there's a reason to have

15   money.  I didn't see a reason to have money because as far

16   as I'm concerned my side should be heard one way or the

17   other, whether I'm rich or poor.  I think that's part of

18   the oath.  I think the oath that the court takes is to

19   consider people, you know, rich or poor equally, but

20   that's clearly not done, you know.

21   Q    So is there a circumstance where the court disagreed

22   with you but you would still credit the legitimacy of the

23   court's judgment?

24   A    Oh, of course.  No, I, I everybody--

25   Q    Can you describe the type of circumstances?

1  A    --everybody keeps acting like I disagree, I

2  disagree, I disagree, but they don't, you know, you, you

3  have to give me something else to agree with.  I end up, I

4  have, I have a scenario.  Okay.  Is it right?  No, I, I

5  don' know it's right.  You know.  I, I think I think very

6  logically.  You know, it's like it said this is, you know,

7  I hate to say it but you know, my 66 statement.  I

8  explained a lot why from an intellectual standpoint it's

9  more likely that the prison I'm in goings to land on the

10 moon than it is for me to say that the court is correct in

11 their finding. Okay. That, that's, I don't for a moment

12 that my prison is going to fly off and land on the moon.

13 That's got an infinitely small chance of happening which

14 means it'll never happened, but it's not, it's based upon

15 theory.  It's based upon observation.  It's not based upon

16 abstract thought whereas the court's finding is based upon

17 abstract thought and that has zero probability of being

18 correct, you know, now if somebody wants to come over and

19 argue that, you know, and they can show me, you know,

20 something that I can put some validity in, I'm more than

21 willing to listen to that.  The problem is, is nobody ever

22 presents an alternative.  You know, you know, we were

23 talking here about, you know, my theory about Harvard or

24 Hanify and King and all this, well, what's the

25 alternative?  The alternative is well, you're wrong

1  because we, we don't agree with that.  Well, okay, but

2  why don't we agree?  You know, that's, that's where I

3  view, that's kind of the court's function.  That's kind of

4  these, these elements.  You, you should come in and we say

5  well we have this element, we have that element, we have

6  this element, you know, and together that, you know, comes

7  to a conclusion.  Now the elements may not be right.  That

8  can, you know, that could be a flaw there too, but you

9  know, at least if we agree upon elements, you know, that,

10  that's what abstract thought is.

11  Q    All right, so--

12  A    That's why I said is like the dictionary.  I mean if

13  you want to disagree with me what malicious means, well we

14  should start out with a dictionary because a dictionary is

15  that, you know, it's kind of what the agreement that that

16  word means, you know.

17  Q    So if, I don't have much more on this, but if we did

18  come to an agreement and we went through a trial in this

19  case--

20  A    Right.

21  Q    --and you agreed to the legal definition of what

22  malicious means--

23  A    Right.

24  Q    --and what, what fire means and all the elements of

25  that--

1  A    Right

2  Q    --and you were convicted of the crime,--

3  A    Right.

4  Q    --and you were convicted of the crime--

5  A    Yeah.

6  Q    --would that satisfy you're, you know, we'd sit down

7  and we'd agree over what the rules are,--

8  A    Well if I--

9  Q    --and then under the rules you did not prevail in

10 your case,--

11 A    Of course.

12 Q    --would you credit that determination?

13 A    Correct.

14 Q    And you understand the consequences of what that

15 might mean to you personally?

16 A    Correct.  Yeah, no, I, like I said is if a jury, if a

17 jury wants to find, you know, if the jury says that no, we

18 disagree, then I have to accept that.  I mean that's part

19 of the rules.  That's part of the system.  Okay, that's

20 what I said, is, is, you know, logically, and you know,

21 they say I don't accept things, but if you did read the

22 civil case there's no court finding I didn't accept.  I

23 just don't let it stop me.  So when they said I, my case

24 wasn't ripe for federal review because I didn't, because I

25 did not, you know, because I did not take what was it,

94

1  complete, you know, I didn't go after straight, state

2  remedies, well, it depends on how you look at that.  If

3  you look at that and you read the First Circuits appeal,

4  they said I had to do an inverse condemsation (sic) which

5  they implied was Chapter 79, but I couldn't do a Chapter

6  79 cause if I do Chapter 79, the first part of Chapter 79

7  is, is you, you, you, you enter a negotiation for the

8  amount of money you're going to get.  So there's a case

9  where I threw away, I threw away my option to ever get

10 paid for the land cause if I wanted to get paid for the

11 land, I had to forfeit my right to own the land, but I

12 didn't forfeit my right to own the land because I felt I

13 wanted to own the land rather than get paid for it.  So I

14 had to go to the, the state court.  So when I read that it

15 doesn't say that I have to file a Chapter 79, it only

16 implies it.  It said it the sentence before but it didn't

17 say it on the actual demand.  So that's why I did the

18 unjust enrichment case.  Now Judge Zobel threw out the

19 unjust enrichment case which he had every right to do.  I

20 wasn't arguing about it, I just felt that if Judge Zobel

21 wanted, you know, money, she's the best one to determine

22 how much money she wants in the unjust enrichment, but she

23 threw that out so I didn't appeal that because, you know,

24 according to the law that was valid for her to do.  So

25 then it spent five years in Massachusetts courts arguing

1   about, you know, arguing, well, they, they, the towns

2   that I had to file Chapter 79 complaint, and I said but

3   nowhere does it say I have to file Chapter 79 complaint,

4   could you show me where it says that, and all they would

5   say, well, we're offended by Mr. Kelly calling us liars

6   that it didn't say that, but, you know, to me the evidence

7   would say, you know, I can't prove something wasn't said,

8   but if they want to say something was said, they should be

9   able to show me the document that says that.  You know,

10  just because something's implied but it isn't said, I

11  don't dare, and that's why I ask the court to, you know,

12  refine that.  If you say I have to file a Chap, Chapter 79

13  complaint so that I can file a, a 42 1983 charge that my

14  land wasn't taken based upon who owns it, why not say

15  that.  Then I can do that without worrying that I lost my

16  right to own my property because I wasn't filing a Chapter

17  79 complaint to get paid for the property, I was filing,

18  which would show a, which would show a contract of good

19  faith, I was filing a, you know, I was filing it only

20  because the court required me to file it, but nobody would

21  ever show me that.  So like I say, when you say am I unre,

22  and don't I accept things, I, I feel I accept things.  I

23  just look for other ways around the problem, okay.

24  Q    All right, those are all my questions.  I want to

25  make sure you have an opportunity to say if there's

1    anything else to round out the record and also to make

2    sure that you're okay with not bringing in the, the

3    doctors who did those evaluations of, of you who I think

4    in your letters you wrote that basically you disagreed

5    with some of the conclusions based on the facts that you

6    may have told them?

7    A    Well--

8    Q    I just want to make sure that it's, that you're okay

9    personally with not having--

10   A    K--

11   Q    --cross examining them?

12   A    Could I just talk a little bit on this issue?  Okay.

13   The, the problem I have with the doctors' opinions and

14   that is I, you know, I spent most of my career working

15   with highly educated people.  I mean Bell Labs was known

16   for highly educated people, and, you know, even when they

17   made me a manager at GTE I think to punish me because they

18   felt I was complaining, I had three PhDs working for me

19   and even my best friend is a PhD, and so I have a little

20   bit of problem, not with PhDs per se, but I have a little

21   bit of problem when, you know, like the court wants to use

22   their conclusions.  That's, PhDs or doctors are highly

23   educated people.  They, part of the education process,

24   they lose the ability to do critical thinking.  They're

25   taught more how to think.  So in the studies, I mean

1  there, there's been studies that show it that they tend

2  to, they tend to follow patterns.  Okay, so when they make

3  their conclusions, their conclusions are not necessarily

4  valid, they're more following the pattern.  That's why I

5  suspect that these were more of a mercenary opinion than a

6  true opinion because the patterns they foun, the patterns

7  they followed.  Now the other thing about PhDs or well

8  they say more intelligent people, but people are better

9  educated and they're, they're extremely smart, okay, and

10  the thing is that they get confused and that's why, you

11  know, I don't really know too many PhDs are in positions

12  that they allow them to make decisions because they, they

13  literally get confused because there's just too much

14  information.  You have this, you have that, you have, you

15  know, and everything conflicts.  So with too much

16  information it's just as bad as too little information.

17  The facts are too confusing, so they really don't make

18  good decisions.  So the way I've always used PhDs is just

19  to talk to them to evaluate what they say because they

20  understand a lot of things and they know a lot of things

21  and they realize a lot of things that you would never

22  realize, and so when you talk to them you, they, they tell

23  you about things you didn't realize and they educate you.

24  So I really look at, you know, these reports where these

25  doctors should be able to educate me or at least explain

1  to me the details of why they feel the way they do.  You

2  know, that doesn't, you know, necessarily mean I agree

3  with them, but it's through those details I can understand

4  what they're doing, and my problem was that none of these,

5  either one of them got into any details.  That's what I

6  kind of wrote up in their statements.  The statements

7  were, you know, they were just drawing conclusions and,

8  you know, but they never asked me about it, and Miss

9  Pinellis actually, you know, she was upset because every

10  time I, I go on, on one of my trans, transit, well, my,

11  you know, one of, ramblings like I'm doing now, she kept

12  trying to bring me back but, you know, the, the thing is

13  that's what she needs to understand.  She needs to

14  understand the details, and then, you know, but I never

15  saw here get any of the details.  So I don't really

16  believe they have the details.  Now if they were here, or,

17  you know, what I would find interesting would be to see if

18  they really did somehow have the details without talking

19  to me, and then see if they, you know, if they had some

20  insight that I don't know.  That's, you know, that's the,

21  that's the issue.  I mean I never, like I said with, with

22  highly educated people making final decisions.  (Laughter)

23  I, they're, like I said they just have, they, they think

24  too much.  They have too much information to make those

25  decisions and they also think in a particular pattern, you

1    know, and I, I don't know, I guess, I guess I've always

2    figured that was my advantage.  I don't think in a

3    particular pattern.  I, my, my life has always been I make

4    mistakes and learn, continue on, you know, so.

5              THE COURT:  So Mr. Kelly, did you, were you, do

6    you--

7              MR. CHAKRAVARTY:  I'm done, Your Honor, thank

8    you.

9              THE COURT:  With regard to the two reports

10   because--    THE DEFENDANT:  Yeah.

11             THE COURT:  --I actually thought the reports

12   were well done, and I guess you and I have a difference

13   there,--

14             THE DEFENDANT:  Right.

15             THE COURT:  --you think there's not enough

16   detail and that they didn't try to explain things to you?

17             THE DEFENDANT:  Well, ye, everything I looked

18   at--

19             THE COURT:  Um-hmmm.

20             THE DEFENDANT:  What they got was wrong.  I

21   mean--

22             THE COURT:  Um-hmmm.  Well, let me just say

23   this.  Like with regard to I guess this is Pivovarova

24   (ph)--

25             THE DEFENDANT:  Yeah.

1          THE COURT:  --Pivovarova, I have trouble with

2    that too.  Her report.  So she says one problem is that

3    Mr. Kelly reports that if you were to go to trial on his

4    criminal matter he would relay all of the wrongs that the

5    town, various organizations and the court have done to

6    him.  As such any reasonable jury or judge could not find

7    him guilty of the criminal matter and she quotes you, "How

8    could anyone hearing what happened rule"--

9          THE DEFENDANT:  Yeah--

10          THE COURT:  --"that I was guilty"?

11          THE DEFENDANT:  --but that's heavily distorted.

12    I mean a lot of that is Mr. Hayne's point of view because,

13    you know, like he said that I, you know, I think I know

14    the law better than judges and lawyers.  He kept repeating

15    that and—

16          THE COURT:  But do you agree with this--

17          THE DEFENDANT:  --you know, in that particular--

18          THE COURT:  Do you think you would be able, at

19    your criminal trial would you be able to bring in all the

20    things that had been done to you in the past?

21          THE DEFENDANT:  No, I, I never said I would

22    bring in those things but, you know, part, that's why I

23    said when you talk malicious, well malicious is your

24    purpose.  I think I should have a right to discuss what my

25    purpose was.

1          THE COURT:  And so--

2          THE DEFENDANT:  You know, and my purpose was to

3    try to save my family's home, you know, and I really don't

4    think, you know, and that's where I guess we, we still

5    disagree.  Maybe I'll convert Mr. Gold but I, you know,

6    just of course I don't know, like I said I don't kn, I

7    know I under, I understand I think a little different than

8    most people, but most people I think would understand

9    that, you know, you have to protect your family's home.

10   You know, that there was a real motivation here.  The

11   motivation was not to cut some power lines cause yeah,

12   even the power lines we were talking about cutting

13   wouldn't have damaged, well, wouldn't, logic, whether, I

14   don't know whether you'd live through it, but they

15   wouldn't have damaged anybody.  They wouldn't, you know,

16   everybody's accusing me, oh, you're going to shut down

17   power.  Well, no, right in the criminal complaint you can

18   see I wouldn't have shut down power.  All I would have

19   done was raise the price of electricity and, you know, as

20   far as I'm concerned that's already been done because, you

21   know, by not, by just the Town of Chelmsford, you know,

22   we're paying more for electricity because they didn't put

23   the sewerage pumping plant where it belongs.  So--

24          THE COURT:  So at your trial, what would your

25   goal be?

1          THE DEFENDANT:  To be found innocent.

2          THE COURT:  And then what would the outcome of

3 that be?

4          THE DEFENDANT:  Well the outcome to the court

5 would be I was found not guilty.  My real goal would be

6 to, to be found innocent which is I think slightly

7 different than being not, found not guilty.

8          THE COURT:  So--

9          THE DEFENDANT:  But--

10         THE COURT:  --is there any possibility of being

11 found innocent at a trial?

12         THE DEFENDANT:  Well, yes, I can be found

13 innocent at a trial, but the court wouldn't care.  I mean

14 the court only cares if I'm found guilty.  You see

15 there's, you know, like in electronics you have two

16 states.  You have one or zero, but the reality is you have

17 three states.  You have a one or a zero but you also have

18 an undefined, okay, and I've used that a few times to get

19 around problems where I can actually pass, you know, three

20 bits of information on a single, well, on a single port,

21 on a single bit because--

22         THE COURT:  So how would you be, how would

23 someone be found innocent at, at a criminal trial?

24         THE DEFENDANT:  At a criminal trial the jury,

25 the jury can basically say, you know, I, I believe this to

1  be true because it's part of the constitution and part

2  of the concept of a fully informed jury, but a jury can

3  actually make a statement.  So this jury doesn't have to

4  say not guilty, you know, cause basically the question is,

5  is he guilty, and they, they can make any statements as

6  long as they don't say he's guilty.  The court assumes

7  that to be not guilty, but they can make additional

8  statements.

9          THE COURT:  Let's say that you're found not

10  guilty or you're found innocent--

11          THE DEFENDANT:  Right.

12          THE COURT:  --then what's the benefit to you

13  personally?

14          THE DEFENDANT:  Then I, I won the case and I get

15  to go free.

16          THE COURT:  And is that the end of it?  Does

17  anything happen to your house then?

18          THE DEFENDANT:  Well, the issue on the house is

19  still, then we have to go back and, you know, I have to go

20  back and start the, hopefully find out exactly where the,

21  the Town of Chelmsford case is with Judge Casper and

22  hopefully get that going, you know, and then start

23  pursuing that.

24          THE COURT:  So this is just a sideline, the

25  criminal trial?  It doesn't have any effect on what

1  happens in any of the other cases?

2         THE DEFENDANT:  Well that's what you're, yeah.

3  This, this trial doesn't have any effect on what happens

4  in the other cases.  That's, you know, that's not an

5  issue--

6         THE COURT:  So why--

7         THE DEFENDANT:  --okay but I hope that, you

8  know, when I say it doesn't have any effect, everything

9  has an effect on other things okay.  I hope the fact that

10 I've gone through this helps encourage, you know, other

11 peo, you know, in like say the case with Judge Casper, she

12 knows that I went through this that maybe I am serious

13 about having this other case heard and maybe she won't

14 just say, well, who cares, frivolous, get rid of it.  You

15 know, so, because I mean it's a little bit of evidence

16 that I at least think it's serious and I would think, you

17 know, I would hope, I don't know, I, you know, I would

18 hope that maybe the court would take the other case

19 serious because of all the problems that were created.

20 So, you know, you had this criminal complaint against me

21 or this criminal case against me that I, you know, was

22 found not guilty of, depending on how you want to view it.

23 That's why I said is if I was found innocent I would feel

24 that's more positive because the jury is actually saying

25 well, no, we kind of agree with what he did, you know,

1   but, you know, they can say they agree with what I did

2   or they can say I'm not guilty of the crime that I've

3   been, you know, but, you know, then I hope that a judge,

4   you know, or hope that in the other cases that people

5   would kind of look at the fact that I went through this

6   just to try to get a hearing cause I think it's horrible

7   that when you really look at and you really think all I'm

8   complaining about is I'm not even, I'm not even to the

9   point, I'm just trying to get the right, to think I have a

10  right to own property.  I'm not even to the right of

11  whether or not I have a right to own property.  It's just

12  whether or not I have a right to think I have a right to

13  own property, and I'm going through this in hopes that at

14  least it'll break the right to think I have a right to own

15  property.  So maybe then it's only an issue of whether or

16  not I have a right to own property because that, that is

17  the case.  That's the case I wanted to have heard.

18          THE COURT:  So what if you went to trial the

19  result was guilty?

20          THE DEFENDANT:  Yup.  Then that of course is

21  delayed for the five years I spend in prison if I live

22  that long because I don't know whether I can pursue - I, I

23  don't know what the rules are.  I mean like right now they

24  won't allow my pursue civil cases which I find is wrong

25  cause I'm not guilty of anything.  I should have a right

1  to be pursuing these civil cases but I can't.

2         THE COURT:  Why not?

3         THE DEFENDANT:  No, no, no way of doing it.  I

4  can't, I can't type anything.  I can't look up anything.

5  I can't, you know, I'm, I'm stuck, you know, I'm stuck in

6  a cell.  There's nothing to do, nothing to read, nothing

7  to, you know, the, well, read is insipid novels, but I

8  mean there's nothing I can read that I would enjoy,

9  nothing I can research and I can't access any of the files

10  so I can't, you know, so how can I, you know, how can I

11  pursue any criminal case, I mean civil case, sorry.  You

12  know, I have two civil cases in this court and both of

13  them I hope are on hold.  Again I don't know.

14         THE COURT:  Well I think I can tell you they are

15  both on hold.

16         THE DEFENDANT:  Okay so--

17         THE COURT:  They are.

18         THE DEFENDANT:  Right.  So hopefully once I, you

19  know, if I'm found guilty, I don't know if I can then get

20  them off hold because when I'm guilty I would at least

21  have more rights.  Right now as far as I can tell I have

22  absolutely no rights.  When you're found guilty, you know,

23  maybe you would be put someplace where, you know, you have

24  access to, you know, copying, document writing,

25  documentation, you know, access to information.

1        THE COURT:  Yeah.

2        THE DEFENDANT:  You know, I think, you know,

3   that's one of the things that has really shocked me that

4   this is the, you know, the criminal procedure.  I mean the

5   criminal procedure is to put you someplace where it just,

6   you know, basically it's gangs and, you know, it's, it's,

7   if you want to, if I really wanted to say things, I mean

8   if this is doing anything it's making me think that we

9   even have more problems in society because what I see

10  there I mean I just filed a complaint last week, you know,

11  trying to get them to do something to create, to stop

12  fights.  Well they ended up creating two fights last week

13  and the one guy who I kind of liked, he was a good guy,

14  you know, he got hurt real bad and, you know, this was

15  just because they won't follow the rules.  They have

16  documented rules.  They have documented policies at the

17  prison and they refuse to follow those, and the result is,

18  is this what I call pri, drug and prison mentality cause

19  that's all the prisons are doing, they're just creating

20  this particular mentality, and then in order to protect

21  yourself you have to be basically part of a gang.  So

22  they're going out of their way to create this horrible

23  environment, and I think, you know, like I said it, if,

24  you know, I don't want another war but it's kind of like

25  another wrong I see that could easily be corrected.  You

108

1  know, it wouldn't be difficult for them to correct it

2  if they just, you know, in this particular case it was

3  these guys kept moving their chairs over blocking up the

4  road, blocking off the aisles.  So I don't know if they

5  were doing it so I couldn't walk or whatever it was

6  because, you know, I try to walk because I can't watch

7  T.V., can't read the newspaper, so I've been walking a lot

8  and, you know, cause I'm healthy now.  I mean I've gained

9  25 pounds so--

10       THE COURT:  You look a lot better than you did.

11       THE DEFENDANT:  You know, I'm, you know, I feel,

12  I feel better than I did two years ago.

13       THE COURT:  Um-hmmm.

14       THE DEFENDANT:  You know, so, the, you know, so,

15  what was I trying to say?  I guess I'm just trying to say,

16  you know, so, you know, I see these battles--

17       THE COURT:  Right.

18       THE DEFENDANT:  --and I, you know, they got

19  nothing to do here but, you know, I have nothing better to

20  do.  If I, if I could access civil cases then I would be

21  filing, you know, I'd be filing charges against the prison

22  to force them to respect their documented policies.

23       THE COURT:  Right, okay.  Okay, so I'm happy to

24  hear argument.  I'm happy to read it if you want to file

25  something.  I will give you whatever time you need.  Would

1  you like to go back and sit with Mr. Gold or you can

2  stay there if you're comfortable there.

3          THE DEFENDANT:  I'll be, I'll be back--

4          THE COURT:  Okay.  So I will say one case that I

5  found that I thought was interesting was the Elaine Brown

6  case.  It's a 2012 case, 669 F.3d 10 and it has to do with

7  the competence of one of these kind of well-known tax

8  evaders.  People who believe the tax system doesn't apply

9  to them and whether that, the fact that the person seemed

10  to have a delusional kind of paranoid set of beliefs about

11  the tax system and the government made them incompetent

12  which the First Circuit said no, but I think the

13  difference, one of the differences between that case and

14  this case is that there was no diagnosed mental health

15  issue which there is here.

16          So, so anyway what's your pleasure Mr.

17     Chakravarty?

18          MR. CHAKRAVARTY:  I think having some time to

19  marshal what might be constructive and useful, I think the

20  tax protestor cases are important.  I think that to the

21  extent that highlighting aspects of the record that might

22  be useful to you signaling that to us or you tell us now

23  then that would help us maybe marshal things from the, the

24  things that Mr. Kelly has filed, his testimony, the things

25  in the report, particularly with an eye towards the

1  causation between mental illness and it's manifestation

2  which is, I, and my questions were designed to try to

3  tease that out a little bit.  I've discussed that at

4  length with Dr. Pinellis and I think that some exploration

5  of where the line is between say a deeply held belief

6  versus a, a delusional belief that is the result of a

7  diagnosable illness such that it crosses that competency

8  line is, it's something that merits scholarship.  Even if

9  we don't have to decide all of that in this case, it's

10  kind of been brought to the fore in this case so I

11  figure--

12         THE COURT:  Um-hmmm.

13         MR. CHAKRAVARTY:  --that it would be helpful.

14         THE COURT:  I mean I do think the case presents

15  a kind of unusual set of circumstances where you have

16  someone like Mr. Kelly who's very intelligent, he's

17  rational and seems to be a good communicator and a good

18  listener, but my main concern at the outset of the hearing

19  was that he believed he was just being set up, everyone is

20  corrupt, it's all a conspiracy against him, and I think to

21  some extent he repudiated that here.  So that to me I just

22  think it would be a violation of due process and the kind

23  of cruelty to put a mentally ill person on trial when they

24  had delusional beliefs about everyone around them and the

25  purpose of the hearing and that they were being tried for

1  a non-crime or that their, the prosecutor was corrupt

2  and getting paid under the table to prosecute him and so

3  on, and I think if that's the case we have a problem.  I

4  wasn't really hearing that but I think I will order a

5  transcript and I can get, and I think Judge Burroughs is

6  going to want it and I can get one pretty quickly.  So

7  you'll see it on the docket and we'll order that today and

8  sometimes it takes two days or something like that, but I

9  do think regardless of my decision we still, Judge

10  Burroughs is the one who makes the final decision and she

11  may want to have a hearing especially if the decision is

12  contrary to two doctors' reports.  So this may not be

13  quite the end of it yet but, so, okay, so perhaps we'll

14  get the transcript, yes?

15            MR. GOLD:  And then two weeks from the

16  transcript for filings to send?

17            THE COURT:  Okay, and if you--

18            MR. GOLD:  Or is that too long?  I--

19            THE COURT:  Well, I'll give you two whatever

20  time you need I'll certainly give you.  If you get them in

21  sooner than that, then we can also start doing our work

22  sooner than that, and I hope we would get something done

23  pretty quickly after receiving your filing.  So two weeks

24  is fine, and if you find you need more time you can ask

25  for it, Mr. Gold, but, and I'll certainly give it to you,

1   but that's a, I think that's a good deadline.

2            How about you Mr. Chakravarty?  Do you--

3            MR. CHAKRAVARTY:  That's, that should be fine

4   for me, Your Honor.

5            THE COURT:  That's fine.  So I think also if the

6   parties decide they want other witnesses you might want to

7   let the Court know right away,--

8            MR. GOLD:  Okay.

9            THE COURT:  --and if we hear nothing, we'll

10  presume that there are no further witnesses.  I'm going to

11  assume that there's no dispute about the admissibility of

12  the reports and there's no disclosure disputes over one

13  side disclosing something to the other and that I'm going

14  to assume--

15           MR. GOLD:  Well--

16           THE COURT:  --no one admits, no one objects to

17  the admissibility of the evaluation reports that I am

18  considering them?  Yes?

19           MR. GOLD:  I just have something to say.  On the

20  docket I filed a, I consulted with Dr. Pivovarova and I

21  met with Mr. Kelly along with her for an update.  I don't,

22  I'm not calling I'm just alerting the Court to that.  I

23  think that's, and, and, Mr. Chakravarty, I don't know if

24  the Court wants to.  I actually am taking a position here

25  regarding competence so I don't see her, an updated

113

1   opinion from her as being helpful to that position.

2   Her position is that she continues to think he's not

3   competent, but the Court may want to or want me to take

4   some action or, or something like that, but just for the

5   record, a week ago Friday we had a, we had a further

6   interview with Mr. Kelly.

7            THE COURT:  Okay, and would it be at all helpful

8   to the parties to have a pre plea PSR done just on the

9   guideline range?  Do the parties need that?  I mean I

10  don't have the authority to order that but Judge Burroughs

11  would if the parties were interested in that.

12           MR. GOLD:  We'll think about it.

13           MR. CHAKRAVARTY:  I certainly have no objection

14  to it, but--

15           MR. GOLD:  Maybe we'll ask Judge Burroughs for

16  that.

17           MR. CHAKRAVARTY:  In terms of your last

18  question, Your Honor, because they're already part of the

19  docket, I don't think we need to specially mark the

20  complaint and the letters that are on the docket from Mr.

21  Kelly.  There may be other things that he has filed that

22  did not make the public docket which I wouldn't have

23  access to.  If the Court is to consider those things, then

24  I would ask that I get access to it, but otherwise--

25           THE COURT:  I think everything's on the docket

1    but we'll check.  I can't think of anything that I

2    haven't printed off the docket to look at, so, but we'll

3    check on that.  That's a good point, and I also am

4    assuming, Mr. Gold, that, you know, the first time I asked

5    you did you object to, or it could've even been Mr. Hayne,

6    to Mr. Kelly's statements going on the public docket and

7    there was no objection, and now I notice they've just been

8    getting put on the docket and is that, will that continue

9    to be okay?

10           MR. GOLD:  Yes, you did ask me and I didn't

11   object.  I think Mr. Hayne may have objected.

12           THE COURT:  Okay.

13           MR. GOLD:  You know, I, I'll talk with Mr. Kelly

14   about what I thinks, think he should do and he'll take,

15   you know, I mean I've seen this play out in different ways

16   in different cases.  Sometimes the court simply doesn't

17   accept filings or puts an order out there that they won't

18   accept filings from a defendant in Mr. Kelly's position.

19   I don't think Judge Burroughs or anyone is doing that here

20   and I, you know, I've talked with him in general terms

21   about what, what that means.  Mostly, we've been looking

22   at it as a potential positive cause he gets some of the

23   things that are important to him on the, on the record.

24           THE COURT:  Well, if you should decide things he

25   is sending in do not belong on the docket or if you want

115

1   us to stop docketing them, then you can certainly let

2   us know and we'll figure out what to do when things like

3   that come in.

4          MR. GOLD:  Okay.

5          THE COURT:  Okay, so anything else?

6          MR. CHAKRAVARTY:  Just to ask to exclude time

7   until the next hearing or decision, Your Honor.

8          THE COURT:  Okay, and I think what we'll do just

9   to keep things rolling is if you have two weeks to file

10  something, that puts us to the 22nd and if I am able to get

11  something out say by the 29th, then you will have a certain

12  amount of time to object which I think is 14 days.  You

13  could notify Judge Burroughs that you have no objection or

14  not, I mean whatever you wish to do but that would speed

15  up her review, but I think just to keep ourselves from

16  having this fall out of sight, maybe we'll set status date

17  of Monday, December 12th at 10:30, and you can appear by

18  phone if you want to, and we'll just check in and see

19  where we are and if there's anything I can do for you?

20         MR. GOLD:  Yes.

21         MR. CHAKRAVARTY: Thank you.

22         THE COURT:  Okay, and obviously if you want Mr.

23  Kelly brought in for that, that's fine, or if it's just a

24  phone conference and,--

25         MR. GOLD:  Okay.

1          THE COURT:  --it's up to you and Mr. Kelly

2   what you want to do, but, Mr. Kelly, I want to keep the

3   case on the radar so, and I think I'll also tell you, Mr.

4   Kelly, you do have two civil cases in this courthouse.

5   One is before Judge Casper.  One is before Judge

6   Burroughs.  Judge Burroughs knew that you were appearing

7   before me for a question of competency and there's a

8   rather complicated body of law on whether someone has

9   been, who has been found incompetent in a criminal case is

10  then competent in a civil case, to prosecute the civil

11  case.  So we've researched that and it's a complicated

12  question, and we just tabled that until this issue got

13  decided because if you're found to be competent there's no

14  problem.  If you're found to be incompetent, then some

15  findings will need to be made in that case, and for that

16  whole question, Judge Burroughs has referred that to me.

17  The district court judges can refer things to the

18  magistrate judge, and she thought since I was doing this

19  competency hearing, if I found you incompetent I would be

20  in a good position then to make a report and

21  recommendation on the other case too which makes sense.

22      So anyway that's what's happening and I don't want

23  you to get paranoid about it so I'm telling you now, okay,

24  cause this, so far everything that's happening is by the

25  book.  No one's doing anything weird in your case.  It's

117

1  all above board okay.  Okay, so and if you have

2  questions about the civil stuff, that's not really Mr.

3  Gold's area of expertise but I'm sure he can answer

4  questions about what's happening with the docket and that

5  type of thing, and also you can write the clerks and ask

6  for a copy of the docket and a copy of filings and Mr.

7  Gold could help you figure out how to do that cause you

8  are entitled to know what's happening with your civil

9  cases for sure, okay.

10       Okay so is there anything else that we need to

11 cover here and if there is that I'm really happy.  If you

12 think of something afterwards or there's something else

13 that comes to mind just contact Ms. Moore.  We can put a

14 phone conference together very quickly or whatever the

15 parties wish to do.

16       MR. GOLD:  Great.  Thank you.

17       THE COURT:  Okay.

18       MR. CHAKRAVARTY: Thank you, Your Honor.

19       THE COURT:  Okay, thank you.

20 (Court adjourned)

21 (12:23:55 PM)

22

23

24

25

118

1                           CERTIFICATION

2        I, Maryann V. Young, court approved transcriber,

3   certify that the foregoing is a correct transcript from

4   the official digital sound recording of the proceedings in

5   the above-entitled matter.

6

7   /s/ Maryann V. Young              November 16, 2016

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**_MARYANN V. YOUNG_**
**Certified Court Transcriber**
**(508) 384-2003**