UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES OF AMERICA )<br>)<br>v. )<br>)<br>DANNY M. KELLY )<br>    Defendant )<br>) | Criminal No. 16-10159-ADB<br>**FILED UNDER SEAL** |

## GOVERNMENT'S POST- HEARING MEMORANDUM ON THE DEFENDANT'S COMPETENCY

The United States of America respectfully submits this memorandum in connection with the competency hearing under 18 U.S.C. § 4247(d) held on November 8, 2016 upon the Court's motion. This memorandum supplements the government's pre-hearing memorandum. (Dkt. 52).

At the hearing, the parties agreed that the court could consider the facts in the record of the case, including reports of two mental health professionals who evaluated the defendant for purposes of the competency determination without an order under 18 U.S.C. §4241. (Dr. Pivovarova's report is hereinafter referenced as "Piv" and Dr. Pinals' report is referenced hereinafter as "Pinals".) The parties agreed to waive cross-examination of these professionals. The defendant testified at length (Dkt. 55 (Transcript)).

### INTRODUCTION

In light of the totality of the evidence, the government's position is that despite the opinions of the two doctors who evaluated Mr. Kelly several months ago, Mr. Kelly is in fact "able to understand the nature and consequences of the proceeding against him [and] to assist properly in his defense." *See* 18 U.S.C. § 4241(d). Under § 4241, to be found incompetent, it must be established by a preponderance of the evidence that Kelly lacks mental competency to stand trial. *Cooper v. Oklahoma*,

517 U.S. 348, 361 (1996). As articulated in *Dusky v. United States*, 362 U.S. 402 (1960) the Supreme Court articulated a general two-part competency standard which considers first, "whether [the defendant] has sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding" and second, "whether [the defendant] has a rational as well as factual understanding of the proceedings against him." *Dusky*, 362 U.S. at 402.

While the conviction of a person legally incompetent to stand trial violates due process, *see Johnson v. Norton*, 249 F.3d 20, 26 (1st Cir.2001), it is similarly repulsive to have a sane person hospitalized against his will. *See generally Lynch v. Overholser*, 369 U.S. 705 (1962). To be competent, the defendant must have sufficient present ability to consult with counsel with a reasonable degree of rational understanding, and have a rational and factual understanding of the proceedings against him. *See United States v. Ahrendt*, 560 F.3d 69, 74 (1st Cir.2009). This requires an "intensely fact-based" inquiry in which an evaluating doctor's analysis is not dispositive. *See United States v. Mahoney*, 717 F.3d 257, 265 (1st Cir. 2013)(citing *Pike v. Guarino*, 492 F.3d 61, 75 (1st Cir.2007)). As the First Circuit has stated, in close cases where there is medical disagreement, "courtroom scrutiny" places the court in a better position to assess the rationales of medical opinions. *See United States v. Giron-Reyes*, 234 F.3d 78, 82 (1st Cir. 2000). Courts can and should form their independent judgement as to whether an expert's opinion is sufficiently factually predicated, reflective of a moment in time, and/or whether intervening events render it less helpful. *See, e.g., United States v. Casteel*, 717 F.3d 635, 643 (8th Cir. 2013); *see United States v. Taylor*, 437 F.2d 371, 380 (4th Cir. 1971)(Sobeloff, C.J concurring in part dissenting in part)( "The cases make it abundantly clear that it is for the fact finder to ascertain the mental condition of the accused; the issue may not be left to the mere conclusions of the experts. This principle applies with equal force to the judge's determination of competency, *Holloway v. United States*, 119 U.S.App.D.C. 396, 343 F.2d 265 (1964)"[.]).

"The 'understanding' required of a defendant is merely of the essentials—for example, the charges, basic procedure, possible defenses—but not of legal sophistication." *United States v. Brown*, 669 F.3d 10, 17 (1st Cir. 2012)(citing *Robidoux v. O'Brien*, 643 F.3d 334, 339 (1st Cir.2011)). There are important observations from the *Brown* case with respect to the factors that fueled the argument of the defendant's potential incompetence. In *Brown*, Edward Brown exhibited atypical legal beliefs, overall distrust of the legal system, even mistaken understandings of the law, but these factors did not indicate incompetence. *Id*. He similarly evidenced loose adoption of anti-government ideation, such as questioning the jurisdiction of the Court, which is more widely-held than many understand, and there are entire movements based on these notions. *See, e.g.*, Antigovernment Movement, Southern Poverty Law Center, available at https://www.splcenter.org/fighting-hate/extremist-files/ideology/antigovernment (last checked on Dec. 15, 2016 )("Sovereign citizen ideology is complex and bizarre and they are best known for clogging up the courts with indecipherable filings and liens targeting public officials. When cornered, many have lashed out in rage, frustration and, in the most extreme cases, acts of deadly violence, usually directed against government officials.") Mr. Brown also thought he would be able to introduce evidence of corruption from his previous court case. *Id*. at 19. This characterizes the constellation of factors that led Dr. Pivarovarova and Dr. Pinals to suggest that the defendant's understanding of the legal process in this case was controlled by delusional symptoms.

For his part, the defendant has repeatedly indicated that his desperation that led to the events in this case was exacerbated by his perceived failing health, and he has steadfastly maintained that he is being persecuted for making a political statement. *See, e.g.*, Dkt. 47:3; 15-cv-14219-ADB (Dkt. 1).

.

The requisite test, of course, is not whether the defendant suffers from some mental illness, but rather whether that mental illness prevents the defendant from adequately being able to consult with his lawyer and understand the proceedings as *Dusky* lays out. *See United States v. Wiggin*, 429 F.3d 31, 37 (1st Cir. 2005)("Competent people can and do make decisions which others consider irrational."). Neither has been proven here.

In tax protestor cases, it is often the case that a defendant maintains deeply held and incorrect beliefs about how the law formed, how it should be implemented, and whether their understanding is a viable defense in the criminal case. *See Robidoux* at 339 ("This is a misunderstanding of the law, but it seems to be a common illusion among certain groups alienated from society and is often reflected in doctrinal writings parroted in pleadings. It does not prevent a defendant from knowing that the government has put him on trial, recognizing the procedures to be used, or appreciating advice that lack of authority claims will not constitute an effective defense.") Tax protestor cases often involve a mélange of sovereign citizen ideology and diminished mental capacity based on delusional ideology, but these ideologies do not preclude an understanding about how the conventional law works, and what the consequences of their alternative world-view are. *See United States v. Croteau*, 819 F.3d 1293, 1302 (11th Cir. 2016). As Judge Stearns has pointed out in compelling a tax protestor suffering under such delusion, such ideology has existed since 1948, and yet since then scofflaws are fairly required to comply. *See United States v. Puccio*, 2011 WL 2604734 (D.Ma. 2011)(Stearns, D.J.)(unpublished)("This is not a new argument—it has been asserted in the federal courts since at least 1948 and has failed in every venue in which it has been raised.") The fact that the defendant has also adopted a world-view based on a strained and misguided understanding of nonsensical propaganda, the law, and personal history does little to inform whether he understands how a criminal trial works and how he can assist in his defense.

Similarly, in terrorism matters, it is not unheard of to have a low-functioning defendant commit a crime, admit to the crime in the face of extraordinary punishment, and then explain why he did the crime to further a delusional belief system. *See, e.g.,* Sentencing Transcript in *United States v. Reid* ("the Shoebomber case"), 02–10013–WGY, available abridged at http://www.cnn.com/2003/LAW/01/31/reid.transcript/. These defendants are not incompetent. Some unhinged individuals understand what the stakes are, and they engage in dangerous behavior to make their point anyway – that does not make them incompetent.

Many of the factors that gave rise to the court's concerns that prompted the competency hearing in this case were also evident in *United States v. Kenney*, 756 F.3d 36 (1st Cir. 2014). There, the First Circuit pointed out that many of these concerns, "are endemic to the criminal justice system." *Id.* (citing James & Glaze, Bureau of Justice Statistics Special Report: Mental Health Problems of Prison and Jail Inmates 1 (2006) (reporting that 45% of federal prisoners in 2005 suffered mental health problems).). In the *Kenney* case, as in *Brown* before it, and in this one, the reason for any *prima facie* concern was largely attributable to concerns first raised by defendant's counsel. *Id.*

Here, the defendant has changed the counsel who had raised this issue over the defendant's objection, and the evidence in fact shows the defendant has meaningfully consulted present counsel extensively, far in excess of the standard of a reasonable degree of rational understanding. *See Ahrendt*, 560 F.3d at 74; Dkt. 55. The evidence also shows that the defendant has a rational and factual understanding of the proceedings against him, as well as a legal sophistication that allows him to meaningfully participate in legal strategy and to distinguish what is against his penal interest.

In *United States v. Figueroa-Gonzales,* the First Circuit affirmed a conviction of a very low-IQ defendant who had been found to be incompetent by two psychologists. 621 F.3d 44, 47-48 (1st Cir. 2010. The First Circuit reviewed the record *de novo* and found, *inter alia,* that the underlying

5

conduct and necessary mental acuity were probative factors, and that a defendant's competence can change over time as some of the stressors dissipate. *Id.* at 47-48. While in that case, one of the psychologists offered circumstances of medication in which the defendant might become competent, a separate BOP evaluation with a competency finding occurred only after the initial competency hearing. *Id.* The case continued toward trial and the First Circuit indicated it was not necessary to hold another competency hearing after that evaluation since the defendant had not theretofore been found incompetent by a court. *Id.* at 48. Consequently, a psychologist's report was not dispositive -- as long as the countervailing evidence demonstrated that the preponderance burden had not been met, the defendant was competent at the time of the hearing.

## **FACTUAL APPLICATION**

### A. Background

The defendant has not been formally diagnosed with a mental illness, nor has he been treated over any time other than the few weeks he attended counseling as a condition of his probation in his previous case. In that case, he was found to be competent in substantially similar circumstances for similar (albeit less dangerous) crimes, with a similar mental state in this Court. *See* 05-CR-10173-JLT.

The defendant has filed numerous civil lawsuits over the past 15 years, and a review of the record reveals that he sought relief on various unconnected issues, which were often dismissed without a hearing. Throughout those lawsuits, the defendant has claimed that the Court system is corrupt, inasmuch as he was seldom getting an opportunity to be heard. Notably, in the weeks leading up to the crime alleged in this case, the defendant was praying for relief in some of those cases, and was growing increasingly exasperated at the lack of progress in his quest to be heard. *See, e.g.*, 15-cv-14219-ADB (Dkt. 1)(Complaint)(filed Dec. 22, 2015)(indicating defendant's health is deteriorating), ((Dkt. 13)(Settlement Proposal)(filed March 29, 2016), (Dkt. 9)(Reply to Answer)(filed Feb. 18,

2016); 16-cv-10560-DJC (Dkt. 1)(Complaint)(filed March 17, 2016); 01-CV-10635-RWZ (Dkt. 20)(Letter to Seventh Circuit)(filed March 15, 2016). In one pleading, he foreshadowed this case if he did not get a chance to be heard in the courts, specifically referencing that he had alternatives to filing law suits, but recognizing that to do so would not "be appropriate in our society", referencing his prior case in which he cut down 18 communication lines. 15-cv-14219-ADB (Dkt. 9:3).

The relatively sophisticated operation involved in the instant crime (assembling, creating, testing and deploying multiple thermite devices in order to cut through cables that could not be cut with ordinary saws, targeting highly elevated international power lines and devising a technique to suspend the thermite devices), as well as the typed message left at the scene of the crime, are all indicative of a deliberate, logical escalation related to grievances for which the defendant was effectively being ignored. *See* Dkt. 1 (Complaint); *see also* Dkt. 43-1 (Defendant Statement on Sep. 29, 2016).

The defendant's competency called into question by his previous attorney in this case, Mr. Hanye, based this on his stated difficulty to effectively communicate with the defendant and to shape his case. Accordingly, as a strategic move, Mr. Hanye chose not to invoke Section 4241, but rather to seek an independent evaluation from Dr. Pivavorova, who concluded that the defendant had a delusional disorder which impaired his competence. Piv. at 11. That gave rise to the question of competence and set us on the path to this hearing which the defendant has opposed, but cooperated with.

B. The Defendant's Testimony (Transcript is "Tx" (Dkt.55)

The defendant steadfastly maintained that he was competent and accurately explained the purposes of the competency hearing. Tx. 18-19. The defendant recognized the competency hearing was not related to the grievances that he had raised in his previous civil pleadings. Tx. 20-21. The

defendant understood the criminal charge against him and its elements. Tx. 21-22. The defendant understood viable defenses to the criminal charges, including necessity and the lack of requisite mental state. Tx. 22, 24-25, 29. The defendant had an elevated appreciation for the state of the law on malice, appropriately citing to a Fourth Circuit Court of Appeals case he had discussed with his attorney which was comparable to this case and which analyzed whether the malice element was met in Section 844(i) cases. Tx. 25-27; *United States v. Gullett*, 75 F.3d 941 (4th Cir. 2008). Although that case tended to undercut an elevated intent requirement which may reduce its viability as a defense, the defendant agreed to discuss with his counsel whether it was a reasonable risk to take before a jury. Tx. 29. Conversely, the defendant had been persuaded by his counsel that a necessity defense was not viable at all. Tx. 30. The defendant maintained the fact that he was not guilty, because he felt his conduct didn't meet the elements of the offense. Tx. 30-31.

The defendant was accurate in his understanding of the potential sentencing consequences from a conviction on the present indictment. Tx. 32. The defendant appreciated that a plea bargain could reduce his exposure to prison and was willing to consider that to accomplish his objectives. Tx. 33. The defendant said that he had taken the expedient option in his last criminal case by pleading guilty pursuant to a plea bargain. Tx. 33.

The defendant explained that he felt he was left with no choice when he had committed his previous crime, Tx. 36, and stated that there was no connection between this case and his previous grievances against Nortel, his former employer. Tx.37-38. The defendant said "I understand that this is a criminal case against me, okay, and I view that differently than I view the reasons that, you know, the reasons I took my actions. You know, the reason I took my action wasn't because of Nortel." Tx. 38.

The defendant explained that what he had been trying to do was to "make a political statement about how [he had been] mistreated and everything else. That's my point of view that, you know, this was, you know, I have to do something." Tx. 38; *See also* Dkt. 62 (Statement of Defendant filed December 13, 2016). He repeated, "I really just made a political statement." Tx. 39.

His goal was to go to trial -- "... all I wanted was a trial." *Id.* at 39-40. The defendant explained that the purpose of his filing civil lawsuits was to solve small but obvious problems for the public, a sort of private attorney general. Tx. 40-41. The defendant asserted that taking the action he did to cause this case was an attempt to draw attention to a societal problem, despite understanding that he might be charged with a crime. Tx. 41-42. The defendant and his counsel maintained that he could mount a defense by challenging the proof as relates to whether he had the mental state required to commit the crime. Tx. 43-45.

The defendant said the underlying facts of this case were the result of an act of desperation to get attention to a cause that abstractly is in the public interest. Tx. 45. The defendant was suspicious of the fair treatment that he would receive in court not because of a vast conspiracy, but rather because he has not seen courts take his lawsuits seriously. Tx. 48-49. He has not been to trial in any of his cases. Tx. 49. If he lost at trial, the defendant would not necessarily take that to mean that the court was corrupt, citing to an interpretation of judicial history which is similar to an interpretation of judicial function (shared by some within anti-government movements like Sovereign Citizens). *See* Tx. 50. The defendant's arguments related to his underlying civil claims logically connect the harm done to him to a cause of action, for example, by claiming a 'taking' constitutes a violation of Section 1983. Tx. 51-52.

He summed up the motive for his actions as "[to try to] get a valid hearing on the civil case." Tx. 53. The defendant expressed desperation that, short of engaging in the instant conduct, he did not

9

have another means to throw "the limelight" on the court, because the media had been ineffective. Tx. 55.

The defendant denied believing that there was a conspiracy against him, but felt the response to his actions has been disproportionate. Tx. 56. The defendant recognized one of the delays in proceeding toward trial was the competency determination process, which he attributed to his former counsel. Tx. 58. The defendant was concerned that the delay would jeopardize the efficacy of a trial if the limelight had gone away. Tx. 58. In order to preserve the limelight, the defendant has written to newspapers during this case. Tx. 58. The significant problems that the defendant had with his previous attorney do not exist with Mr. Gold. Tx. 59. The defendant was pragmatic and was willing to listen to the advice of his counsel in the case. Tx. 59.

The defendant indicated that the problems that gave rise to his behavior would not be solved by his release. Tx. 60. If he did not have a hearing in his case, he does not know what he would do next. Tx.61-62. The defendant expressed frustration that in previous cases, he was told that he needed a lawyer, but he couldn't afford one. Tx. 63-64.

The defendant understood the prosecutor's function. Tx. 64-65. He identified a potential defense strategy to challenge whether the brush fire was caused by an attempt to take down powerlines, thereby preventing the government from meeting all the elements of the charged offense. Tx. 65. The defendant believed that the evidence, even if uncontested, does not necessarily satisfy the legal elements. Tx. 66. The defendant also understood that characterizing the thermite devices that he created as "cutters" would be detrimental to his penal interests at trial. Tx. 67-68. The defendant said the government bore the burden of proof, and he did not concede that that burden would be met by the evidence. Tx. 67-68.

The defendant's grievances will remain even if he is acquitted, just as they did after his previous federal criminal case. Tx. 69. Part of the defendant's motivation for this crime was that the FBI and U.S. Attorney had not taken any actions to assist him as they allegedly promised they would after the previous crime he committed. Tx. 70. The defendant claimed that he is now too old to keep fighting injustice in society anymore, but hoped that the FBI and U.S. Attorney would. Tx. 72-73, 75. The defendant explained that acts like the one he committed would continue to occur unless the underlying problems in society were corrected. Tx 77-78.

The defendant committed the acts alleged in the indictment to draw attention to something wrong that he felt had been done to him. Tx. 78. The defendant acknowledged that the acts would be against his penal interests, but had hoped that if he was believed by a jury, then subsequent courts may pay more attention to one or more of his other cases. Tx.79-80.

The defendant explained his concerns about Harvard (a theme in his writings and evaluation) by explaining that many of the judges who denied him hearings were Harvard-educated, and Harvard (and other universities like MIT) have a tendency to favor those within their own network. Tx. 82-83. The defendant explained that he didn't know whether this was a conspiracy, but it was an observation he had made, implying that it had repeatedly worked to his detriment. Tx. 83-84.

The defendant has never been medicated for mental health issues, and mental health counseling was terminated in his previous court case. Tx. 85. The defendant denied being mentally ill, and doesn't feel there's a treatment for him. Tx. 89. The defendant asserted that he simply thinks differently from other people, not as a result of illness. Tx. 89. The defendant understood that after a trial in this case, he would accept the finding of the court, but he would look for other ways around the problem. Tx. 93, 95.

The defendant was critical of Dr. Pivavorova and Dr. Pinals' reports because neither of them adequately got into the details of the defendant's beliefs, and that they didn't have the patience to listen to his 'ramblings'. Tx. 98. He explained that is a reason he supplemented the record with his docketed statements. Tx. 98. The defendant asserted that highly educated people tend to think in particular patterns, and that's what happened with these reports. Tx. 98-99. The defendant explained that Dr. Pivavorova's belief was a reflection of his previous counsel's mistaken belief that the defendant thought an airing of his grievances would lead to an acquittal in this case. Tx. 100. The defendant acknowledged that he would be unable to bring in all of the details of his previous grievances, he merely expects to be able to discuss his purpose in committing the *actus reus*. Tx. 100.

The defendant acknowledged that at a trial, he hoped to be found not guilty or innocent. Tx. 102. If that happened, he hoped that the other judges who were hearing his civil cases may take his action more seriously and give him a hearing. Tx 104-105. If he was convicted, the defendant acknowledged that he would have to wait five years to pursue those hearings. Tx. 105.

At the time of the hearing, the defendant appeared healthier than he had in two years, and appeared to be much healthier than at the time of the two evaluations. Tx.109.

### C. Mental evaluations

Dr. Pivovarova noted that the defendant maintained persecutory beliefs about those that he had sued by asserting that they had cheated him, conspired against him [not necessarily with each other], and obstructed him. Piv. at 6-7. Notably, such sentiments animate many plaintiffs. The defendant's psychological testing was unremarkable, and therefore did not suggest incompetency. *Id*.

Dr. Pivovarova concluded that the defendant understood the legal system and the charges against him, but that his lack of appreciation for the consequences and their likelihood evidenced compromise. Piv. At 8-9. However, at the competency hearing, the defendant stated the potential and

12

likely minimum penalty in the current indictment, and expressed clearly that it was a long shot for his defense strategy to prevail. While Dr. Pivovarova attributed to delusion what she perceived as the defendant's compromised ability to perceive the jeopardy he is under – it is not evident how likelihood of a *non-serious* outcome would be consistent with his perception of federal corruption. Moreover, she arrived at this conclusion with little factual predicate. To the contrary, there is evidence that the defendant would perceive less risk of a serious consequence in this case because he was in fact given a non-serious (probationary) disposition after destroying eighteen telephone and cable lines in his previous case. 05-10173-JLT. That would not be delusional nor evidence of incompetence.

Dr. Pivovarova also concluded that while the defendant understood the trial process, his perception that he would not receive a fair trial, and the fact that he summarized the burden of persuasion as "who[se] story is more believable", shows that he was compromised. Piv. at 9. The defendant's synopsis of the burden of persuasion is taught in law schools and trial advocacy courses around the country, and the fact that some defendants do not receive fair trials is no matter for conjecture. The idea of bias in court is neither frivolous nor a delusional, as it is something we fight mightily to avoid. *See, e.g.,* Nathan Koppel, Are Federal Courts Biased in Favor of Big Business?, Wall Street Journal, February 8, 2011 available at http://blogs.wsj.com/law/2011/02/08/are-federal-courts-biased-in-favor-of-big-business/.

Dr. Pivovarova also pointed to the defendant's inability to communicate with and adopt the defense strategy suggested by his previous lawyer as correlated to his delusions. Piv. at 10. However, the current posture demonstrates that the defendant cooperates with his current counsel, understands the proceedings, possible defense strategies and has even prepared admirably for testimony.

Dr. Pivovarova also relied on the defendant's belief that he will be able to discuss his previous civil cases during the course of this criminal case. Piv. at 10-11. She claimed that this evidenced

debilitating delusion. However, given that the defendant's motives for committing this crime may have in fact been motivated by the failure to be heard in those cases, it remains a non-frivolous possibility that he will be able to reference those cases at trial in some way, and in any event, he can write about them, and place them on the docket, use them as mitigation in a sentencing proceeding, and discuss them at a competency hearing, some of which he has *already* done.

Dr. Pivovarova also recognized that the defendant's mental state appeared to be dynamic in that, at the time of the evaluation, he appeared to be deteriorating. Piv. At 11. She incorrectly concluded that it was unlikely that he would have any less delusional reasoning if he were to obtain a different attorney. Piv. at 11. The dynamism with respect to the defendant's mental abilities, especially in the face of incarceration and what he then-perceived to be deteriorating health, gives reason to suggest that whatever his condition at the time, it has improved in all relevant respects. Moreover, whatever the delusional aspect of his belief system, it does not appear so pervasive as to have compromised the apparent legal functionality of the relationship between Mr. Gold and defendant, contrary to her expectation.

In the course of the probationary conditions of the defendant's sentence from his prior criminal case, he attended ten psychotherapy sessions over an eight week period. Dr. Pivovarova noted that he talked at great length about the federal government and corporate America not caring about the little guy. Pivovarova report at 4-5. A similar platform resonated among millions of Americans in the recent national election.

Dr. Pinals, the government's retained psychiatrist, was less conclusory throughout the course of her report, but largely relied upon what she observed as the defendant's apparent trivialization of the consequences of the proceedings and its inter-relationship with his civil law suits, along with his distrust of the integrity of the court. Pinals at 13. "[T]he point of the trial is for him to turn things

14

around and demonstrate the corruption of the Court". *Id.* This statement, several months ago may have seemed predicated upon a delusional belief system – but in the wake of the defendant's testimony, a rational and goal-oriented logic becomes evident. In this context, the purpose of committing the crime was to become involved in a high profile case which may make it more likely as a practical matter that he will be able to be heard, that the media will be attentive, and, if successful, perhaps the judges in his other cases will not summarily dismiss him. The defendant also persuasively explained that his colloquial reference to the "Harvard boys" is no more than deductive reasoning about the possibility that vested interests of people who happen to be Harvard alumni appear to always be opposing him and there is a correlative, but not necessarily causal, relationship that comes from that network. These revelations undercut the conspiratorial tenor which gave rise to the delusional correlation in Dr. Pinals' report.

### D. Distinguishing Mental Evaluations

Unquestionably, Dr. Pivovarova and Dr. Pinals' reports raise a question about the extent and nature of the defendant's mental health, and its impact on his ability to communicate with his then-attorney Mr. Hanye. On balance, both of these reports suggest an almost parental empathy for the defendant, rather than a cold reflection on a defendant who neither evidences extraordinary mental compromise (especially as compared to others who engage in ideological violence), nor a causal relationship with fundamental misunderstandings about the legal process in this case. Indeed, the defendant presents much more purposeful and rational than most; he is as he writes in his filings, attempting to make a political statement through this case. Regardless, their opinions should not be dispositive here.

First, their opinions were a snapshot in time – the product of a review of records and the two respective interviews of the defendant. Second, their opinions pre-dated the change in the defendant's

15

lawyer. This is significant because of two reasons. First, Mr. Hanye prevented Dr. Pinals at least (and there is also no evidence to the contrary from Dr. Pivovarova's report), from inquiring about facts related to the crime charged. The reason the defendant committed the acts and their correlation to an unlikely, but logical, outcome is critical to appreciating the defendant's understanding of the current proceedings and the details of a trial. Second, Mr. Hanye's primary complaint was what he believed was the defendant's inability to communicate effectively with him, which is a very important factor in a competency evaluation, but they do not pertain to the defendant's relationship with his current counsel.

Third, the experts' reports rely on an interpretation of the defendant's delusional belief that he would obtain justice in other cases as a *result* of engaging in this offense. However, at the competency hearing, if became clear that the defendant merely wants a *chance* to be heard on those matters, and if he gets significant attention and is no longer virtually anonymous, a judge may be more likely to give him a hearing. Although he overestimates the news-worthiness of his plight, this is not so far-fetched or delusional. It is, however, desperate. Fourth, the defendant's health has improved significantly since his incarceration in this case, and since his evaluations. The stability of the defendant's physical health, his weight, and understanding that his cancerous nodules do not follow a linear progression, is a telling and graphic representation of how differently situated he is. Fifth, these evaluations were done before the defendant's testimony in this hearing, which makes them significantly less important than direct observations of the defendant and do not include the alternative plausible rationale to his desire for a trial in this case.

## ARGUMENT

The defendant's appreciation of the penal implications of this prosecution, and more broadly of his motives, are essential to understand the logic and purpose of the defendant's hopes for a trial.

16

Understanding that logic, the defendant's delusions are placed into a clearer context as the acts of a desperate person, compelled to act for specific purposes, among them to retaliate for government inaction, and to have an audience to spread his cautionary messages in this and his civil cases. Through this lens, those actions are a considered, although unlikely, product of logic rather than mental illness. The experts were unable to explore this rationale, and they calculated teleologically that the defendant's delusions must inform his understanding about the trial process. They did not articulate as the defendant did, his appreciation for the legal nuances of *mens rea*, that his strategy, while perhaps unlikely to succeed, was rooted in a sound understanding of the legal process; he understands his own penological interests and the procedures in this case even if he chooses an aggressive strategy that gives them little weight; and fundamentally they neither observed nor believed that he could ever have a working relationship between himself and his attorney. The court saw a principled and logical man who was trying a gambit to accomplish his ambitions, and someone who is far more sophisticated than most defendants, let alone the very few whose mental illnesses prevent them from adequately understanding and participating in what is happening.

In fact, the defendant's motives and actions are not so different from those who commit violence for other causes. Those unorthodox individuals are almost always misguided by a belief system, some may call them delusional, and they often overestimate the prospective influence and importance of their counter-culture actions. Most of those defendants are much less sophisticated as to the legal processes, much less capable of mounting nuanced legal strategies, and they are routinely prosecuted and convicted in courts around the country.

By contrast, the defendant's testimony demonstrated strategic calculation within the framework of the trial process. The defendant was very careful in acknowledging the acts, without acknowledging the requisite elements of the crime. When pressed, he demonstrated a careful parsing

17

of the necessary *mens rea* and the extent to which he had a specific intent to attempt to destroy property. He avoided confessing and understood how that might negatively affect his criminal interests. Although the defendant studied and appreciated the remoteness of success of a defense strategy that challenged his intent, he also calculated that it would give him a platform to express why he did not harbor the requisite intent by explaining what drove him to call attention to himself.

It bears repeating that the defendant's competency is not a measure of his mental health, nor mitigation of his legal responsibility, rather, it is the prerequisite to have a most basic due process of someone who can understand its fundamentals. After the hearing, there is little doubt that the defendant has a crystal-clear appreciation of the risks and remote rewards of the criminal process. While the reasons for his committing the crime and his appreciation for the trial process converge with his desire to take the stand and/or get media attention, there has been no demonstration that any of those understandings are a product of mental disease or defect any more than it is a strategy for a defendant who has an unorthodox worldview.

Finally, this defendant denies mental illness, cares deeply for his family, harbors deeply held sincere beliefs that he yearns to publicize, is of high-functioning intelligence and improving health, which leads to a humane reality of the significance of a finding of incompetence. If found incompetent, the defendant will be sent for restoration against his will. Because the full context of evidence suggests that he is competent, he may promptly be determined by BOP to be competent and returned to criminal proceedings for further competency hearings. However, it is also possible that the BOP determines that there have been no changed circumstances, that his long-held world view and opinions are unlikely to be changed through chemistry or therapy. In either case, the defendant will return to court, either for another competency hearing, or to determine whether he presents a danger to persons or property. The defendant's history of serious damage to property, recidivism, unsatisfied grievances and

likelihood to act out in stressful circumstances, makes it unavoidable to find that he poses a danger to property, and perhaps to persons. He will have to perpetually resist stressors that commonly push people to violence such as financial, narcissistic injury, illness and loss. The defendant, therefore, faces the torturous prospect of being an intelligent and competent man subjected to indefinite detention in a mental health facility. Our system is designed to protect him from such a fate, just as it protects those who are irremediably compromised from standing trial. He appears prepared to face the criminal consequences of his actions – he planned on facing them -- and that is how our system works.

## CONCLUSION

For the reasons explained herein, the evidence does not satisfy the extraordinary standard necessary to find a defendant incompetent.

Respectfully submitted,

CARMEN M. ORTIZ
United States Attorney

By: _____
Aloke Chakravarty
Assistant U.S. Attorney

## Certificate of Service

    I hereby certify that this document filed with the Clerk's Office will be sent electronically to the counsel for the defense.

By: _____
Aloke Chakravarty
Assistant U.S. Attorney