UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

UNITED STATES,
        Plaintiff,

        v.                                CRIMINAL NO. 16-10159-ADB

DANNY M. KELLY,
        Defendant.


REPORT AND RECOMMENDATION
ON DETERMINATION OF DEFENDANT'S
COMPETENCY TO STAND TRIAL


KELLEY, U.S.M.J.


I. Overview


 Danny M. Kelly is charged by indictment with violating 18 U.S.C. § 844(I) (maliciously

damaging and destroying by means of fire and explosive materials real and personal property

used in interstate or foreign commerce and in an activity affecting interstate and foreign

commerce, and attempting to do so).  The government alleges that he made incendiary devices

and attached them to power transmission lines in Tyngsborough, Massachusetts.  In 2005, he

pled guilty to a crime in this district with a similar fact situation before Tauro, D.J., and received

probation. (*See* Criminal No. 15-10173-JLT, #8.)

        Mr. Kelly's initial appearance was in April 2016; defense counsel raised the question of

competency approximately one month later.  Well-qualified experts for the defense and for the

government subsequently evaluated Mr. Kelly and both opined that as a result of a mental illness

he was not competent to stand trial.

Mr. Kelly was dissatisfied with his defense attorney's performance and so defense counsel was permitted to withdraw on August 2, 2016 and a second defense attorney was appointed.  At a status conference on August 19th the government and the new defense attorney both informed the court that they were not moving for a competency hearing, notwithstanding the experts' reports.

Given that two experts had concluded that Mr. Kelly was not competent, the somewhat bizarre facts of this case and the 2005 case, and the confused, rambling contents of written statements Mr. Kelly had filed on the docket in the case, the court, *sua sponte*, ordered that a competency hearing should be held.

At the hearing in November 2016, Mr. Kelly was the sole witness.  The government and defense counsel argued that he was competent, although defense counsel communicated that he had some reservations about the matter.  In his testimony, Mr. Kelly, who was preoccupied with unrelated matters such as civil cases he has filed, expressed some irrational ideas about the case, but he seemed to have the ability to understand the trial process and the law and, most importantly, to listen to and consult with his attorney.  In addition, his persistent belief that the courts and government were corrupt were tempered by what seemed to be a willingness to keep an open mind on that subject with regard to this case.  Although it viewed competency as a close question, at a status date after the hearing the court informed the parties that it was inclined to find Mr. Kelly competent to stand trial.

The government filed a post-hearing memorandum.  Defense counsel, who was having "renewed concerns" about Mr. Kelly's competence because of a conversation with Mr. Kelly's

wife and some of Mr. Kelly's filings on the docket, requested additional time to see his client and file his memorandum. That memorandum, filed on December 30, 2016, argued that Mr. Kelly was not competent. The government filed a response. Defense counsel asked for additional time to file a supplemental expert report, which the court allowed. That report was filed on March 7, 2017; the same defense expert who previously opined that Mr. Kelly was incompetent four months earlier found so again.

After careful review of the entire record and considering the court's observations of Mr. Kelly, this court recommends that the district court find by a preponderance of the evidence that Mr. Kelly is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, and that the court commit the defendant to the custody of the Attorney General for hospitalization to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward. Title 18 U.S.C. § 4241(d).

## II.  History of the case

Mr. Kelly had an initial appearance on April 4, 2016 and, at the request of defense counsel, his detention hearing was continued to May 3, 2016. On May 3rd defense counsel requested a 30-day continuance so that he could have an expert evaluate Mr. Kelly for competency. On June 7th Mr. Kelly was indicted on one count of violating 18 U.S.C. § 844(I), (#14), and he appeared in court that day. His attorney represented that the defense expert's report would be ready in a few weeks. Meanwhile Mr. Kelly's arraignment and detention hearing was set for June 23rd. On June 22nd, defendant's expert's competency report was filed,

in which the expert concluded that Mr. Kelly was not competent. (#70.)

Mr. Kelly filed a motion on June 7th asking that his attorney be fired.  On June 23rd the court held an *ex parte* hearing re counsel and ruled that defense counsel would remain on the case at least for the detention hearing.  On the same day, in court with both parties, defense counsel asked for the arraignment to be continued.[1]  A detention hearing was held and the government called one witness, FBI Special Agent Scott McGaunn.   The court took the matter of detention under advisement and continued the case to June 30th for arraignment and further detention hearing.  Since that time defendant has regularly filed lengthy handwritten statements with the court that have been docketed without objection from defense counsel.  (*See, e.g.,* ## 36, 38, 42, 43, 44, 62, 69, 75, 77, 79, 94, 98.)[2]

On June 30th the government moved that its expert be allowed to examine Mr. Kelly and defendant did not object.  The court requested more information concerning Mr. Kelly's possible release: the court asked defendant to file a statement from his expert addressing how electronic monitoring and confinement to his home would affect his mental health, and asked defendant to file a statement that he would not damage property and would abide by conditions of release if released.  The court again took the matter of detention under advisement.[3]  The government asked for one month to file an expert's report.  The government's evaluation was due on July

---

[1]In light of the continuing issues concerning Mr. Kelly's competency, the arraignment did not take place until February 14, 2017.

[2]At the competency hearing, defense counsel stated that one of Mr. Kelly's goals is to "air his grievances" in public and that counsel hoped that publishing the statements on the docket would provide him with a means of accomplishing that goal.  (#55 at 12.)

[3]The defendant did not respond to these requests.  The court eventually issued an order of detention (#96), finding that Mr. Kelly was a danger to the community.

4

29th and a status hearing was scheduled for August 2nd.  At the request of the defendant a hearing regarding competency was set for August 19th.

On August 2nd the court held a second *ex parte* hearing regarding counsel.  The court permitted counsel for Mr. Kelly to withdraw and appointed new counsel.  As defense counsel was new to the case, the August 19th hearing was changed to a status date.

Shortly before the August 19th hearing the government's expert report was provided to the court and to the defendant: the government's expert, like the defendant's expert, found that Mr. Kelly was not competent. (#34.)  Nevertheless, in court on August 19th, the government and defense counsel both stated that they were *not* seeking a hearing regarding competency.  The court stated that it would review the experts' reports and took the matter under advisement.

A status conference was held on September 13th.  The court found that based on the government and defense experts' reports concluding that Mr. Kelly was incompetent, there was reasonable cause to believe that the defendant was presently suffering from a mental disease rendering him mentally incompetent to stand trial, and pursuant to 18 U.S.C. § 4241(a) the court, on its own motion, would hold a hearing to determine whether Mr. Kelly was competent. The court ordered the parties to confer about what witnesses they would call and to talk to their experts regarding the experts' availability to testify.

The hearing, which is discussed in detail below, was held on November 8th.  Both parties argued that Mr. Kelly was competent.  Mr. Kelly was the only witness. (*See* #55 (transcript of hearing).)

The court ordered the parties to file post-hearing memoranda two weeks after the transcript of the hearing was prepared.  Defense counsel requested additional time and eventually

filed the memorandum on December 30th.  In his memorandum, defense counsel argued that the defendant should be found incompetent. (#74.)  On January 27, 2017, the government filed a memorandum in response. (#84.)

On January 30, 2017 a status conference was held with the defendant present.  Defense counsel argued that defendant should be found incompetent.  Mr. Kelly objected and argued to the court that he is competent.  Defense counsel sought one week to file an updated expert report in support of his position that defendant should be found incompetent, which the court granted. After several continuances, defense counsel filed the updated expert report on March 7, 2017. (#114.)

III. Facts of the present case

On March 30, 2016, authorities responded to a brush fire in a field near Locust Avenue in Tyngsborough, Massachusetts which had engulfed three to four acres. (#1-1 (affidavit in support of complaint) at 2.)  They found several "suspicious metallic cylindrical devices"  attached to high-voltage power lines managed by the National Grid company. *Id.* at 3. One device was on the ground. *Id.*  The wires carry power to the Boston area from Canada, and the affidavit detailed the substantial impact that damage to the wires would have on commerce and stated that damage to the wires would have "international ramifications." *Id.*  Fire personnel and local law enforcement determined that the devices "could have been used to damage the lines." *Id.*  "The devices "can be described as similar to a pipe bomb in appearance - a cylindrical metallic container, with a fuse, with chemical contents."  *Id*. at 4.

A note found at the scene stated in part that if the letter was found "the cutters must have worked.  Sorry it was necessary to cut your lines, but the good lord has given me no choice";

complained that the FBI and "US attorney" are corrupt; stated that "the cutter was tested by cutting through a 1 inch black pipe"; commented on the corrupt "DOJ" and courts; stated that if the author did not receive help in getting "the Courts to actually respect the law and undo the damage they did to my family," then he "might as well do [his] part in destroying the society"; and gave directions for contacting the author by opening a P.O. Box through a fake advertisement for a job on "craiglist" [sic]. *Id.* at 4-5.

The complaint affidavit details a prior federal case from this district involving Mr. Kelly from 2005, No. 05-cr-10173-JLT, where he pled guilty to one count of extortion under 18 U.S.C. § 875(d), for cutting approximately eighteen telephone and cable lines.  In that case, he left a note at the scene of that crime that "bore numerous similarities" to the note left at this crime scene. *Id.* at 5.  For example, he blamed his actions on "corrupt" government and organizations, he said he had no choice but to act, and complained that his family had been harmed.  *Id.* at 5-6. In that case, he demanded that Verizon and Comcast pay him in order to avoid future attacks.  *Id.* at 9.

The complaint affidavit also states that Mr. Kelly has "filed over a dozen civil lawsuits against various defendants, including the town of Chelmsford, many of them complaining about his property rights."[4] *Id.* at 7.

The complaint affidavit states that in January 2016 Mr. Kelly purchased chemicals on eBay and had them shipped to his home in Chelmsford. *Id.* at 8. The chemicals can be used to create incendiary devices and, in fact, the devices in this case appeared to have been made with

---

[4]As described *infra*, the Town of Chelmsford took a piece of Mr. Kelly's land by eminent domain and built a public utility station on it, and even though the piece of land was small and he was compensated, he believes that his rights were violated in this regard. (#114 at 4.)

these chemicals. *Id*. at 8-9.

At the detention hearing on June 23, 2016, the government admitted 28 exhibits and, at Mr. Kelly's request, a statement he had written was entered into evidence as exhibit 29.  Many of the exhibits are pictures, showing: the crime scene; the incendiary devices that were found at the scene; the note that was found at the scene; power lines and "grinder-type" devices from a 2012 incident in Tyngsborough that was unsolved, where someone had tried to damage power lines; an incendiary device that the police found in Mr. Kelly's barn that is "very consistent with the devices found in Tyngsborough" in connection with this case; packaging from chemicals and chemicals from Mr. Kelly's house that are consistent with the chemicals used in the devices found at the scene; and other materials found in the house that constitute evidence that he had made the incendiary devices found at the crime scene, including power tools and a certain type of string, and sheetrock that was used as "endcaps" for the incendiary devices, among other items.  (#111 (transcript of hearing) at 7-11.)  FBI Special Agent McGaunn testified that two of the devices found at the crime scene had Mr. Kelly's fingerprints on them. *Id.* at 11.

Mr. Kelly's statement, admitted as exhibit 29, is a 29-page rambling exposition on the wrongs that corporations have done him in the past, the injustices he suffered at the hands of the Town of Chelmsford, and his belief that this criminal case is a ploy by the government to silence him so that he cannot sue Chelmsford. *See, e.g.,* exhibit 29 at 28 ("It looks like the Government will be successful in killing me, just to make sure I cannot, ever, get a hearing on my land being blatantly stolen in unquestionable violation of 42 § 1983.").

IV.  Mr. Kelly's background and civil cases he has filed

As set out in the pretrial services report, Mr. Kelly is 62 years old.  He was born in

Chicago, Illinois and has a Bachelor of Science from DeVry University in Chicago. He is married with three grown children and has lived in Chelmsford, Massachusetts at the same address since 1986. The only criminal conviction he has is the prior extortion case from 2005, discussed above, where he pled guilty and was sentenced to five years probation, which he successfully completed. There is no suggestion anywhere in the record that he is violent toward other people. The record is clear that he has loving relationships with his wife and children.

Mr. Kelly has no history of mental health treatment, other than attending about ten psychotherapy sessions while he was on probation in connection with the 2005 extortion case. He stopped attending the sessions because he was opposed to medication and did not think he needed treatment. His therapist diagnosed him with Delusional Disorder (Persecutory Type), Dysthymia, and Paranoid Personality Disorder. (#114 at 4.)

Presently, Mr. Kelly has a metastic carcinoid tumor that has metastasized to his liver. (#70 at 4.) He was diagnosed in 2015 and he requires medical care including monthly hormone injections, draining of his abdomen of fluids with a catheter, and other medical treatments. *Id.*

The defense evaluator, Ekaterina Pivovarova, Ph.D.,[5] states that Mr. Kelly's "work history has been punctuated by lawsuits and disagreements with his employers, which stemmed in large part from his feelings of being underappreciated and treated unfairly." (#114 at 3.) The government's evaluator, Debra A. Pinals, M.D., reports that Mr. Kelly worked for several companies, but that one company in particular, Nortel, where he worked in the 1980's and early 1990's, became a focus for his belief that he was being "screwed," as he believes Nortel profited

---

[5]Both the defense and government evaluators are experienced and well-qualified. (*See* #114 -1 (Dr. Pivovarova's curriculum vitae); #34-2 (Dr. Pinals' curriculum vitae).)

from products that he developed without compensating him. (#34 at 4.)  Dr. Pinals describes the

products, the course of Mr. Kelly's employment with Nortel and the ensuing litigation that Mr.

Kelly initiated against the company. *Id.*  Dr. Pinals stated that Mr. Kelly's involvement with the

courts led him to adopt a persistent belief that there are "Harvard boys" who are involved in

corruption and conspiracies related to politics and the justice system, "with various judges being

connected to the network." *Id.*

Another major focus of Mr. Kelly's litigation pertains to the Town of Chelmsford's

taking of some of Mr. Kelly's land and building a public utility station on it.  Dr. Pivovarova

notes that Mr. Kelly's family "reports that the amount of property taken was negligible," and that

he was compensated, but he persists in believing that the town's actions violated his

constitutional rights. (#114 at 4.)  Mr. Kelly reports that another goal of his is "to publicize his

perceived plight in newspapers to educate society about the 'greed of corporations . . . and towns

that are in the pockets of big money.'" *Id.*

Dr. Pivovarova reports that Mr. Kelly has filed 15 federal civil cases and "at least three

state cases" in which he has represented himself. *Id.*  "He has sued large corporations (e.g.,

Nortel Networks, Wang Laboratory, Canobie Lake Park, MacDonald's, UPS), small business

[sic] (e.g., local grocery store, local mechanic's shop), municipal bodies (Town of Chelmsford),

and high-ranking officials (Governor of the Commonwealth of MA, Commissioner of the

Department of Employment and Training, Secretary of Public Safety)." *Id.*  The lawsuits, some

of which are described in detail in Dr. Pivovarova's report, were frivolous and all have been

dismissed except for the two cases that are now pending in this district.  *See id.*

Mr. Kelly's pleadings in the many civil cases he has filed confirm that he has a persistent

paranoid belief that courts are corrupt and together with others, such as the Town of Chelmsford, are conspiring against him. *See, e.g*,. #70 at 6 (excerpts from the pleadings and a letter to Judge Woodlock). One of the cases pending in this court, *Kelly v. Town of Chelmsford*, No. 15-cv-14219-ADB, was filed in December 2015. Mr. Kelly complains that, in violation of his First Amendment rights, Chelmsford "allows a religious Holiday display to be on Town Property at School Street and Main Street in blatant violation of the First Amendment." (#1 at 5.) He further avers that "the Town is allowing this religious display just to hurt and aggravate Plaintiff and his family." *Id.* In the "background" section of the complaint, Mr. Kelly states that Chelmsford has taken his land, laments the fact that no court has ruled in his favor concerning the matter, and repeatedly states that the courts are corrupt: "The Town was correct in their assumption that the Court would ignore its sworn obligation and law [sic] and joined forces with the Town to run a scam on me to steal my land." *Id.* at 2. He explains, "[b]ut then the Court does say that the law and Constitution have no meaning. It is all about the profit that the Court can make. Clearly any Court that had even the slightest respect for its obligation and law could easily have resolved the case is less than 5 minutes of the Court's time. Yet after 15 years my case is still ongoing." *Id.* at 2-3.

The second case pending in this court, *Kelly v. Day*, is yet another attempt by Mr. Kelly to litigate the taking of his land by the Town of Chelmsford. The complaint references Nortel, the "Harvard boys," and the corrupt courts. (No.16-cv-10560-DJC, #1.) In September 2016 Mr. Kelly sent a letter to Judge Casper in this case, explaining that he has been trying to get the "right to own land" for over fifteen years, and that "[d]ying of cancer with a prognosis of less than a year I created a device that can take down power lines, cut pipelines, blow up malls, city

blocks, cars, etc. . . .  I see it as a true doomsday device.  I needed something to encourage

people to help me with this simple case.  I need to save my family's home before I die."  (#11 at

2.)

## V.   The law pertaining to competency

"It has long been held that the conviction of a person legally incompetent to stand trial

violates due process."  *Johnson v. Norton*, 249 F.3d 20, 26 (1st Cir. 2001) (citing *Pate v.*

*Robinson*, 383 U.S. 375, 378, (1966)).  The test for competency is whether the defendant has

sufficient present ability to consult with counsel with a reasonable degree of rational

understanding, and has a rational and factual understanding of the proceedings against him.

*United States v. Ahrendt*, 560 F.3d 69, 74 (1st Cir. 2009) (per curiam) (citing *Dusky v. United*

*States*, 362 U.S. 402, 402 (1960)).

The determination of competency to stand trial is governed by the standards set out in 18

U.S.C. § 4241, which provides that any time after the commencement of a prosecution for an

offense, "the defendant or the attorney for the Government may file a motion for a hearing to

determine the mental competency of the defendant.  The court shall grant the motion, or shall

order such a hearing on its own motion, if there is reasonable cause to believe that the defendant"

is not competent. Title 18 U.S.C. § 4241(a).  "If, after the hearing, the court finds by a

preponderance of the evidence that the defendant is presently suffering from a mental disease or

defect rendering him mentally incompetent . . .  the court shall commit the defendant to the

custody of the Attorney General [for hospitalization]." Title 18 U.S.C. § 4241(d).

The question of competency to stand trial is "often a difficult one in which a wide range

of manifestations and subtle nuances are implicated."  *Drope v. Missouri*, 420 U.S. 162, 180

(1975) (finding that there are "no fixed or immutable signs" that require inquiry into competency, but a court may consider defendant's irrational behavior, demeanor, and medical opinion regarding competency).  The First Circuit has noted the "intensely fact-based nature of competency requirements." *United States v. Mahoney*, 717 F.3d 257, 266 (1st Cir. 2013) (quoting *Pike v. Guarino*, 492 F.3d 61, 75 (1st Cir. 2007)).  Factors emphasized in the case law include whether defense counsel, who has the unique advantage of observing whether his client can assist in his defense, raises the issue, *see United States v. Muriel-Cruz*, 412 F.3d 9, 13 (1st Cir. 2005); whether the defendant's claimed limitations seem exaggerated,  *see United States v. Figueroa-Gonzalez*, 621 F.3d 44, 46-47 (1st Cir. 2010); and whether the defendant's problems rise to the level of the legal definition of incompetence or simply demonstrate "irrational" or bad judgment, *see United States v. Wiggin*, 429 F.3d 31, 37 (1st Cir. 2005).  The undertaking is complicated by the fact that competence is temporal, and a defendant's status may change over time, necessitating a new inquiry.  *See Drope*, 420 U.S. at 181; *Yeboah-Sefah v. Ficco,* 556 F.3d 53, 82 (1st Cir. 2009).

## VI.  The experts' reports

Dr. Pivovarova examined Mr. Kelly for the defense twice, on October 28, 2016 and on February 26, 2017, interviewing him for a total of six hours.   During the October evaluation she observed him interacting with his first defense attorney; at the February evaluation she observed him interacting with the second.  She administered the Personality Assessment Inventory test to Mr. Kelly, reviewed numerous documents concerning the case, and had lengthy interviews with defense counsel, Mr. Kelly's wife, and his daughter. (#70 at 8; #114 at 1-2.)   She reaches the same conclusions in both reports; the court finds her reports to be well-researched and reasoned.

13

Dr. Pivovarova diagnoses Mr. Kelly with Delusional Disorder, Persecutory type, finding that he "presents with long-standing, irrational, and unshakable beliefs (delusions) that he is being conspired against, cheated, and obstructed in the pursuits of his long-term goals.  In addition, Mr. Kelly presents with grandiose beliefs that are associated with his persecutory beliefs, and that further impair his reasoning abilities." (#114 at 9.)  She notes that Mr. Kelly has experienced these delusions since the 1980's. *Id.*

Dr. Pivovarova sets out the correct legal standard and then opines that while he has an understanding of the charges and their consequences, and the criminal justice system in general, Mr. Kelly's "delusional beliefs . . . impair his ability to accurately perceive the legal system at-large and the trial process specifically."  *Id.* at 7.  To illustrate, she carefully sets out specific statements he made to her and concludes that he believes the charges against him are invalid; the government is running a "scam" on him to prevent him from litigating his civil cases; he does not understand how evidence can be used against him; he does not comprehend the risks of testifying; and he "engages in irrational thinking about reasons for pursuing certain legal strategies."  *Id*. at 10.

Dr. Pivovarova notes in her first report that Mr. Kelly had problems communicating with his attorney. (#70 at 10.)  She states that contrary to Mr. Kelly's complaints that his attorney had not done anything for him and would not discuss the case with him, she personally witnessed the attorney discuss the case with him and review possible legal strategies. *Id.*  Mr. Kelly, however, "did not appear to incorporate information provided by his attorney about the likelihood of success for certain legal strategies and other case-related matters.  Instead, Mr. Kelly repeatedly said that [the attorney] was not listening to the legal strategy that Mr. Kelly wanted to pursue."

14

*Id.*

Dr. Pivovarova notes in her second report that while present defense counsel initially believed Mr. Kelly was competent and he could work with Mr. Kelly, "over time, [counsel] observed Mr. Kelly's rigid, irrational, and persecutory beliefs to endure unchanged and continue to hamper his ability to discuss realistic legal strategies." (#114 at 9.)   Regarding his ability to assist counsel, she writes:

> [Counsel] explained that he had reconsidered Mr. Kelly's competency, such that he no longer believed him to be able to meaningfully assist in his defense . . . . Specifically, he reported that Mr. Kelly's beliefs about the case have remained inflexible, prohibiting him from discussing alternative legal strategies.  Moreover, he noted that even when he provided Mr. Kelly with incontrovertible information that contrasted Mr. Kelly's beliefs, Mr. Kelly failed to incorporate this into the larger framework of the case.  Additionally, [counsel] described being concerned that Mr. Kelly had begun to consider him as being part of a 'scam' that he previously only described as being by the court and the FBI.

*Id.* at 8.

Mr. Kelly commented to Dr. Pivovarova that counsel "doesn't have the right facts . . . He hasn't got the context right.  This only proves that my points were absolutely correct." *Id.* She observed Mr. Kelly to disregard what his attorney said, "while continuing to assert his own interpretation of the legal issues." *Id.*  It appeared to her that some of the legal points had been discussed "multiple times before," with Mr. Kelly unable to incorporate the attorney's advice "into his thinking." *Id.*

Dr. Pivovarova concludes that "Mr. Kelly is suffering from a Delusional Disorder that significantly impairs his abilities to understand the nature and consequences of the proceedings against him and assist properly in his defense." *Id.* at 10.

The government's expert, Dr. Pinals, also submitted a carefully-reasoned and thorough

report. (#34.)  She interviewed Mr. Kelly for approximately 6.5 hours on July 23, 2016 and

reviewed numerous documents pertaining to the case.  *Id*. at 2-3.  The employment, family, and

psychiatric history she sets out for Mr. Kelly is essentially the same as in Dr. Pivovarova's

report.  *Id*. at 3-6.  Dr. Pinals also diagnoses Mr. Kelly with Delusional Disorder, Persecutory

Type, and, in addition, Paranoid Personality Disorder and perhaps major depressive disorder.  *Id*.

at 12-13.  She states:

> The diagnosis of Delusional Disorder, Persecutory Type is based on Mr. Kelly's
> longstanding sense of injustice in a particular domain, namely the corruption of the
> Nortel Company and the Courts, and his belief that these entities are conspiring against
> him, cheating him, spying on him and harassing him against any number of goals he may
> have had.  This belief system has lasted for years and appears to at times have a waxing
> and slightly waning (though never remitted) course related to other stressors.  It is
> delusional in nature as it reflects a series of beliefs, idiosyncratic to Mr. Kelly, not shared
> by others, and interconnected in implausible ways.

*Id*. at 12.

Dr. Pinals explains in detail Mr. Kelly's responses to her questions concerning his

knowledge about the trial process, the charges and potential consequences, and his ability to

assist counsel.  *Id*. at 9-11.  She observes that "Mr. Kelly draws unique meaning from unrelated

events and makes interpretations that others do not make."  *Id.* at 12.  His "functioning in other

dimensions, such as having a wife and children and even friends is consistent with the diagnosis,

which reflects a circumscribed persecutory belief system without other symptoms."  *Id*.

Mr. Kelly, in her opinion, "currently lacks the capacities associated with standing trial as

a criminal defendant" because although he has a factual understanding of the charges, he "lacks a

rational understanding of the nature and object of the proceedings."  *Id.* For example, he thinks

the current criminal case is about his land dispute; he believes the point of the trial is to

demonstrate that the court is corrupt; he is unable to assess the evidence against him; he cannot

understand his lawyer's strategy in his efforts to defend him; and he believes the judge may be corruptly connected to the "Harvard boys" and would make pre-conceived findings of guilt against him, among other things. *Id.*

Dr. Pinals evaluated Mr. Kelly at a time when his first defense attorney was still representing him, and counsel was present at the time of her interview. She noted that Mr. Kelly "seems at odds with his attorney who is trying to defend him in this criminal case while Mr. Kelly is working toward a goal of addressing a civil matter related to a land dispute." (#34 at 13-14.) She detailed some of the specific interactions between Mr. Kelly and his attorney: "Mr. Kelly spent time 'educating' [his attorney] about the nuances involved in different types of courts and 'Congressional Laws' that would mean that the case should ultimately result in an apology related to the case with Chelmsford so that he would not owe money to them, and his wife would not have that debt to deal with after Mr. Kelly passed away." *Id.* at 11.

Dr. Pinals concluded that "Mr. Kelly currently is exhibiting symptoms of mental illness consistent with psychotic delusional thought processes that directly impair his reasoning, his ability to rationally understand the trial participants and processes and thus impair his abilities relevant to competence to stand trial." *Id.* at 14.[6]

VII. The competency hearing

---

[6]Mr. Kelly's numerous statements that he has filed on the docket, totaling over 150 pages, demonstrate that Mr. Kelly is delusional, in accordance with the observations of the two experts. For example, in his Petition for Removal of Counsel, he complained that his first attorney "has no intentions of helping or defending me in anyway! [Counsel] has yet to even discuss my case with me. Clearly he does not have any idea of my position and clearly does not care . . . he has only done things to hurt me mentally and physically." (#19.) Throughout the statements he discusses his dispute with Nortel, (*see, e.g.*, #36 at 6-11); the corruption of the courts, (*see, e.g.* #42 at 8; #43 at 5; #62 at 8); his view that he created a "tool that can destroy society" in hopes of saving his family's home and society, (*see, e.g.*, #76 at 2), and other delusional themes referenced by the experts.

On November 8, 2016, the court held a competency hearing at which Mr. Kelly was the only witness.  Prior to Mr. Kelly's testifying, defense counsel attempted to explain why he thought Mr. Kelly was competent.  Counsel stated that although he did not disagree with the experts' diagnoses of Mr. Kelly, "competence and mental illness are two discrete issues." (#55, (transcript of hearing) at 8.)  He thought Mr. Kelly "very well may have the, the functional kind of ability to reason and also take a step back from his own disorder in making decisions" although he also said that at times he was "not sure" of that. *Id*. at 9-10.  He said he found that Mr. Kelly was "open to what [counsel] had to say." *Id*. at 11. He alluded to the fact that Mr. Kelly wanted to go to trial to air his grievances and expressed hope that, nevertheless, Mr. Kelly might decide to settle the case "in a pragmatic way," but suggested that because of the distraction of the competency proceedings, he had not been able to discuss settlement of the case with Mr. Kelly.  *Id*. at 12.

Mr. Kelly stated that he had prepared for his testimony with counsel (whose obvious goal was to help him establish that he was competent) and, when carefully examined on direct by counsel, he was able to talk with some sophistication about the elements of the crime, possible defenses to the charges, and the trial process.  *Id*. at 19-28.  He and counsel referenced a technical defense to the case concerning the malice element.  *Id.* at 42-43.  He also testified that he would listen to counsel and take seriously his advice.  *Id*. at 29-33.   While he talked about courts being corrupt, he expressed hope that they were not all corrupt.  *Id*. at 49.

When permitted to speak at length,[7] Mr. Kelly revealed profound confusion and

---

[7]Defense counsel frequently redirected Mr. Kelly and at one point admonished him not to "go off into the weeds" as they had discussed was his tendency to do, reminding him that "we didn't want to do that here." *Id.* at 34.

misperceptions about the consequences of a guilty verdict, the reason he was being prosecuted, and the mechanics of the trial process. For example, he stated that his goal was to win the case so that he would be able to persuade a "big corporation to pay off the court so that they would allow" his civil case concerning the taking of his land to be heard. *Id*. at 52. He thought that if this did not happen, his wife was going to lose their house and his family would be "destroyed." *Id*. at 79.[8] He also said, in a very roundabout way, that he does not believe he is being prosecuted for valid reasons, but for the "personal benefit" of those who are prosecuting him, *id*. at 56-57; that he wanted to litigate the case in order to "save society," *id*. at 40; and that a jury, rather than finding him not guilty, might find him innocent, which would have the effect of the jury saying "no, we kind of agree with what he did," which, in turn, would make a judge on his civil case look more favorably upon him. *Id*. at 104-105.

## VIII.  <u>Discussion</u>

The court first considers whether Mr. Kelly is presently suffering from a mental disease or defect.[9] The four mental health experts who have had contact with Mr. Kelly have all diagnosed him with a mental illness. In a report dated August 15, 2016, Dr. Pinals opined that he "exhibits the signs of a Delusional Disorder, Persecutory Type as well as Paranoid Personality Disorder," and "perhaps meeting the criteria for major depressive disorder or dysthymia." (#34 at 12-13.) Dr. Pivovarova diagnosed him with Delusional Disorder, Persecutory Type, in her reports dated June 22, 2016 and March 6, 2017. (#70 at 11; #114 at 9.) A psychiatrist, Dr.

---

[8]Mr. Kelly appeared to confuse the issue of his land being taken by Chelmsford with another issue, namely, that Chelmsford had sent him a bill for $133,000 for failing to connect to the sewer system. *Id*. at 72.

[9]The government, while arguing that Mr. Kelly's mental illness has not been "formally diagnosed," nevertheless concedes that he suffers from one. (#64 at 6; #84 at 3.)

Roger H. Gray, M.D., who was engaged by the defense in Mr. Kelly's 2005 case to write an aid-in-sentencing report, diagnosed him with "Bipolar Disorder Not Otherwise Specified, R/O Delusional Disorder, and Paranoid Personality Disorder."[10] *(See* No. 05-cr-10173-JLT #6-1 at 5 (report of Dr. Gray).). Dr. Gray's reasons for his diagnosis in his report from 2005 bear striking similarities to the reasons given in Dr. Pivovarova and Dr. Pinals' reports, confirming that Mr. Kelly has exhibited the symptoms of this illness over a long period of time. *Id.* (noting Mr. Kelly's pervasive paranoia and concluding that he "demonstrates remarkably poor insight and judgment based on delusional belief about conspiracies and a nearly global effort to hurt him."). A condition of Mr. Kelly's supervised release in 2005 was that he seek mental health treatment, which he did, at the Mental Health Association of Greater Lowell, where he was diagnosed with "Dysthymia vs. Major Depression; R/O Bipolar Disorder; R/O Delusional Disorder, Persecutory Type, and Paranoid Personality Disorder." (#74 at 18-19.)   Because four mental health professionals diagnosed Mr. Kelly with similar, if not identical, mental health disorders over a period of twelve years, all noting the same constellation of symptoms, the court finds that there is ample evidence from which to conclude that Drs. Pinals and Pivovarova correctly diagnosed Mr. Kelly as presently suffering from a mental illness, namely, Delusional Disorder, Persecutory Type.[11]

---

[10]"Rule out" in the context of a mental health diagnosis does not mean that the diagnosis was rejected, rather, it means the diagnosis is a possibility, but the doctor cannot definitely diagnose the disorder for various reasons, including not having enough information at the time of writing.

[11]Defendant's post-hearing memorandum sets out at length the description of Delusional Disorder from the current version of the Diagnostic and Statistical Manual of Mental Disorders, including the definition of delusions as "fixed beliefs that are not amenable to change in light of conflicting evidence"; the specific diagnostic criteria; the fact that those suffering from the disorder exaggerate small slights and "may engage in repeated attempts to obtain satisfaction by legal . . . action"; that a common characteristic of individuals with delusional disorder is "the apparent normality of their behavior and appearance when

The next question is whether Mr. Kelly's mental illness affects him to the extent that he is unable to understand the nature and consequences of the proceeding against him. After the competency hearing, the government filed a memorandum in which it carefully details portions of Mr. Kelly's testimony, arguing that the testimony demonstrates he has a rational and factual understanding of the proceedings against him, and he can "meaningfully participate in legal strategy and to distinguish what is against his penal interest."  (#64 at 5, 7-11.) The government correctly notes that  "[t]he 'understanding' required [for the competency standard] is of the essentials – for example, the charges, basic procedure, possible defenses – but not of legal sophistication," *Robidoux v. O'Brien*, 643 F.3d 334, 339 (1st Cir. 2011), and argues that Mr. Kelly, who "evidenced a greater-than-typical capacity to understand the legal process and complexity of legal definitions," meets this requirement.  (#64 at 3; #84 at 1-2.)

With regard to Mr. Kelly's obviously delusional ideas expressed at the hearing, for example, his view that a not guilty verdict would result in a corporation's paying off the corrupt court, thus paving the way for the court to decide favorably one of Mr. Kelly's civil suits against the Town of Chelmsford, his persistent views that the court is corrupt, and that the government is persecuting him by bringing the present "sham" case, the government argues that the fact that Mr. Kelly has "adopted a world-view based on a strained and misguided understanding of nonsensical propaganda, the law, and personal history" does not mean that he is incompetent, citing to cases where defendants with "delusional belief system[s]," such as tax protestors or those who commit acts of terrorism, have been considered competent to stand trial.  (#64 at 4-5.)

---

their delusional ideas" are not being acted on; and that individuals may be able "to factually describe that others view their beliefs as irrational but are unable to accept this themselves."  (#74 at 23-25.)  Mr. Kelly displays all of these characteristics.

In fact, the government is correct that there is solid support in the case law for the idea that litigants may hold "beliefs that have no legal support – think of tax protestors who insist that wages are not income, that taxes are voluntary, or that only foreigners must pay taxes . . . [s]ometimes these beliefs are sincerely held, sometimes they are advanced only to annoy the other side, but in neither event do they imply mental instability or concrete intellect . . . so deficient that trial is impossible." *United States v. James*, 328 F.3d 953, 955 (7th Cir. 2003).

The court appreciates that "[a] defendant may have serious mental illness while still being able to understand the proceedings and rationally assist his counsel." *United States v. Widi,* 684 F.3d 216, 221 (1st Cir. 2012) (citation omitted). In addition, as the government points out, the fact that a defendant holds delusional beliefs does not dictate a finding of incompetence. This court expressed a tentative opinion after the competency hearing that Mr. Kelly might be competent because in spite of his mental illness and delusional beliefs, it appeared that his ability to listen to counsel and apply reason to counsel's advice might be sufficient to satisfy the legal standard. Mr. Kelly's condition, however, appears to have deteriorated after the competency hearing.[12]

Turning to the issue whether Mr. Kelly, in spite of his mental illness and delusional beliefs, is nonetheless able to "assist properly in his defense," that is, whether he has "sufficient present ability to consult with his lawyer with a reasonable degree of rational understanding," *Dusky*, 362 U.S. at 402, the court considers first the experts' opinions. It is clear from both

---

[12]The fact that the second defense attorney thought, for a time, that Mr. Kelly was competent does not mean that he is presently competent. As set out above, the law makes clear that a defendant's competency may change over time, *see Yeboah-Sefah,* 556 F.3d at 82; defense counsel, at the time he thought Mr. Kelly was competent, expressed reservations on that point, (#55 at 10); and Dr. Pinals explained that Mr. Kelly's disorder is one that appears to have a "waxing and slightly waning (though never remitted) course" related to stressors in his life, (#34 at 12).

experts' reports that Mr. Kelly's inability to reason and his adherence to paranoid, intransigent, erroneous beliefs are the direct product of his mental illness.  (*See* #34 at 12-14; #114 at 7-10.)[13] Both experts' reports detail how Mr. Kelly is unable to consult meaningfully with counsel.  Dr. Pivovarova's second report, which includes her observations of Mr. Kelly's interactions with defense counsel on February 27, 2017, almost four months after the competency hearing on November 8, 2016, may be the most useful in assessing Mr. Kelly's competency as it is the most recent opinion and also confirms the changes that counsel, who originally thought Mr. Kelly was competent, saw in his functioning.  Her comments, set out above at length, include the fact that Mr. Kelly's "inflexible beliefs," which he adheres to even when prevented with "incontrovertible evidence" that he is wrong, prevent him from discussing legal strategy with counsel.  Mr. Kelly, instead of demonstrating the capacity to listen to counsel and meaningfully weigh his options, believed that the fact that counsel disagreed with him actually "proved [Mr. Kelly] was correct." (#114 at 8.)   Dr. Pivovarova also quotes defense counsel, who told her that he believes Mr. Kelly to be incompetent; he cannot discuss legal strategy with Mr. Kelly; and that Mr. Kelly may have begun to consider counsel as part of the "scam" against him along with the FBI and the court.  *Id*.

The court also considers the fact that two defense attorneys raised the issue of Mr. Kelly's competence.  Counsel must raise the issue of competence even if adverse to the client's interest, or, as here, even when the client disagrees with counsel: it is not a matter of strategy or even of zealous representation, but a "settled obligation."  *Robidoux,* 643 F.3d at 338-9.  In addition, the courts have stressed that competency is a comparatively narrow concept, "focusing

---

[13]The court notes that there is no indication anywhere in the record that Mr. Kelly is malingering.

*on the defendant's part in the trial.*"  *Id*. at 339 (emphasis in original).   The First Circuit has noted that defense counsel, "more than any other courtroom player 'enjoys a unique vantage for observing whether [his] client is competent.'" *Brown*, 669 F.3d at 17 (quoting *Muriel-Cruz*, 412 F.3d at 13).

In his post-hearing memorandum defense counsel states plainly that "the current severity of Mr. Kelly's symptoms deprive him of the ability to make rational calculations about his case or participate in his defense in a meaningful way." (#74 at 2.)  Counsel notes that Mr. Kelly cannot accept the fact "that he may be incorrect about the issues that are important to him; the only explanation that seems to make sense is that he is the victim of blatant and malevolent corruption." *Id.* at 3.  Mr. Kelly's "beliefs about both the facts and legal rules pertaining to his case" are "incorrect and unshakeable." *Id.* at 6-7.

The court's own observations of Mr. Kelly confirm that Mr. Kelly is simply unable to process legal concepts and apply them to facts if they do not comport with his paranoid views. At a status hearing on February 14, 2017, Mr. Kelly complained to the court that the goal of the court "was to keep me in jail till I die," that he had been "fraudulently indicted," the charges against him were "random" and "unreasonable," that he had "no idea of any evidence" against him, and the case was "just made up to scam me." (#104 at 8-11.)  The court responded by setting out for Mr. Kelly the considerable, one might say, overwhelming, evidence establishing probable cause against him. *Id*. at 10-12.  Mr. Kelly, nevertheless, continued to argue with the court, *id*. at 14-15, and then later filed a six-page letter in which he again argued that the charges against him are invalid.  (#110.)   It is clear to the court that Mr. Kelly, whose reason has been hijacked by his mental illness, is simply unable to comprehend why he has been charged with a

crime.  As the First Circuit has said, "[o]ne of the jobs of counsel - and, in limited respects, the

judge - is to explain matters to the defendant, and it is that understanding that is required [to

establish competency]."  *Robidoux*, 643 F.3d at 339.  Certainly, a defendant is free to reject an

explanation, but Mr. Kelly's mental illness prevents him from even understanding it.

The cases cited by the government can be distinguished from this case.  The First Circuit

in *United States v. Brown,* a tax protestor case,[14]  found that although the defendant there had

"firmly held, idiosyncratic political beliefs punctuated with a suspicion of the judiciary," and in

fact misunderstood the law, he was not incompetent. 669 F.3d at 18.  But in *Brown*, unlike here,

trial counsel never raised the issue of competency before or during the trial, and the appellate

court found that there was "no evidence that [defendant] could not consult with [his counsel]

'with a reasonable degree of rational understanding'" during the trial.  *Id.* (quoting *Ahrendt*, 560

F.3d 74 (further citation omitted).)

The government quotes *United States v. Wiggin*, 429 F.3d 31, 37 (1st Cir. 2005), for the

proposition that "[c]ompetent people can and do make decisions which others consider

irrational."  The defendant there, who suffered from a traumatic brain injury, only raised the

issue of competency after trial, apparently because he regretted not having taken a favorable plea

bargain.  There was expert testimony that he seemed to be malingering. Furthermore, his reasons

for not taking the plea bargain were not irrational, just misguided.  *Id*. at 36.  The First Circuit

found that he only demonstrated poor judgment, not rising to the level of incompetence to stand

trial.  *Id*.  In *United States v. Kenney,* 756 F.3d 36 (1st Cir. 2014), where defendant had a brain

---

[14]The court stated that Mr. Brown's belief system was akin to the "so-called sovereign citizen
movement" whose proponents reject most taxation as illegitimate, do not believe federal or state statutes
or proceedings apply to them, and place special significance on commercial law. *United States v. Brown*,
669 F.3d at 18 n.12.

tumor and possibly other mental health issues that reportedly affected his cognitive abilities, the First Circuit found that where defense counsel "never voiced any specific concern about Kenney's competency," *id*. at 45, and where defendant's actions in the case were not indicative of incompetency, the court found that it was not error for the trial judge to have failed to raise the issue *sua sponte*.  *Id*. at 44-45.

The government also cites to the sentencing transcript of *United States v. Richard Reid* for the proposition that "in terrorism matters, it is not unheard of to have a low-functioning defendant commit a crime, admit to the crime in the fact of extraordinary punishment, and then explain why he did the crime to further a delusional belief system." (#64 at 5.)   But Mr. Reid, like other terrorists who are willing to use violence against noncombatants to further political and ideological goals, was not diagnosed with a mental illness, nor was his competency questioned in the proceedings against him.   Furthermore, it is difficult to equate Mr. Reid's extreme political and religious beliefs, driven by global forces and shared with millions of others, with Mr. Kelly's *sui generis*, utterly mistaken conviction that the Town of Chelmsford is determined to take his house away from him.

Finally, the government argues that Mr. Kelly "is a cerebral, opinionated and idiosyncratic man" and states that many of his criticisms of the legal system are valid ones and "are not atypical for lay people." (#84 at 5-7.)  For example, the government states that at the competency hearing, Mr. Kelly explained that "his colloquial reference to the 'Harvard boys' is no more than deductive reasoning about the possibility that vested interests of people who happen to be Harvard alumni appear to always be opposing him and there is a correlative, but not necessary causal, relationship that comes from that network." (#64 at 15.)   This argument has

some superficial appeal - of course, many people might perceive that there is a network of Harvard alumni that promotes its members - but if one studies Mr. Kelly's two-page rambling explanation in response to the court's question about his fixation on the "Harvard boys," (*see* #55 at 80-81), it is pure sophistry. "Lay people" do not typically believe that District Court Judges Woodlock and Harrington were appointed to the bench by Ted Kennedy because of "all the ties at Chappaquiddick"; that there is a "conspiracy from Harvard"; that Harvard became "kind of a boys club, and they did that in the venture capital area . . .  and [Mr. Kelley] see[s] no reason to suspect that they didn't also do that in the court because every judge in the court except for Judge Tauro and Judge Gorton... was out of Harvard... so [Mr. Kelly] s[aw]...this possible conspiracy"; that Judge Woodlock and John Hanify (an attorney for Nortel in Mr. Kelly's suit before Judge Woodlock) "work together and Judge Woodlock was good friends with Edward Hanify, okay, who was the guy who got Senator Kennedy out of the Chappaquiddick mess, and they worked together to get Judge Harrington his position"; and that "Hanify and King," Nortel's lawyers in Mr. Kelly's lawsuit before Judge Woodlock, told Mr. Kelly that "[t]he law and the Constitution don't matter, they tell the judge what to do." *Id*. at 82-83.[15]   At any rate, even if Mr. Kelly is able to fashion some valid questions and concerns about the law and his legal situation, that does not mean that he is competent.

## IX.  Conclusion

The court RECOMMENDS that the district court find by a preponderance of the

---

[15]The court notes that with regard to whether Mr. Kelly's views are objectively delusional, the experts' reports quote Mr. Kelly's family members as confirming that he has "long-standing, irrational, and unshakeable beliefs (delusions) that he is being conspired against, cheated, and obstructed in pursuit of his long-term goals." (#70 at 5.)   With regard to his refusal to take his attorney's advice, Mr. Kelly's son told Dr. Pivovarova that the family has "been trying to plead with him," but he "refuses to talk to the family about it, acts like we are all idiots when we don't understand what he's doing in court." *Id*. at 10.

evidence that Mr. Kelly is presently suffering from a mental disease or defect rendering him mentally incompetent to the extent that he is unable to understand the nature and consequences of the proceedings against him or to assist properly in his defense, and that the court commit the defendant to the custody of the Attorney General for hospitalization to determine whether there is a substantial probability that in the foreseeable future he will attain the capacity to permit the proceedings to go forward. Title 18 U.S.C. § 4241(d).

## X. Review by District Judge

The parties are hereby advised that any party who objects to this recommendation must file specific written objections with the Clerk of this Court within 14 days of the party's receipt of this Report and Recommendation.


/s / M. Page Kelley
M. Page Kelley
March 13, 2017                                    United States Magistrate Judge